## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF CONNECTICUT

YALE NEW HAVEN HOSPITAL,
20 York Street
New Haven, CT 06510,

                 Plaintiff,

     v.

ALEX M. AZAR II, Secretary,
United States Department of Health and
Human Services,
200 Independence Avenue, S.W.
Washington, D.C.  20201,

               Defendant.

Case No. _____

## COMPLAINT

Plaintiff, Yale New Haven Hospital ("the Hospital"), by and through its undersigned attorneys, brings this action against defendant Alex M. Azar II, in his official capacity as Secretary ("the Secretary") of the United States Department of Health and Human Services ("HHS"), and states as follows:

## I.  STATEMENT OF THE CASE

1. This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.* (the "Medicare Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq.*  The issue in this action is whether, for Federal Fiscal Year ("FFY") 2014, CMS unlawfully adopted and implemented a policy that excluded from the calculation of the Hospital's Medicare Uncompensated Care Disproportionate Share Hospital ("UC DSH") payment the data from a hospital that had merged into the Hospital for Medicare payment purposes before the beginning of FFY 2014.  CMS's failure to include the data caused the Hospital's FFY 2014 UC DSH payment to be understated by approximately $5,465,859.

2.      The exclusion of this data was substantively unlawful under the UC DSH statute and other authorities for several reasons including, most importantly, because the purpose of the UC DSH payment is to compensate hospitals for "uncompensated care" provided to "uninsured" patients based on the amount of the care that the hospital was expected to provide in FFY 2014. Exclusion of an entire subsumed hospital's data indisputably caused the Hospital's FFY 2014 UC DSH payment not to reflect all of the uncompensated care that the Hospital was expected to provide in FFY 2014 and ultimately did provide.

3.      The policy undergirding the exclusion of this data was also procedurally unlawful under the Medicare Act, the APA, and other authorities, for several reasons, including that the Secretary, acting through the Centers for Medicare & Medicaid Services ("CMS"), the agency within HHS that is responsible for administering the Medicare program, (a) departed from long-standing agency policy and applied the new policy for the first (and only) time in FFY 2014, (b) did not provide notice about the possible imposition of this new policy or an opportunity to comment, as required by the APA and the Medicare Act, or even a reasonable explanation for the policy, or adopt the policy in a regulation through notice-and-comment rulemaking, (c) did not meet the requirement that the new policy, which was presented for the first time in a final rule, be the logical outgrowth of what was presented in an antecedent proposed rule, and (d) when confronted about the lack of rationality of the policy, reversed it for FFY 2015 and all subsequent FFYs, but unreasonably refused to correct the FFY 2014 underpayments.

4.      When the Hospital appealed to obtain its proper FFY 2104 UC DSH payment, the administrative review tribunal, the Provider Reimbursement Review Board ("PRRB"), dismissed the appeal for lack of jurisdiction, finding that Congress allegedly had precluded administrative review of CMS's action in 42 U.S.C. §1395ww(r)(3) ("the Review Preclusion Statute").  The

PRRB's jurisdictional dismissal is unlawful and must be reversed because *inter alia* Congress did not (and could not Constitutionally and otherwise) preclude review of an agency policy that was not lawfully established, and thus *ultra vires*, because of procedural flaws and substantive inconsistencies with the underlying statute and other substantive shortcomings.

5.     Where an administrative decision denying jurisdiction in a Medicare payment appeal is reversed, the next step often is to remand the matter back to the agency for a decision on the merits of the underlying payment dispute.  Such a remand is unquestionably inappropriate here because, when dismissing a similar appeal for lack of jurisdiction under the Review Preclusion Statute, the PRRB stated that it lacks the authority to grant the kind of relief sought here.  Thus, if this Court were to reverse the PRRB's unlawful jurisdictional dismissal and remand this action back to the Secretary, the Secretary would remand it to the PRRB, which would order "expedited judicial review," thus causing the action to be back in U.S. District Court without any further agency action and without the agency ever having addressed the merits after all.  Moreover, if this Court were to reverse the PRRB's unlawful jurisdictional dismissal, CMS has all of the information that it needs to calculate and pay the amount due to the Hospital and, thus, there are no facts that need to be resolved by the PRRB, making remand futile.

6.     Based on the foregoing, the Hospital respectfully asks that the Court (a) vacate the PRRB's jurisdictional dismissal, (b) find that the PRRB had jurisdiction over the Hospital's appeal, and (c) order the Secretary to recalculate the Hospital's FFY 2014 Medicare UC DSH payment and pay the amount owed, with the statutory interest required under 42 U.S.C. §1395oo(f)(2).

## II.  JURISDICTION AND VENUE

7.      This Court has jurisdiction under 42 U.S.C. §1395oo(f) (appeal of final Medicare program agency decision) and 28 U.S.C. §§1331 (federal question) and 1361 (mandamus).

8.      Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1391.

## III.  PARTIES

9.      Plaintiff Yale New Haven Hospital (Medicare Provider No. 07-0022) is a not-for-profit, acute-care teaching hospital located in New Haven, Connecticut.  At all times relevant to this action, the Hospital was qualified as a Medicare-participating, general acute-care hospital-provider under the federal Medicare program pursuant to the Medicare Act.

10.      Defendant Alex M. Azar II is the Secretary of HHS.  The Secretary, the federal official responsible for administration of the Medicare program, has delegated that responsibility to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this complaint, the Hospital refers to the agency as CMS.

## IV.  GENERAL STATUTORY AND REGULATORY BACKGROUND

### A.      General Background of the Medicare Program

11.      The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease.  42 U.S.C. §1395c.  The Medicare program is federally funded and administered by the Secretary through the CMS and its contractors.  42 U.S.C. §1395kk; 42 Fed. Reg. 13,282 (Mar. 9, 1977).

12.      CMS implements the Medicare program, in part, through the issuance of official Rulings.  *See* 42 C.F.R. §401.108.  In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes numerous other

interpretative rules implementing the Medicare program, which are compiled in one or more CMS Manuals. The Secretary also issues other subregulatory documents to implement the Medicare program, which generally do not have the force and effect of law.

13. The Medicare Act, at 42 U.S.C. §1395hh(a), prohibits the application of any rule or policy that establishes or changes a substantive legal standard governing the payment for service unless it is promulgated by the Secretary by notice-and-comment rulemaking. Specifically, the Secretary is required to "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program. 42 U.S.C. §1395hh(a)(1). Further:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. §1395hh(a)(2). In addition, the Medicare Act specifies that where a final rule "is not a logical outgrowth of a previously published notice of proposed rulemaking . . ., such provision shall be treated as a proposed regulation and shall not take effect." 42 U.S.C. §1395hh(a)(4).

14. The Medicare program is divided into five parts: A, B, C, D, and E. Part A of the Medicare program provides for coverage and payment for, among others, inpatient hospital services on a fee-for-service basis. 42 U.S.C. §§1395c *et seq.* Part A services are furnished to Medicare beneficiaries by "providers" of services, including the Hospital, that have entered into written provider agreements with the Secretary, pursuant to 42 U.S.C. §1395cc, to furnish hospital services to Medicare beneficiaries.

15. CMS pays providers participating in Part A of the Medicare program for covered services rendered to Medicare beneficiaries through "Medicare Administrative Contractors" ("MACs"), which are agents of the Secretary. Each Medicare-participating hospital is assigned

to a MAC.  42 U.S.C. §1395h.  The amount of the Medicare Part A payment to a hospital for services furnished to Medicare beneficiaries is determined by its MAC based on instructions from CMS.

**B.      Medicare Inpatient Prospective Payment System**

16.     Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the hospital inpatient prospective payment system ("IPPS") to reimburse hospitals, including the Hospital, for inpatient hospital operating costs.

17.     Under IPPS, Medicare payments for hospital operating costs are not based directly on the costs actually incurred by the hospitals.  Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments.  One of these adjustments is the Medicare "disproportionate share hospital" or "DSH" payment.  *See* 42 U.S.C. §1395ww(d)(5)(F).

**C.      Medicare DSH Adjustment**

18.     Hospitals that treat a disproportionately large number of low-income patients are entitled by statute to a DSH adjustment, in addition to standard Medicare payments.  42 U.S.C. §1395ww(d)(5)(F).  Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients.  These higher costs have been found to result from the generally poorer health of low-income patients.  The DSH adjustment provides additional Medicare reimbursement to hospitals for the increased cost of providing services to their low-income patients and a hospital that qualifies for DSH payments is known as a "DSH hospital."

19.     There are two methods of determining qualification for a DSH adjustment: the more common "proxy method" (42 U.S.C. §1395ww(d)(5)(F)(i)(I)) and the less common "Pickle method" (42 U.S.C. §1395ww(d)(5)(F)(i)(II)).   The Hospital's DSH calculations were made using the proxy method, under which entitlement to a DSH adjustment, as well as the amount of the DSH payment, is based on the hospital's "disproportionate patient percentage" ("DPP").   42 U.S.C. §1395ww(d)(5)(F)(v) and (vi).

20.     The DPP is the sum of two fractions, which are designed to capture the number of low-income patients a hospital serves on an inpatient basis by counting the number of days that low-income patients receive inpatient services in a given fiscal year ("inpatient days").   Thus, the two fractions serve as a "proxy" to determine low-income patients, rather than having CMS count the actual number of such patients.

21.     The first fraction, referred to as the "Medicaid fraction," is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible* for medical assistance under a State plan approved under title XIX, but who were *not entitled to benefits under Part A of this title*, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi)(II) (emphasis added).   The Medicaid fraction, therefore, is intended to account for hospital inpatients "who were not entitled to benefits under [Medicare] Part A," but who were "eligible for medical assistance" under a Medicaid State plan at the time that they were receiving inpatient services at the hospital.

22.     The second fraction, referred to as the "Medicare/SSI fraction," accounts for inpatients who are current Medicare Part A recipients and also entitled to benefits under SSI, a federal low-income supplement.   The Medicare/SSI fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) *were entitled to benefits under Part A of this subchapter* and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) *were entitled to benefits under Part A of this subchapte*r.

42 U.S.C. §1395ww(d)(5)(F)(vi)(I) (emphasis added).  The Medicare/SSI fraction, therefore, is the percentage of a hospital's Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they were receiving inpatient services at the hospital.

**D.**      **UC DSH Payment**

23.      Congress enacted the UC DSH payment system in §3133 of the Patient Protection and Affordable Care Act ("ACA").  42 U.S.C. §1395ww(r); *see also* 42 CFR 412.106(f)-(h).  The purpose of the UC DSH payment is to compensate DSH hospitals for "uncompensated care" provided to "uninsured" patients.  Thus, beginning with FFY 2014, a DSH hospital received two separate DSH payments.  The first payment, known as the "traditional DSH payment," is 25% of the amount due to the hospital under the historical DSH methodology.  The second payment, known as the "UC DSH payment," is the hospital's share of 75% of the amount of the national total traditional DSH payment, with each DSH hospital's specific share calculated using the new methodology in ACA §3133.

24.      Under the new methodology in ACA §3133, CMS calculates the UC DSH payment for each DSH hospital based on the following three factors:

> Factor 1 - 75% of CMS's estimate of the traditional DSH payment that would be made for the coming FFY.

> Factor 2 – An adjustment to reflect CMS's estimate of the percentage change in the national uninsured rate for "the most recent period for which data is available" as compared with a baseline uninsured rate for 2013, less a small statutory reduction.

> Factor 3 - Each qualifying DSH hospital's uncompensated care as a percentage of
> the total uncompensated care for all qualifying DSH hospitals.

If a DSH hospital's uncompensated care is understated in Factor 3, its percentage of "total uncompensated care" also will be understated.  Factor 3 is the focus of this action because the exclusion of the data from the hospital that was subsumed into the Hospital before 2014 caused the Hospital's "percentage of the total uncompensated care for all [DSH] qualifying hospitals" for FFY 2014 to be too low, causing the Hospital's FFY 2014 UC DSH payment to be too low.

25.     CMS calculates UC DSH payments in advance of each FFY as part of the annual IPPS rulemaking using historical data.  By regulation, the UC DSH payment is not reconciled with or revised based on data from the FFY for which the payment is being made.  UC DSH payments for hospitals are posted on the CMS IPPS rulemaking website.

26.     For FFY 2014, CMS chose to implement the UC DSH statute by basing its calculation of each hospital's share of the UC DSH payment pool on the ratio of a DSH hospital's combined inpatient Medicaid days and Medicare/SSI days to the total calculation of such days for all DSH hospitals nationally, using historical cost report data from the hospitals' audited Medicare cost reports for 2010 or 2011, depending on which of those cost reporting periods yielded more recent data.  *See* 78 Fed. Reg. at 50,642.

**E.     UC DSH Review Preclusion Statute**

27.     ACA §3133 includes the Review Preclusion Statute, codified at 42 U.S.C. §1395ww(r)(3), which states:

> (3) Limitations on review.  There shall be no administrative or judicial review
> under section 1395ff of this title, section 1395oo of this title, or otherwise of the
> following:
>
> (A) Any estimate of the Secretary for purposes of determining the factors
> described in paragraph (2).

(B) Any period selected by the Secretary for such purposes.

The PRRB dismissed the Hospital's appeal, finding that the Review Preclusion Statute deprived it of jurisdiction over the Hospital's otherwise properly filed PRRB appeal.

**F.     PRRB Hearing Procedures and the Procedure for Administrative and Judicial Review of PRRB Decisions**

28.     If a hospital is dissatisfied with a final determination as to the amount of its Medicare IPPS payment, the hospital may appeal to the PRRB if it meets the other requirements set forth in 42 U.S.C. §1395oo(a).  In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the PRRB is authorized to decide questions relating to its jurisdiction.

29.     The publication of UC DSH payments in the Federal Register in the IPPS Final Rule constitutes a final determination that may be appealed to the PRRB under this authority.

30.     The decision of the PRRB on substantive or jurisdictional matters constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision.  The Secretary has delegated his authority under the statute to review such decisions to the CMS Administrator.

31.     A hospital may obtain judicial review of a final administrative decision, whether substantive or jurisdictional, by filing suit within 60 days of receipt of the final action on the administrative appeal in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia.  42 U.S.C. §1395oo(f).  In any such action, the Secretary is the proper defendant because, under 42 C.F.R. §421.5(b), the Secretary, acting through CMS, "is the real party of interest in any litigation involving the administration of the [Medicare] program."   Under 42 U.S.C. §1395oo(f)(2),

interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. §1395oo(f).

32.     Judicial relief is also available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a defined and non-discretionary duty to honor that right.  *City of New York v. Heckler*, 742 F.2d 729 (2nd Cir. 1984); *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001).

**G**.     **The Administrative Procedure Act**

33.     Under the APA, a "reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  Furthermore, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §706(2)(C).

34.     Additionally, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law."  5 U.S.C. §706(2)(D).  The APA dictates rulemaking procedural requirements, specifically the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented.  5 U.S.C. §553.

## V.  STATEMENT OF FACTS AND UC DSH REGULATORY AUTHORITIES

**A.**     **The Hospital's FFY 2014 UC DSH Payment**

35.     When calculating the Hospital's FFY 2014 UC DSH payment, the Hospital expected that CMS would include all relevant data from Hospital of Saint Raphael ("HSR"),

Provider No. 07-0001, which had merged into the Hospital for Medicare payment purposes effective September 12, 2012, because doing so would be consistent with, and was required by, (a) the agency's long-standing policy of calculating Medicare payments using combined data from hospitals that had merged for Medicare payment purposes where the surviving hospital assumed the Medicare provider agreement of the subsumed hospital and (b) the purpose of the UC DSH payment, which is to compensate hospitals for "uncompensated care" provided to "uninsured" patients based on the amount of the care that the hospital was expected to provide in FFY 2014.  As a result of this transaction, the Hospital assumed HSR's Medicare provider agreement and HSR's CMS certification number ("CCN") was subsumed under the Hospital's CCN going forward for Medicare payment purposes (HSR's CCN was retired but not terminated).  More important for purposes of the UC DSH payment, following the closing of the transaction, the Hospital continued to operate the facility formerly owned by HSR as it was operated by HSR before the transaction (*i.e.*, as an acute care facility), including its provision of uncompensated care, with those services now being provided under the Hospital's CCN.

36.     In the FFY 2014 IPPS Proposed Rule, published in the Federal Register on May 10, 2013 (78 Fed. Reg. 27,486 (May 10, 2014)), CMS announced its proposed methodology to calculate UC DSH payments for FFY 2014 without mentioning in either the preamble or the regulatory text any proposed deviation from the agency's long-standing policy of calculating post-merger Medicare payments using combined data from hospitals that had merged for Medicare payment purposes.

37.     In the Medicare DSH-Supplemental Data table published with the FFY 2014 IPPS Proposed Rule, CMS listed (a) the historical Medicaid and Medicare/SSI inpatient days that would be used for each hospital for the proposed Factor 3 calculation and (b) a projection as to

whether a hospital would receive a DSH payment for FFY 2014.  Notably, data for <u>both</u> HSR and the Hospital appeared in this table and a percentage of the UC DSH payment pool amount was calculated for both.  This table properly reflected the intent of Congress that, for Factor 3 purposes, CMS should account for the UC DSH days provided at the hospital level for every DSH hospital, including a DSH hospital that was subsumed into another DSH hospital before FFY 2014.

38.     Because the FFY 2014 IPPS Proposed Rule identified both HSR and the Hospital as DSH hospitals that would receive UC DSH payments, it was mathematically impossible for the Hospital not to qualify for a UC DSH payment if HSR's and the Hospital's data were combined.  For this reason, and the absence of any mention in the FFY 2014 IPPS Proposed Rule of any deviation from long-standing CMS policy of using combined merged hospital data for Medicare payment purposes, the Hospital had no reason to comment on the calculation of its or HSR's FFY 2014 UC DSH payments in the Proposed Rule.

39.     In the FFY 2014 IPPS Final Rule, published in the Federal Register on August 19, 2013 (78 Fed. Reg. 50,496 (Aug. 19, 2013)), CMS responded to a comment to the FFY 2014 IPPS Proposed Rule, which CMS paraphrased as follows:

> Two hospitals merged in 2011 with one surviving provider number.  These hospitals had two cost reports and two SSI ratios in 2011.  However, in the proposed rule, CMS calculated Factor 3 using only the surviving hospital's cost report data and SSI ratio data.  The hospital submitted a public comment requesting that we account for the merger and include both hospitals' data in the calculation of the Factor 3 amount.

78 Fed. Reg. at 50,642.  CMS issued the following ambiguous response to this comment in the preamble of the FFY 2014 IPPS Final Rule without addressing the issue raised by this comment in the text of any regulation adopted by the Final Rule:

> Data associated with a CCN that is no longer in use are not used to determine [a hospital's Medicare DSH payment adjustment, CCRs for outlier payments, and wage index values] under the surviving CCN.  Furthermore, data reported on the Medicare hospital cost report under the CCN associated with the old provider agreement would not necessarily be used to determine hospital payments for the CCN associated with the surviving provider agreement.

*Id.*  Contributing to the ambiguity, CMS also stated "Factor 3 will be calculated based on the low-income insured patient days (that is, Medicaid days and SSI days) under the surviving CCN, based on the most recent available data for that CCN from the cost report for 2011 or 2010."  *Id.*

40.     Based on this response, one possible (but legally unexpected) reading appeared to be that, in some instances where a merger occurred after the periods from which the calculation data was extracted, CMS could choose not to combine the data of two hospitals that merged into a single multi-campus provider for purposes of the Factor 3 calculation, even in instances where both hospitals were otherwise DSH-eligible.  This is inconsistent with long-standing CMS policy under which CMS does not credit the surviving hospital with the subsumed hospitals data for Medicare payment purposes <u>only if</u> the surviving provider does not accept assignment of the subsumed hospital's Medicare provider agreement.  This long-standing policy was designed by CMS to encourage a surviving hospital to accept assignment of the subsumed hospital's provider agreement for Medicare payments, thereby accepting the subsumed hospital's assets and any liabilities owed to Medicare.  In connection with the Hospital's acquisition of the assets of HSR, the Hospital assumed HSR's provider agreement and, thus, its Medicare liabilities.  The Hospital contacted CMS immediately after issuance of the FFY 2014 IPPS Final Rule and asked the agency to address this distinction in the agency's policy between these two different types of mergers in a correction rule to be issued before the start of FFY 2014, which CMS refused to do. *See* ¶¶42-43, *infra*.

41.     Thus, CMS unexpectedly and without notice excluded the inpatient days from HSR when calculating the Hospital's FFY 2014 UC DSH payment.  This policy change, which was abandoned in FFY 2015, is referred to herein as the "FFY 2014 Merged Hospital Policy." The FFY 2014 Merged Hospital Policy unreasonably caused the Hospital's DSH inpatient days to be understated because (a) the former HSR facility continued to operate as before the acquisition by the Hospital, but now as a separate campus of the Hospital (the "YNHH Saint Raphael Campus"), and (b) the YNHH Saint Raphael Campus was expected to provide the same amount of uncompensated care as it had before the acquisition by the Hospital and actually did so in FFY 2014.

**B.**      **Response of the Provider Community to the FFY 2014 Merged Hospital Policy**

42.     Shortly after publication of the FFY 2014 IPPS Final Rule, a number of hospitals, including the Hospital, and a national hospital association, responded to CMS's invitation in the FFY 2014 IPPS Final Rule to provide information on errors in the data published with the Final Rule by disputing the FFY 2014 Merged Hospital Policy.  These entities (a) expressed concern that CMS had not introduced in the FFY 2014 Proposed Rule this significant change to long-standing Medicare payment policy concerning merged hospitals and thus had not received meaningful industry input, and (b) recommended that CMS account for the aggregate data of both hospitals in a merger.  As noted in these letters, CMS did not give any indication that it intended to reverse long-standing policy by favoring "new hospitals" that had not accepted assignment of a provider agreement (and did not accept Medicare liabilities) as a result of a sale over hospitals that had merged for Medicare payment purposes where the surviving hospital accepted assignment of the provider agreement (including Medicare liabilities) that was subsumed into the surviving hospital's provider agreement.

43.     When CMS issued corrected data in the Federal Register and a related Interim Final Rule with Comment Period on October 3, 2013, the FFY 2014 Merged Hospital Policy, and resulting data, were not corrected or even addressed.  *See* Medicare Program; FFY 2014 Inpatient Prospective Payment Systems: Changes to Certain Cost Reporting Procedures Related to Disproportionate Share Hospital Uncompensated Care Payments, 78 Fed. Reg. 61,191 (Oct. 3, 2013).  In subsequent months, the Hospital and others continued, without success, to discuss this issue with CMS and offered possible remedies.

C.     **The FFY 2015 IPPS Rulemakings**

44.     In the FFY 2015 IPPS Proposed Rule, CMS noted that it had received additional comments about FFY 2014 Merged Hospital Policy since publication of the FFY 2014 IPPS Final Rule "that suggest using only the surviving CCN produces an estimate of the surviving hospital's uncompensated care burden that is lower than warranted." FFY 2015 IPPS Proposed Rule, 79 Fed. Reg. 27,978, 28,103 (May 15, 2014).  To address that problem, CMS proposed "to incorporate data from both of the hospitals that merged" for purposes of calculating the FFY 2015 UC DSH payment to "improve our estimate of the uncompensated care burden of the merged hospital," effectively reversing the FFY 2014 Merged Hospital Policy.  *Id.*

45.     Thus, for the Factor 3 calculation for FFY 2015, CMS proposed to identify hospitals that merged after the period from which the historical data was drawn but before the publication of each year's IPPS rule.  *Id.*  Once identified, CMS would combine the data from both hospitals (*i.e.*, the most recently available full-year cost reports from the subsumed and surviving CCNs) for purposes of calculating the Factor 3 distribution, which CMS would do until all data for the merged hospitals would become available under the surviving CCN.  *Id.*

46.     Unlike the FFY 2014 IPPS Final Rule's preamble text that lacked clarity on the distinction between transactions where a provider agreement was assigned and those where it was not, CMS offered a methodology that clearly applied to mergers where a hospital assumes the provider agreement of another.   CMS defined "merger" as "an acquisition where the Medicare provider agreement of one hospital is subsumed into the provider agreement of the surviving provider."  *Id*.  CMS stated that it would combine the data of the merged hospitals because the surviving hospital "is subject to all applicable statutes and regulations and to the terms and conditions under which the assigned agreement was originally issued."  *Id*.

47.     In the FFY 2015 IPPS Final Rule, CMS adopted the corrected proposed Factor 3 calculation methodology for merged hospitals.  FFY 2015 IPPS Final Rule, 79 Fed. Reg. 49,854, 50,020–22 (Aug. 22, 2014).   But, the agency did not speak to the residual disparity that continued to exist regarding UC DSH payments for FFY 2014 and, thus, did not correct the Hospital's unlawful FFY 2014 UC DSH payment.

**D.     Procedural Background**

48.     The Hospital's January 24, 2014 letter timely appealed its FFY 2014 UC-DSH payment and the FFY 2014 Merged Hospital Policy to the PRRB. The PRRB's May 30, 2018 decision dismissed the Hospital's appeal for lack of jurisdiction because Congress allegedly precluded administrative review of CMS's FFY 2014 Merged Hospital Policy in the Review Preclusion Statute.

49.     In a letter dated June 11, 2018, the Hospital asked the CMS Administrator to review the PRRB's May 30, 2018 decision.  The Hospital has not yet received a response to its request for CMS Administrator review, but notes that CMS has not submitted comments to the CMS Administrator concerning the PRRB's decision.  Thus, the Hospital believes in good faith

that the CMS Administrator will not  review the PRRB's decision and expects that the PRRB's

May 30, 2018 jurisdictional decision will remain the Secretary's final decision for purposes of

judicial review.  *See* 42 U.S.C. §1395oo(f)(1).  This action is being timely commenced within 60

days after the Hospital's receipt of the PRRB's May 30, 2018 decision.  *Id.*

E.     **The PRRB's Decision is Unlawful and Should Be Reversed with an Order Requiring**
       **the Secretary to Recalculate the Hospital's FFY 2014 UC DSH Payment.**

       50.     The PRRB's May 30, 2018 dismissal decision is unlawful because (1) Congress

did not (and could not Constitutionally and otherwise) preclude review of an agency policy not

lawfully established, and thus *ultra vires*, whether because of procedural flaws or substantive

inconsistencies with the underlying substantive statute and/or other authorities, and (2) the

Review Preclusion Statute does not preclude the instant challenge to a UC DSH calculation

resulting from application of the unlawful FFY 2014 Merged Hospital Policy.

       51.     The Review Preclusion Statute facially does not preclude review of every agency

action that could affect the UC DSH "estimate" because the statute also precludes review of the

selected period.  The preclusion of review of the "period" would be entirely unnecessary if any

"estimate" of Factor 3 were shielded from review.  Moreover, the Preclusion Statute does not

explicitly preclude review of CMS's FFY 2014 Merged Hospital Policy.

       52.     The Hospital's challenge to CMS's exclusion of inpatient days from HSR when

calculating the Hospital's FFY 2014 UC DSH payment obviously is not a challenge to a "period"

selected by the Secretary "for purposes of determining the factors described in paragraph (2)"

(regarding the calculation of the "additional payment" to DSH-eligible hospitals) because the

Hospital is not challenging the decision by CMS to use inpatient days from DSH hospitals from

FY 2010/2011 (the period) to calculate the Hospital's FFY 2014 UC DSH payment.

53.     The Hospital's challenge to CMS's exclusion of inpatient days from HSR when calculating the Hospital's FFY 2014 UC DSH payment also is not a challenge to an "estimate" of the "amount of uncompensated care" because the Hospital is not challenging the correctness of the estimate of the Hospital's FFY 2014 UC DSH payment that CMS made using the data from the time period selected in the FFY 2014 IPPS Final Rule.  Rather, the Hospital is challenging CMS's unexplained, erroneous, and *ultra vires* failure to include the data from HSR in the Hospital's FFY 2014 UC DSH calculation, which was already set out for HSR in the FFY 2014 IPPS Proposed Rule.  The Review Preclusion Statute did not, and could not, shield CMS's *ultra vires* action from administrative and judicial review and, thus, should be interpreted facially not to preclude the Hospital's challenge.  Notably, there is no textual or legislative support for the proposition that Congress intended to preclude review of *ultra vires* agency action and, as courts have found specifically in the context of Medicare Part A, statutory review preclusion language must clearly apply to the agency action being challenged.

54.     Where an administrative decision denying jurisdiction in a Medicare payment appeal is reversed, the next step often is to remand the matter back to the agency for a decision on the merits of the payment dispute.  Such a remand is unquestionably inappropriate here because, when dismissing a similar appeal for lack of jurisdiction under the Review Preclusion Statute, the PRRB stated that it lacks the authority to grant the kind of relief sought here.  *In Re DCH Regional Medical Center,* PRRB Case No. 14-2097, Request for Expedited Judicial Review Denied (December 10, 2015).  Thus, if this Court were to reverse the PRRB's unlawful jurisdictional dismissal in the instant action and remand the instant action to the Secretary, the Secretary would in turn remand it to the PRRB, which would order "expedited judicial review,"

thereby causing this action to be back in U.S. District Court without the agency ever having addressed the merits at all.

55.     Moreover, if this Court were to reverse the PRRB's unlawful jurisdictional dismissal, CMS has all of the information that it needs to calculate and pay the amount due to the Hospital and, thus, there are no facts that need to be resolved by the PRRB, making remand futile. *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969) (plurality opinion) (Remand to an agency is not proper where it would be "an idle and useless formality" because "[*SEC v. Chenery Corp*., 332 U.S. 194 (1947)] does not require that we convert judicial review of agency action into a ping-pong game.").

## CAUSES OF ACTION

### COUNT I
### Violation of the APA and the Medicare Act
### (Decision is Contrary to Law)

56.     The Hospital hereby incorporates by reference paragraphs 1 through 55 herein.

57.     The APA prohibits the Secretary from implementing the Medicare Act through actions, findings or conclusions that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §706(2).  The FFY 2014 Merged Hospital Policy and the Hospital's FFY 2014 DSH payment are substantively unlawful and should be set aside because they violate the plain meaning of the UC DSH Statute, and otherwise violate the Medicare Act, in that the Secretary calculated that payment without including HSR's data.

58.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospital's properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

## COUNT II
## Violation of the APA and the Medicare Act
## (Decision is Contrary to Law)

59.     The Hospital hereby incorporates by reference paragraphs 1 through 58 herein.

60.     The APA prohibits the Secretary from implementing the Medicare Act through actions, findings or conclusions that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §706(2).  The FFY 2014 Merged Hospital Policy and the Hospital's FFY 2014 DSH payment are procedurally unlawful and should be set aside because that payment was calculated using the FFY 2014 Merged Hospital Policy, which the Secretary did not adopt properly under the APA and the Medicare Act.

61.     The FFY 2014 Merged Hospital Policy is procedurally unlawful under the Medicare Act and the APA because, *inter alia*, it (a) was set forth for the first time in the FFY 2014 IPPS Final Rule and was not presented in the FFY 2014 IPPS Proposed Rule or any earlier proposed rule, (b) was not the logical outgrowth of any policy presented in the FFY 2014 IPPS Proposed Rule or any other earlier proposed rule, (c) was not adopted as a regulation through notice-and-comment rulemaking, and (d) deviated from long-standing agency policy without explanation or justification.

62.     Conduct by an agency is considered arbitrary and capricious when it is not explained, or when it is not rationally explained.  The Secretary did not justify the FFY 2014 Merged Hospital Policy, which conflicted with previous policies and which the Secretary abandoned in FFY 2015, but without correcting the unlawful FFY 2014 UC DSH payments made under that policy.

63.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospital's properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

### COUNT III
### Violation of the APA
### (Agency Action Unsupported by the Evidence in the Record)

64.     The Hospital hereby incorporates by reference paragraphs 1 through 63 herein.

65.     The FFY 2014 Merged Hospital Policy and the Hospital's DSH payment are unlawful and should be set aside because they are unsupported by substantial evidence in the record.

66.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospital's properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

### COUNT IV
### Mandamus

67.     The Hospital hereby incorporates by reference paragraphs 1 through 66 herein.

68.     The Secretary has the non-discretionary duty to (a) reimburse the Hospital fully at the amounts to which it is entitled under the law, (b) apply policies that are substantively and/or procedurally valid, and (c) avoid imposing policies that substantively and/or procedurally *ultra vires*.  The Hospital is entitled to a writ of mandamus under 28 U.S.C. §1361 invalidating the FFY 2014 Merged Hospital Policy and directing the Secretary to recalculate the Hospital's FFY 2014 UC DSH payment after including the HSR data.  The Review Preclusion Statute does not apply to mandamus actions and, even if it this Court were to find that it does, that statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

## COUNT V
## All Writs Act

69.     The Hospital hereby incorporates by reference paragraphs 1 through 68 herein.

70.     The Secretary violated the Medicare Act and APA, and acted *ultra vires*, by applying the FFY 2014 Merged Hospital Policy and calculating the Hospital's FFY 2014 UC DSH payment without including the HSR data.  Under the All Writs Act, 28 U.S.C. §1651, and other authority, the Hospital is entitled to issuance of an order invalidating the FFY 2014 Merged Hospital Policy and requiring the Secretary to recalculate the Hospital's FFY 2014 UC DSH payment after including the HSR data.

## COUNT VI
## United States Constitution – Separation of Powers and Due Process Clauses

71.     The Hospital hereby incorporates paragraphs 1 through 70 herein.

72.     The Secretary's FFY 2014 Merged Hospital Policy and failure to calculate the Hospital's FFY 2014 UC DSH payment without including HSR data were unlawful under the Medicare Act and the APA.  The Secretary has the non-discretionary duty to comply with the Medicare Act and the APA.  Thus, this Court has jurisdiction and authority over this action under the separation of powers and due process clauses of the United States Constitution, and other authorities, to (a) reverse the PRRB's May 30, 2018 jurisdictional dismissal FFY 2014, (b) invalidate the FFY 2014 Merged Hospital Policy, and (c) order the Secretary to recalculate the Hospital's FFY 2014 UC DSH payment after including the HSR data.

**REQUEST FOR RELIEF**

WHEREFORE, the Hospital requests:

1.      An order reversing the PRRB's May 30, 2018 adverse jurisdictional decision;

2.      An order instructing the Secretary and the PRRB to reinstate the Hospital's FFY 2014 UC DSH appeal;

3.      An order invalidating the FFY 2014 Merged Hospital Policy;

4.      An order instructing the Secretary to recalculate the Hospital's FFY 2014 UC DSH payment after including the HSR data, and pay the Hospital the additional amount due, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

5.      The issuance of a writ of mandamus, after invalidating the FFY 2014 Merged Hospital Policy, requiring the Secretary to (a) order the PRRB to accept jurisdiction over the Hospital's FFY 2014 UC DSH challenge and (b) recalculate the Hospital's FFY 2014 UC DSH payment after including the HSR data, and pay the Hospital the additional amount due, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

6.      An order that the Court shall retain jurisdiction over this action for purposes of enforcement until notice from the Hospital of the Secretary's compliance with this Court's orders;

7.      Legal fees and costs of suit incurred by the Hospital;

8.      An award of interest as required by 42 U.S.C. §1395oo(f)(2); and

9.      Such other relief as this Court may consider appropriate.

Respectfully submitted,

Dated:  July 24, 2018

BY:  /s/ Patrick M. Noonan (#ct00189)
Patrick M. Noonan
Donahue, Durham & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437
T: (203) 458-9168
F: (203) 458-4424
*Counsel for Plaintiff*

s/ Robert L. Roth*

| | |
|---|---|
| John R. Hellow | Robert L. Roth (D.C. Bar No. 441803)* |
| HOOPER LUNDY & BOOKMAN, P.C. | Kelly A. Carroll (DC Bar No. 1018485) |
| 1875 Century Park East, Suite 1600 | HOOPER LUNDY & BOOKMAN, P.C. |
| Los Angeles, CA  90067-2517 | 401 9th Street, NW, Suite 550 |
| Tel:  (310) 551-8155 | Washington, DC  20004 |
| Fax:  (310) 551-8181 | Tel:  (202) 580-7701 |
| E-mail: jhellow@health-law.com | Fax: (202) 580-7719 |
| | E-mail: rroth@health-law.com |
| | *pro hac vice admission motion pending* |