```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3    _____
      Yale New Haven Hospital   )
 4            Plaintiff        )NO: 3:18cv1230(JCH)
                               )May 9, 2019
 5     vs.                     )3:33 p.m.
      Alex M. Azar, II         )
 6            Defendant.       )
      _____)141 Church Street
 7                              New Haven, Connecticut

 8

 9                    HEARING

10

11

12    A P P E A R A N C E S:

13    For the Plaintiff :  Patrick M. Noonan
                           Donahue, Durham & Noonan
14                         741 Boston Post Road
                           Guilford, CT 06437
15
                           Robert L Roth
16                         Hooper, Lundy & Bookman, P.C.
                           401 9th Street, NW
17                         Ste 550
                           Washington, DC 20733
18
      For the Defendant :  Carolyn Aiko Ikari
19                         U.S. Attorney's Office-HFD
                           450 Main St. Room 328
20                         Hartford, CT 06103

21                         Daniel S Schwei
                           US Department of Justice,
22                         20 Massachusetts Ave. NW
                           Room 7340
23                         Washington, DC 20530

24

25
```

1          THE COURT:  Good afternoon to everyone.  We're

2     here this afternoon in the matter that's known as Yale

3     New Haven Hospital versus Alex Azar, 318cv1230.  If I can

4     have appearances please.

5          MR. ROTH:  Good afternoon, Your Honor.  My name

6     is Robert Roth, representing Yale New Haven Hospital and

7     with me at counsel table here is our local counsel

8     Patrick Noonan and Mark Lombardi, Assistant General

9     Counsel for the Yale New Haven Health System.

10          THE COURT:  Good afternoon to you.

11          So I was having trouble hearing your name.  Are

12     you Attorney Roth?

13          MR. ROTH:  Roth.

14          THE COURT:  I think I confused it with part of

15     your firm's name so I wanted to be sure.  Thank you very

16     much.

17          MR. SCHWEI:  Good afternoon, Your Honor.  Daniel

18     Schwei from the Department of Justice on behalf of the

19     United States.  Joining me at counsel table is Carolyn

20     Ikari from the United States Attorney's Office.

21          THE COURT:  Good afternoon to you, Attorney

22     Ikari and Attorney Schewi.

23          We're here this afternoon for an oral argument

24     on the defendant's motion to dismiss for lack of subject

25     matter jurisdiction under Rule 12(b)1.  I don't know if

1    your local counsel have advised those visiting from out

2    of state, I have read everything.  I have read a lot of

3    cases.  I have read the briefs.  I have thought about the

4    issue and what my questions and concerns are.

5           It doesn't mean I'm any smarter or that I have

6    it right, so please feel free to gently correct me in my

7    thinking.  But I say that to you because my view of oral

8    argument, and I hate to make this sound egotistical, but

9    it is your opportunity to explain to me what I'm

10   misunderstanding or what I have wrong or what I'm

11   overlooking that would change my view.

12          Now, the problem with that statement is that

13   there will be a series of questions that I have and just

14   because I ask a question, doesn't mean that's my view.

15   But I'm looking for help to think through whatever is

16   that's reflected in the question.

17          If when I finish with the questions, hopefully

18   we'll have time.  If you feel compelled that you want to

19   say something and get that on the record and my questions

20   haven't touched on it, feel free to make me aware of it.

21          However, I would very much appreciate it if

22   counsel answers my questions.  It is amazing how many

23   lawyers don't answer a question.  It is the one thing I

24   tell to young lawyers of how can they be a good lawyer.

25   I start with listen to the question and answer it.

1          And I'll just explain what happens to me if

2     somebody doesn't answer my question.  I have trouble

3     absorbing what you are saying because I spend the whole

4     time thinking about my question and hoping I will

5     remember that question for whenever it is that you finish

6     the non-responsive answer.

7          I don't think it is in your interest to try to

8     give me a different answer, but if you think it is I

9     guess, go right ahead.  Enough of a preface.

10          I guess we'll start, Attorney Schewi.  I assume

11     that you are here to do the argument.  If you want to go

12     to the podium.  Make sure that you use the microphone.

13     First, it helps the reporter, but more importantly, your

14     opposing counsel will have trouble hearing you if it is

15     not coming through the speaker.

16          All right, sir.  I guess we'll start right at

17     the core of it.  You tell me how it is that the

18     plaintiff's challenge in this case fits in the plain text

19     of the preclusion statute.  Yeah.  I'd just like to hear

20     your answer.  I have some follow-ups.  I will throw out

21     that broad question.  So give me the Reader's Digest

22     answer to that.

23          MR. SCHWEI:  Certainly, Your Honor.  The

24     preclusion provision precludes judicial review over,

25     quote, any estimate of the Secretary for purposes of

1   determining the DSH factors. Here, the numerator of

2   Factor Three is precisely what Yale New Haven Hospital is

3   challenging.  At its most basic level, the Secretary used

4   94,000 days and change.

5           THE COURT:  Instead of 11,000 and change.  I did

6   read the briefs.

7           MR. SCHWEI:  Exactly, Your Honor.  So the relief

8   they are seeking in this case an order directing the

9   Secretary to recalculate the payment and issue that

10  additional payment.  It is impossible to grant that

11  relief without overturning an estimate of the Secretary

12  which is exactly what Congress precluded review over.

13          THE COURT:  Let's assume I'm with you on that

14  analysis. Isn't that only half of the pie?  Don't they

15  also challenge the procedure by which the Secretary

16  developed this policy and don't they ask, among all those

17  really kind of troublesome remedies of ultimately

18  prevailing with money in their pocket, don't they ask for

19  an order invalidating the merged hospital policy because

20  of procedural defects or deficiencies which would not

21  necessarily give them the relief they ask for otherwise?

22          In other words, more money or recalculation, a

23  different formula.  Secretary might end up with exactly

24  the same formula and they wouldn't put a penny in their

25  pocket, but they would get a process they alleged in

1    Count Two they were denied.  How is that precluded under

2    the plain language of the plain text of the preclusion

3    statute?

4            MR. SCHWEI:  Because regardless of the ground on

5    which this Court were to invalidate the estimate, the

6    relief, even for a procedural claim, would still be

7    vacating the estimate that the secretary made all the way

8    back in fiscal year 2014 and remanding for the secretary

9    to engage in more process to calculate a new estimate,

10   which may or may not be new, but the procedural nature of

11   any claims would not challenge the -- would not change

12   the applicability of the preclusion provision that's

13   consistent with every court that has addressed the

14   preclusion provision out of the D.C. circuit.  I'm happy

15   to address those claims.

16           THE COURT:  But the D.C. Circuit didn't address

17   this question, did they?

18           MR. SCHWEI:  They did, Your Honor.

19           THE COURT:  Show me where.

20           MR. SCHWEI:  So.

21           THE COURT:  Tell me where the language is about

22   procedural due process notice and comment, desire to

23   vacate the rule to go back for more process in the agency

24   without regard to what the outcome could be, that

25   relief -- if I ordered that relief, that number is still

1    in place.  So you tell me where is it in *Florida Health*.

2          MR. SCHWEI:  If I may grab --

3          THE COURT:  Go right ahead.  I think the

4    district court judge.  It is not Jackson is her middle

5    name.

6          MR. SCHWEI:  There were two judge Jacksons in

7    the two cases.

8          THE COURT:  The judge who did the next one.  The

9    *DCH* one that's up on appeal.  I think she even commented

10   about the claim in her case that sounds like a due

11   process claim saying that wasn't in the first case or the

12   decision so maybe she's wrong.  I guess you will tell me

13   where I'm going to find she's wrong.

14         MR. SCHWEI:  With respect to the procedural due

15   process specifically, I agree with Your Honor that that

16   constitutional claim was not present, but the notice and

17   comment arguments were present in *Florida Health*.  That's

18   clear from Footnote 3 of the District Court opinion in

19   *Florida Health* which is 89 F.Supp 2d 3rd on page 132.  In

20   Footnote 3, the Court makes clear that in addition to

21   arbitrary and capricious arguments, the hospital also

22   claims that, quote, that it violated the APA's notice and

23   comment requirements, end quote.  And so I think at issue

24   in *Florida Health* were APA procedural claims, the D.C.

25   Circuit obviously did not distinguish between the

1    substantive and procedural APA claims and in *DCH*, there

2    were clearly procedural claims at issue.

3         So no court has ever distinguished between the

4    substantive and procedural nature of the claims.  I think

5    that makes perfect sense because regardless of the nature

6    of the challenge, what Congress was trying to do in terms

7    of setting up a prospective payment system with

8    prospective estimates that are not subject to later

9    challenge, it doesn't matter why somebody is challenging

10   it later.  The preclusion provision is meant to guard

11   against all of those potentially disruptive later

12   challenges.

13        THE COURT: All right.  Let me ask you this

14   hypothetical.  Assume the Secretary woke up one day in

15   2014, came into work and dictated the regulation or

16   policy that we have in front of us, just off the top of

17   his head.  Maybe he had some memos telling him what he

18   should think about, but nothing disclosed to the public.

19   He announced that afternoon once it was typed up, that

20   policy.  Is it your position, is it the Government's

21   position that no one can challenge anything the flows

22   from that policy?

23        MR. SCHWEI:  A policy about calculating the

24   estimate which is what we have here, so assuming that for

25   the sake of Your Honor's hypothetical, yes, that is

1    exactly what Congress precluded and that makes good sense

2    in terms of the prospective nature of these estimates.

3              THE COURT:  Why does it make good sense?  We

4    have laws about the power of agencies to issue policies

5    and regulations. Congress gives agencies a lot of

6    authority, but they also tell them you have to attack

7    these questions of what regulations or policies will have

8    in a certain way.  You have to give process, notice and

9    comment, whatever words you want to use, right?  You are

10   telling me that the plain meaning, the plain text of the

11   section we're talking about in WW whatever it is subpart

12   3, limitation of review, that when it says no review of

13   any estimate, forget about the period selected, that's a

14   nonissue so no review, no judicial review of any estimate

15   for the purposes of determining the factors.  In other

16   words, the formula and the numbers that derive from the

17   formula, right, that that includes the -- I was going to

18   say process but that begs the question.  The outcome of a

19   regulation or policy and the process of creating the

20   policy cannot be attacked?

21             MR. SCHWEI:  Yes, Your Honor, and --

22             THE COURT:  Boy.  You are really going far I

23   think.

24             MR. SCHWEI:  Your Honor, I think that speaks to

25   the strength of the preclusion that Congress implemented.

1          THE COURT:  What do you do with *McNary*?  What's

2     the other one?  There's another case out there.

3          MR. SCHWEI:  I think *McNary* is the perfect

4     example, Your Honor, to contrast that case with the

5     present one.

6          THE COURT:  You tell me how it contrasts.

7          MR. SCHWEI:  So *McNary* involves a collateral

8     challenge regarding procedures implemented in individual

9     adjudications for a benefit and so the particular

10    question being adjudicated is are these individual alien

11    applicants eligible for a certain immigration status.

12    Their challenge was not we are in fact entitled to that

13    status.  Their challenge was to the procedures used such

14    as are we entitled to English language interpreters and

15    the key language from *McNary* that I really want to focus

16    on occurs at 498 U.S. at 495, where the Supreme Court

17    said, quote, the individual respondents in this action do

18    not seek --

19         THE COURT:  A substantive declaration that they

20    are entitled to SAW status.  It happens to be highlighted

21    in my copy.  I was struck by that language as well.

22         MR. SCHWEI:  Your Honor, if I can, I hope the

23    next sentence is also highlighted.

24         THE COURT:  It is.

25         MR. SCHWEI:  Which I think is exactly what the

1    plaintiffs are doing here.  The fact that they prevail on

2    the merits on their purportedly procedural objections

3    have the effect of establishing their entitlement to SAW

4    status.

5            THE COURT:  Absolutely.  Let me ask you this

6    hypothetical.  Assume that we have a complaint filed in

7    court by Middlesex Hospital.  That's a local hospital.  I

8    doubt they qualify for this type of payment but whatever,

9    the ABC Hospital.  They brought one count that's

10   equivalent to Count Two in this case.  What I call a

11   procedural complaint, a complaint about process.  Not the

12   calculation but the policy that was established.  Okay?

13   And they complain about the process surrounding that.

14   All right.  And let's assume that the only relief they

15   seek is an order invalidating that policy because of the

16   violation of due process or notice and comment, whatever

17   you want to call it.  Why isn't that *McNary*?

18           In other words, that hospital may win in front

19   of me, go back to the Secretary and the Secretary will

20   say okay, here it is.  I'm going to adopt the same

21   policy.  You tell me what's wrong with it.  People

22   complain.  People will say that's not fair.  Don't do

23   this.  Don't do that.

24           At the end of the day, I would press you on the

25   idea the Secretary couldn't choose this policy, right,

1    because I understand from all of the cases I read and

2    also prior knowledge that they have wide discretion in

3    picking things of what they are going to do.  Understand

4    it to attack it on substance is very high.

5         But so at the end of the day, the Secretary

6    might say, you know, what I'm really sorry I didn't give

7    you the right notice and process back whenever it was.

8    Now I have.  I've listened to everything you said and

9    considered it, but I'm going to implement the exact same

10   policy.  The Middlesex Hospital didn't win any money out

11   of that, right?  They didn't get to put another penny in

12   their pocket just like the immigrant got a better process

13   but wasn't guaranteed the result.  The immigrant might

14   have won.  Might have gotten status, right?  Just like

15   Middlesex Hospital might win by getting a different

16   ranking and get more money.  I don't know how that will

17   happen.  You allude to the fact that would be a

18   nightmare.  I don't know if it is.  They wouldn't

19   necessarily win.  I think that's what *McNary* is saying.

20        I think if you cut through a lot of complaint

21   here and you look just at that cause of action and that

22   relief, I don't know why they can't have that.

23        MR. SCHWEI:  I think several responses, Your

24   Honor.  The first is respectfully that's not how I read

25   their complaint which is not saying the Secretary did it

1    in a procedurally improper manner and the Secretary may

2    after more process actually be able to implement the same

3    policy.

4         The way I read their complaint is the Secretary

5    did it improperly and should be foreclosed from ever

6    implementing the policy, and so I guess I would defer to

7    the plaintiff here about what they are trying obtain

8    through this lawsuit.

9         THE COURT:  I will.  Don't worry.  That doesn't

10   mean I can strike every other remedy they seek based on

11   your motion.  I can strike all their other counts, but

12   what I'm trying to get at with you is, if I'm left with

13   Count Two in the third paragraph of relief, why isn't

14   that.  I'm struggling with why it is within the language

15   of the preclusion on review and why it isn't like *McNary*.

16        MR. SCHWEI:  So I think going beyond the

17   complaint here and talking about that hypothetical

18   situation, that draws in the D.C. Circuit line of cases

19   embracing the idea that you cannot challenge a general

20   procedure if your only goal is to reverse your

21   individualized decision and that's exactly what we have

22   here where the plaintiff on page 29 of their opposition,

23   admits -- obviously we are challenging the estimated

24   self.  They are not seeking a general vacatur of the

25   policy and then recalculation of every hospital's fiscal

1    year 2014 Factor Three, pursuant to whatever ultimate

2    policy the Secretary arrives at at the end of the new

3    notice and comment provision.

4         They are only seeking relief as to their

5    individual hospital and I think that's exactly what the

6    D.C. Circuit talks about.  Stepping back to understand

7    why Congress would have implemented this preclusion

8    provision, the nature of the Factor Three DSH payments

9    here are a fixed pool of money with each hospital getting

10   a pro rata share.  The Secretary making an estimate up

11   front about each hospital's pro rata share, if hospitals

12   are allowed to challenge after the fact the Secretary's

13   prospective estimates, whether it's substantive

14   challenges, procedural challenges or other types of

15   challenges, it threatens to undo the whole scheme where

16   each hospital's Factor Three and the ultimate amount of

17   money they receive depends on every other hospital's

18   Factor Three.

19        The plaintiff says, well, you don't have to

20   recalculate everyone's money here, but critically the

21   question before this Court is what does the preclusion

22   provision mean and adopting their interpretation of the

23   preclusion provision allowing these types of generalized

24   broad challenges would open the door, not just for their

25   claim but any swath of claims alleging procedural defects

1    in the Secretary's estimates and that's exactly the type

2    of disruption that Congress wanted to avoid through the

3    preclusion provision and the prospective system.

4        THE COURT:  I'm sure Attorney Ikari told you

5    that I love analogies.  I think they are really powerful

6    and I'm terrible coming up with them.  The one that's

7    running through my head right now which admittedly is

8    terrible, is basically what you are saying if the

9    Secretary were driving a car on business to get from the

10   headquarters, her headquarters to a meeting at the White

11   House and she runs a red light and kills somebody.  She

12   should just be able to continue because it would be a

13   terrible disruption if she has to stop and deal with an

14   accident.  God forbid.  There's nothing in the budget to

15   pay for the death of that person.  It isn't budgeted, so

16   we couldn't possibly deal with fact that this loss has

17   been suffered.  Admittedly a terrible analogy.  Your

18   argument, your argument that caused me to have that

19   terrible analogy.

20       My response to that is and I know, you know, you

21   are being a good lawyer.  You want to keep driving me

22   back to the plaintiff's complaint which is laden up with

23   all kind of things and if I agree with the D.C. circuit,

24   they are out the door.

25       What I'm trying to do is to get you to focus on

1  the part of their complaint which I think does say

2  procedurally you screwed up, Secretary and you can't do

3  that.  The law requires you to follow certain things.  So

4  they mention notice and comment, they talk about

5  something I'm not that familiar with but the concept

6  there's a pre-existing policy.  You can't change it

7  without letting us know you are going to do it, put us on

8  notice in the notice period, that you didn't reveal what

9  the rule was going to be at any time until you pronounced

10  it.  That's all process.  Those are allegations of

11  paragraph 61.

12          MR. SCHWEI:  I agree with Your Honor that they

13  allege process-related claims, but the therefore I think

14  is different.  The therefore that they ask for is the

15  Secretary violated the process.  Therefore, we get our

16  money.  They are not saying the Secretary violated the

17  process.  Therefore, the Secretary has to do more

18  process.

19          THE COURT:  So you don't have to make that

20  argument again.  If that's their argument, I won't say

21  I'm granting your motion, but I will treat the Complaint

22  as that's what it is doing and then I will decide if I

23  agree with the D.C. Circuit.

24          So but what I'm trying to get is that's not what

25  they are doing.  When counsel gets up, if he says yeah,

1    Judge, I did ask for a lot of that kind of remedy and

2    money and I want a recalculation but, you know, I asked

3    for this process.  I asked you to vacate this regulation

4    because it is unlawful because process violations under

5    the law which isn't covered by the preclusion review,

6    certainly not the plain text and it's *McNary* tells me

7    that I can even with a preclusion, I can go over there

8    and look at the process and that's what he said he wants,

9    that's what I'm trying to get you to help me understand

10   why he would be wrong if that's what he wants.

11           MR. SCHWEI:  I think we have talked about the

12   line of cases that you can't just do something.

13           THE COURT:  I agree.  You can't repackage it.  I

14   think that's probably what the *DCH* plaintiff might suffer

15   from.  I think they tried to go this route a little bit

16   and they didn't quite go far enough.  I'm not sure

17   whether the plaintiff here has -- I don't know whether he

18   hasn't gone far enough, but that he's done it right

19   because as you say, this claim which might be a good one

20   or have jurisdiction, let's put it that way.  Maybe the

21   notice was fine.  What do I know.  At least I have

22   jurisdiction.  You know, and I understand why he did

23   this.  He's between a rock and a hard place, but it is

24   bundled up with a whole lot of other things.  If I agree

25   with the D.C. Circuit, that's what they are.  All wrapped

1    up challenges to the estimate, you know.  I'm not saying

2    the plaintiff is home free on his cause of action, I just

3    think that -- I have questions for the plaintiff on the

4    preclusion scope and his request for remedy like give me

5    more money, redo my estimate, those kind of remedies that

6    the D.C. Circuit spoke about in Florida.

7            But at the end of the day, I have this Count Two

8    and I have relief paragraph number 3.  It's like boy,

9    that looks like *McNary* to me.  If it were standing by

10   itself, it would be *McNary*.

11           MR. SCHWEI:  Let me start with the text of the

12   preclusion provision and the preface, the prefatory

13   language of the preclusion provision there shall be no

14   administrative or judicial review under Section 1395ff,

15   Section 1395oo or otherwise.  The D.C. Circuit has noted

16   in *Texas Alliance* that that language is a term of art in

17   the Medicare context and it is the strongest possible

18   there shall be no judicial review language that Congress

19   uses and under Section 95FF and OO and otherwise namely

20   the APA, plaintiffs can bring procedural challenges to

21   Medicare policies under 1395ff and oo.

22           THE COURT:  Yeah, right.

23           MR. SCHWEI:  And so by excluding that type of

24   review, Congress is not distinguishing between

25   substantive challenges and procedural challenges.

1    Congress is excluding both types of challenges which fall

2    within the umbrella of those statutory sections, so I

3    think the plain text supports the notion procedural

4    claims are barred.

5          I think also the idea that the identical claim

6    between *DCH* versus this Complaint, that one might succeed

7    and one might fail only underscores how it is all about

8    semantics and repackaging of claims.  That is, of course,

9    what Congress wanted to avoid through preclusion.  The

10   disruption and the uncertainty caused by allowing claims

11   against the Secretary's prospective estimates will be the

12   same regardless of how a plaintiff packages its claims,

13   and I think that's a consistent theme throughout all of

14   these Medicare cases.  That packaging really should not

15   matter because we're going to what we're asking what did

16   Congress want.  Just to return to the analogy which I

17   agree --

18          THE COURT:  I think we need to stop because I

19   have a lot more questions and you don't have a lot more

20   time.  The problem with your argument is you stop at the

21   colon.  What it says is there will be no judicial review

22   under those sections which admittedly would be where you

23   find the APA-type of review of any estimate of the

24   Secretary.

25          The way I put my hypothetical I would say that's

1    a review of the process of promulgating the regulation.

2    If they wanted to suspend for the purposes of this

3    estimate, this estimating process, and appeal under the

4    APA or whatever it is OO, whatever the language is, that

5    says once you go to the board, you can go to a federal

6    court.  If they wanted to suspend that, in terms of

7    process, as it led to an estimate, not the calculation,

8    but the defining of it, I would have written there will

9    be no judicial review, not under OO but for the remedies

10   in OO.

11          In other words, that I think they are saying

12   that OO is a vehicle that gets you to federal court in

13   this area of Medicare regulations and there are saying

14   you can't use that vehicle to challenge the estimate.

15   And I don't need to be told because I have some questions

16   for the plaintiff, that challenging the estimate, there's

17   no way you can challenge the estimate without challenging

18   the pieces that make the estimate right.  So that's the

19   trouble that they had at D.C., and I think it is a

20   problem for the plaintiff here, but he hasn't had a

21   chance to speak.

22          So you don't have to tell me about that aspect

23   of challenging the estimate.  To me anything that creates

24   the final estimate number which went in the pocket of the

25   various hospitals, whether it is the enumerator or

1    denominator, it is the data, it is the period you pick,

2    whatever, that can't be challenged as a substantive

3    matter, but I don't think that means you can't challenge

4    the process of creating a regulation that eventually

5    leads to an estimate.

6         MR. SCHWEI:  I think if that is correct, then

7    there will be significant disruption and uncertainty for

8    the Secretary DSH calculations which Congress wanted to

9    be final and not subject to review.  I think the ability

10   to recast a challenge as not going to the ultimate merits

11   but only the process by which something was done, can

12   easily be pled and obtained in virtually every case

13   trying to challenge the DSH estimate.

14        THE COURT:  I don't think so.  I think the

15   plaintiff in *McNary* they really wanted to get

16   remedies from the immigration process, right?  But they

17   didn't ask for that.  They knew they might not get it and

18   Congress said you can't complain about this outcome, but

19   you can complain if we have a Star Chamber approach to

20   Government process, right?  I don't know.  I think *McNary*

21   is still good law.

22        MR. SCHWEI:  The way I would think about the

23   plaintiff's claim, even framed in procedural terms, is

24   the Secretary followed the wrong process in

25   calculating our estimate.  In the sense of didn't go

1    through the right notice and comment.  The Secretary

2    calculated our estimate after improperly failing to go

3    through notice and comment.  That is still an attack on

4    the estimate.  There is no way to grant relief even on a

5    procedural claim without vacating the current estimate.

6         THE COURT:  Well, if he goes through a process

7    and he comes out with a different formula or factor,

8    whatever, probably not using the right term there.  He

9    changes whether the way Yale wants it or some other way.

10   It could be Yale losses more money with the new rule,

11   right, and they wouldn't be able to challenge that so

12   long as the process is okay.  Whatever it is.

13        If he ends up with a different formula that

14   leads to different estimates for everybody, I don't know.

15   I go back to my second, my second hypo and that is the

16   Secretary of one of our agencies could come in in the

17   morning and just pronounce a regulation or policy that

18   governs millions and billions of dollars of money and

19   thousands of entities or hundreds of thousands of people

20   and do it without regard to his legal obligations under

21   the APA?  I find that hard to believe.

22        MR. SCHWEI:  I think there are always going to

23   be difficult hypotheticals in the context of Medicare

24   preclusion provisions.  Yet courts continue and have

25   consistently given effect to the full scope of those

1    Medicare preclusion.

2           THE COURT:  Let me change the tune.  Let's

3    assume that you're right that Section 3 wipes out all

4    kinds of judicial review.  There's no remedy at all no

5    matter what the Secretary did as far as process, forget

6    about the calculation flowing from the formula he came up

7    with.  Why can't the plaintiff seek redress from

8    mandamus?  Isn't that exactly the situation if someone

9    acts, you know, I don't want to say illegally, much more

10   than illegally, clearly illegally, whatever the language

11   is I'm not remembering.  Why can't he mandamus them to do

12   the process correctly just like judges get mandamused for

13   not, I don't know, whatever, ordering the Government to

14   turn over discovery when there's no obligation to do so.

15   There's a case in the Second Circuit to that effect.  Why

16   can't he mandamus the Secretary?

17          MR. SCHWEI:  So in our opening brief, we cited

18   various cases holding that mandamus would fall within the

19   type of preclusion language at issue here.  The or

20   otherwise language, and notably in the plaintiff's

21   opposition, they don't respond at all regarding their

22   mandamus claim, so I view it as effectively forfeited.

23          But to answer the actual question here, I think

24   number one, there's the text of the preclusion provision

25   that doesn't apply to the nature of the claim or the

1    cause of action for a claim.  It applies to the Medicare

2    claims or otherwise which is the strongest possible

3    language that Congress could have used and then

4    additionally, the mandamus claim is predicated on some

5    sort of duty owed to the plaintiff which they cannot

6    establish here.  It is the secretary going --

7         THE COURT:  It's 72 degrees, Joe.  Come on up.

8    You don't have to ask permission.

9         Sorry, sir.  It is a running joke in the

10   building.  Basically I keep this at 68 usually.  Somehow

11   we got it to 72.

12        MR. SCHWEI:  I promise it was not me.

13        THE COURT:  Go ahead.  You were talking about

14   the mandamus claim is predicated on some sort of duty

15   owed to the plaintiff that they can't establish.

16        MR. SCHWEI:  Correct, Your Honor.  They cannot

17   establish that the Secretary owed a mandatory ministerial

18   duty in connection with the overall rulemaking procedures

19   related to the fiscal year 2014 DSH payment which was the

20   first year that it was in effect.  So I don't think the

21   mandama's claim would overcome the preclusion provision,

22   and I certainly don't think it would be overcome as a

23   claim that's appended purely for purposes of

24   manufacturing jurisdiction.

25        THE COURT:  Would you agree that this FFY2014

1   merged hospital policy is a change in the substantive

2   legal standard governing benefits or payments for

3   services and that, therefore, he could only implement the

4   policy by regulation?

5           MR. SCHWEI:  No, Your Honor.

6           THE COURT:  That wasn't the answer I expected.

7           MR. SCHWEI:  Let me distinguish between two

8   parts of the question.  Just to answer the second part,

9   does it need to be done by regulation, the answer is yes

10  because all IPPS, the inpatient, those must be done by

11  regulation.

12          As to the first part, is this a change in

13  policy, I would say no.  This was the very first year the

14  payment was enacted and in effect, so they were creating

15  policy at the outset.

16          THE COURT:  The payment for fiscal year '13 was

17  changed by statute and this is a new payment, a different

18  payment?

19          MR. SCHWEI:  Correct.  It is the Affordable Care

20  Act which became effective fiscal year 2014 for this

21  payment, so it was the first Congress or HHS had ever

22  implemented this payment.

23          THE COURT:  My last question is whether you know

24  what's the status of the D.C. case, the *DCH* case that you

25  argued sometime ago?

1          MR. SCHWEI:  We do not have an update since it

2     was argued in September 2018.  Obviously we will apprise

3     this Court if we -- if and when the D.C. Circuit issues a

4     decision, but obviously I cannot predict when that may

5     occur.

6          THE COURT:  I'm sorry.  I said it was a last

7     question.  It wasn't.  What is the Government's position

8     in this regard?  Would the Secretary have had the

9     authority to promulgate this policy without notice and

10    not comment?

11         MR. SCHWEI:  Again I think the statute requires

12    the prospective payment rulemaking to be done through

13    notice and comment in the Federal Register.  It is an

14    entirely separate question whether a plaintiff can

15    obtain --

16         THE COURT:  That wasn't my question.  That's

17    fine.  I thought that was going to be your answer.  I

18    have been surprised by some of yours, so I wanted to be

19    sure.  Give me a minute to see if I've skipped anything

20    else.  That's all I have for now.  Thank you very much.

21         MR. SCHWEI:  Thank you.

22         THE COURT:  Mr. Roth.  Let's start with what

23    claim or claims you are making here.  It strikes me that

24    you are trying to attack the substance of your statement

25    and formula or factors that create that estimate.

1          MR. ROTH:  Yes, Your Honor.  At least that.

2   We're attacking the way -- more fundamentally attacking,

3   Your Honor, and I think I answered your question, but if

4   not, I will elaborate in this way.  What we're

5   fundamentally -- the fundamental problem here for Yale

6   New Haven Hospital is that the data -- that the whole

7   purpose of this uncompensated care disproportionate share

8   hospital formula, the whole purpose of it was to

9   compensate hospitals who didn't get compensated by having

10  insured patients. That's the whole purpose.

11         What the Secretary did was excluded all data for

12  Hospital of Saint Raphael.  That was the problem.  And

13  the reason that that happened, though, was because of a

14  series of procedural defects.  Had those procedural

15  defects not occurred, Your Honor, this policy never would

16  have been implemented in 2014.

17         THE COURT:  You can't say that.

18         MR. ROTH:  I can say, Your Honor, that the first

19  time that it went through notice and comment rulemaking,

20  the first opportunity the Secretary had to deal with it,

21  he withdraw -- he changed it and he didn't go through the

22  notice and comment rulemaking in 2014.

23         And when the language that was used in 2014, is

24  even left open the possibility of what was going to

25  happen in 2015 with respect to the treatment of merged

1    hospitals.

2         THE COURT:  If that's what your case is about,

3    why are you asking for me to order the Secretary to

4    recalculate your payment under the formula that you like,

5    in other words, the 2015 formula, because that sure

6    doesn't sound like process when you asked me to do that.

7    That's he got it wrong and I get to fix it.

8         MR. ROTH:  Fair question, Your Honor.  In the

9    normal course of an APA-type challenge like this, the

10   request would be go back for clarification, further

11   explanation, whatever the Court would need.  In this

12   instance, what we have is a policy that the Secretary has

13   never implemented for years and years and years before

14   2014.

15        THE COURT:  I don't understand has never

16   implemented.  If he hadn't implemented, you wouldn't be

17   here complaining.

18        MR. ROTH:  The policy -- the point is that the

19   policy that is at issue in 2014 had to do with how to

20   treat merged hospitals, right?  And the Secretary had

21   changed direction in 2014 in a final rule only and then

22   it abandoned that in the following year.

23        So I accept your correction, Your Honor, that

24   the only year it was applied was in fiscal year 2014

25   without explanation.

1            THE COURT:  All right.  Well, I guess I will ask

2      point blank.  You have argued that you think *Florida*

3      *Health* is wrong.  I guess I really struggle with given

4      the Complaint it had in front of it, which I don't read

5      to be a procedural due process.  I know counsel pointed

6      me to the District Court opinion.  I will go back and

7      look at that and if we can access the Complaint, I guess

8      I will access that.

9            But I don't read the circuit's opinion as

10     focusing on what I think you have tried to do at least in

11     part of Count Two and in paragraph 3 of the relief which

12     is to complain about process.  Okay.  I don't think they

13     addressed that.  And I think that the District Court

14     Judge in *DCH* has kind of said that, you know, like this

15     Complaint is a little different from that one, but I

16     think they lose under *Florida*.  The challenge for me I

17     think is clearly you're precluded from saying the

18     estimate is wrong.

19            MR. ROTH:  *Florida*?

20            THE COURT:  You are precluded.  I think I'm

21     stating instead of a question.  The preclusion statute

22     has to mean something.  And I think that I don't know in

23     every word or every line of the *Florida* decision on the

24     D.C. Circuit, but I would say as a general matter, I

25     think they are right that when it says you can't

1    challenge under any statute or otherwise, the estimate,

2    that has to -- there's was the period I guess.  But if

3    you are going to challenge an estimate, you're arguing,

4    well, the data they used didn't include the right data.

5    Well, to me, what is the estimate but the data used.  You

6    are saying the estimate is wrong.  Why?  Because of the

7    data.  They can't be uncoupled and so I don't know.  I

8    guess the Congress could have said you can't attack or

9    appeal the estimate or anything that went into

10   calculating the estimate or deriving the estimate or the

11   data.  They could have gone on and on and on.  But I

12   don't think they needed to.  You tell me why I'm wrong.

13   You obviously argue it in your brief.  What I'm saying is

14   you are going to have to persuade me of it.

15            MR. ROTH:  I don't recall ever saying the

16   *Florida Health* Science was wrong.  I'm fine with *Florida*

17   *Health*.

18            THE COURT:  You are trying to distinguish

19   yourself from it.

20            MR. ROTH:  I think the facts distinguish us.  So

21   let's talk about.  So from the moment *Florida Health*

22   *Sciences* was brought, the Medicare reimbursement bar was

23   okay.  This is kind of a long shot because it had to do

24   with exactly the thing that --

25            THE COURT:  That second paragraph.

1           MR. ROTH:   In that second paragraph.   It was the

2    period of time.   What happened is this one hospital.

3    This one hospital it turned out that they had gotten a

4    revised Medicare Cost Report in April 2013 instead of

5    March of 2013.   Therefore, the whole thing should be

6    attacked.   What I love about the *Florida Health Sciences*

7    is that, you know, in Judge Griffin says even if we gave

8    the narrowest reading possible to this preclusion

9    statute, we're not going to get to where you need to go.

10   I accept that.   Right.

11          The problem with the *DCH* District Court opinion,

12   it didn't mention the repeal in Fiscal Year 2015 which is

13   crucial.   The bigger problem with *DCH* --

14          THE COURT:   You are going to explain to me that

15   statement but you go ahead.

16          MR. ROTH:   Let me make the second point and come

17   back to the first one.   With respect to the APA issue,

18   Administration Procedure Act issue, we were surprised by

19   what came out in the final rule because we didn't expect

20   there to be this departure from this long standing policy

21   with respect to DSH payments, right.   *DCH* doesn't raise

22   that issue.   *DCH Hospital* didn't raise that issue.   Do

23   you know why, Your Honor?   I don't know if I made this

24   clear in our papers.   It is because they are the ones

25   that submitted the comment.

1          THE COURT:  That would be my question to you.

2     How is it that another hospital is able to comment on the

3     very thing you're unhappy about during the comment

4     period?  How can it be then that you didn't have notice

5     and an opportunity to comment?  Are they just brilliant

6     that they saw this issue?  Nobody else would have seen

7     it.

8          MR. ROTH:  I have the answer to that.  That's a

9     really good question, and it was only preparing today

10    that it was like, oh, that's the answer to the question.

11         So what happened was the Yale New Haven merger

12    with Hospital of Saint Raphael finished in September 12,

13    2012.  We have four other hospitals that have this issue.

14    All of those mergers took place in 2012.

15         So when the 2014 proposed rule came out, it

16    identified DSH amounts for both of the hospitals.  But

17    the merger that was at issue in *DCH* of the two Alabama

18    hospitals that occurred in 2011, when the information

19    came out for them, only one of their hospitals were

20    listed and they didn't know why.  So they wrote a

21    comment.  What's going on here?  Don't you have the same

22    policy that you have had for years of including -- in

23    fact, what they did they even met with the agency to say

24    aren't you going to include all DSH for the purposes, so

25    while that particular hospital had notice, we had none.

1   No notice.  Not in the language and not in the tables.

2          THE COURT:  I'm struggling with why they are

3   different than you.  I understand that they were a year

4   earlier and you're a year later.  I don't understand why

5   that drives a different conclusion.

6          MR. ROTH:  It drives different facts about the

7   notice.  You had asked the question about notice from the

8   proposed rule.  We had no notice because both of our

9   hospitals both Yale New Haven and Hospital of Saint

10  Raphael were included in that proposed rule in the tables

11  that were attached to that proposed rule.

12          The two Alabama hospitals at issue in *DCH*

13  including DCH Regional, they only had one hospital listed

14  so they knew something was up.  There's 4300 IPPS

15  hospitals and we can't know everything about all of them.

16  We know that our two hospitals were listed so Yale New

17  Haven, in particular, had no reason to comment because in

18  2011 data, it showed both hospitals, both qualified for

19  Medicare disproportionate share.  Both were then merged

20  2012.

21          The policy had always been to give hospitals the

22  benefit when they merge and accept the provider

23  agreement.  What I don't know is whether the hospitals in

24  Alabama didn't accept the provider agreement.  If that's

25  not true, then their data would not have been included.

1          THE COURT:  If they didn't accept it?

2          MR. ROTH:  Right.  When this came out in August

3    of 2013, what we did is we figured that the Alabama

4    hospitals didn't accept the provider agreements.  We

5    figured that must have been what happened to them why

6    there was only one.

7          But in ours, Yale New Haven accepted all

8    liabilities for Hospital of Saint Raphael.

9          THE COURT:  Let me ask this.  Are you saying

10   that in the proposed rule itself, not the attachments,

11   with the listing of that you had the two hospitals

12   reflected in that attachment, your numbers, but in the

13   language of the rule, did that change between the

14   proposed rule that had an attachment showing the two

15   hospitals and the final rule which in substance says, one

16   hospital?

17         MR. ROTH:  The proposed rule was absolutely

18   silent.  It had nothing about the merged hospital policy

19   at all.

20         THE COURT:  When I go to the final rule, how do

21   I learn it's one hospital for you?  Is there language in

22   the rule?

23         MR. ROTH:  There was a language in the final

24   rule.

25         THE COURT:  That language wasn't in the proposed

1  rule?

2          MR. ROTH:  Not at all.  There was nothing about

3  merged hospitals in the proposed rule at all.  Totally

4  silence.  In the tables, there was just a way we had seen

5  it in every other year.  We thought okay.  So that's why

6  it was a surprise and we contacted the agency probably a

7  day or two after the final rule came out and said what's

8  going on here.

9          THE COURT:  Right.  They ignored you basically.

10         MR. ROTH:  They said come see the court

11  ultimately.  They are the ones who told us to pursue our

12  administrative remedy.

13         THE COURT:  They hadn't talked to their lawyer

14  yet.

15         MR. ROTH:  I think they had talked to their

16  lawyer.

17         THE COURT:  Give me a moment.  I'm off track.  I

18  want to figure out where I'm going to jump in.  But all

19  of that, all of that makes -- makes you maybe have a

20  claim over which I have jurisdiction which attacks the

21  process, right?

22         MR. ROTH:  And if I could, could I comment or

23  would you like me to wait, Your Honor?

24         THE COURT:  Go ahead.

25         MR. ROTH:  The other point that's so important

1    here is that the rulemaking requirements that you asked

2    Mr. Schewi about, where he said ultimately yes, notice

3    and comment does apply.  There's a specific statute

4    1395hh and (a)(2) and (a)(4) that make those requirements

5    that apply explicitly in the Medicare Act.

6            It is beyond the APA.  These are requirements on

7    that statute.

8            THE COURT:  1395.

9            MR. ROTH:  hh.

10           THE COURT:  Give me a minute.  I think I had it.

11   Right.  hh 42USC and the first paragraph is authority to

12   prescribe regulations, et cetera.  I have looked at that.

13           MR. ROTH:  It is statutory.

14           THE COURT:  Understood.  Why doesn't the waiver,

15   not the waiver, you know what I mean, the limitation on

16   review section say, okay, we normally would say that in

17   this area, you know, they promulgate regulations.  You

18   have to do it a certain way, but, you know, this is a

19   whole new ball of wax.  We have the Affordable Care Act.

20   Everybody is screaming about it anyways, so let's get it

21   done.  We don't want to have 4,000 lawsuits around the

22   country.  The poor district judges are too busy anyways,

23   so we'll just put a lid on it.  You can't go to court.

24   You can't have any judicial review under any statute or

25   otherwise.

1          MR. ROTH:  Except, as Your Honor knows, it

2    doesn't say that.  It would be completely inconsistent

3    with the whole purpose of the statute.

4          In other words, the Government and Congress

5    could have very easily said there will no judicial review

6    of anything relating to the process or the payment.

7    Right.  Because we, our firm, we litigated *McAllen*, we

8    litigate *Athens*, I personally litigated *Palisades*.  We

9    have been all over this substantive versus procedural

10   distinction for almost thirty years with Congress.

11   Congress knows very well what's going on in this area.

12         If Congress wanted to shield and the reason, of

13   course, that Congress didn't do that is because they

14   can't.  They can't preclude the judiciary as the D.C.

15   Circuit said in the *COMSAT* decision.  As Justice Ginsberg

16   said that that that you can't take away the ability of

17   the judiciary to do its job unless there is -- because

18   that involves separation of power issues.

19         THE COURT:  How do you get to ask me to order

20   the Secretary to recalculate your payment?  How do I do

21   that?  Your payment is based upon this thing called the

22   estimate, right?

23         MR. ROTH:  Right.

24         THE COURT:  And the Congress printout, it can't

25   say more clearly you will have no judicial review anyway

1    you can think of of the estimate.  How do you get to have

2    me?  How do you plead a claim and ask for a remedy that

3    says just wipe out what the secretary did?  Let's pretend

4    it's '15.  We'll do what he did in '15.  Tell him to give

5    us a better number.

6           MR. ROTH:  It is a fair -- it is a fair comment,

7    Your Honor, and I have two answers, neither which may

8    particularly resonate with you.  One is ever since we

9    brought the first case, we had to make sure we met

10   jurisdictional requirements which were $10,000 at the

11   provider reimbursement review board and then court and

12   even though it's a federal judicial, federal Medicare

13   challenge.

14          The other is that is that ultimately that's kind

15   of what we want to do is get paid for this.  So we didn't

16   want to preclude the Court from actually accepting the

17   fact because going to the point that you made, Your

18   Honor, is that you had said what happen.  The big problem

19   that I think you're struggling with and that the panel in

20   *DCH* struggled with at the circuit court was the

21   Government is not giving you any limit to the preclusion

22   language.  Not giving you any.  They are making you kind

23   of formulate it.  As I thought Judge Millett, in

24   particular, was very powerful in saying there has to be

25   some limit.  She used the example of the calculator that

1    had the broken button on it.  Even under those

2    circumstances, counsel for DOJ they are trained to not

3    accept.  That's a hypothetical.  But obviously I think

4    the Court knew at that point that there was essentially

5    in the recognition that there had to be some limitation

6    to the preclusion language and that limitation to the

7    preclusion language is what applies here.

8         If there is no limitation to the preclusion

9    language then what that does it gets us into, like you

10   said, mandamus, all writs acts, ultra vires.  It gets you

11   into these other -- into this other area of review on

12   this.  If we get into that kind of area, I think this

13   Court could order that relief.

14        THE COURT:  I think that's a bridge too far for

15   the district court judge who thinks there's such thing as

16   separation of powers and different branches have

17   different things to do.  Maybe that's the appropriate

18   remedy.  I don't know.

19        You mentioned separation of powers, but I don't

20   know that you really made any argument about it that

21   wouldn't be fairly characterized as conclusory argument.

22   Am I being unfair to you?  What argument supports that

23   claim?

24        MR. ROTH:  I think the reason that we pled it

25   that way and only mentioned it if for one paragraph in

1   our response, we had the one brief on this thing, was to

2   really try to drive home and maybe inappropriately to

3   drive home that we believe that this issue rises to the

4   level of constitutionality because of the Secretary's

5   lawyer at the Department of Justice failure to say that

6   there's any limitation on preclusion because they have

7   this disruption which I'm happy to explain to you why

8   that is a false concern.

9          THE COURT:  Let's hold that for a second.  Let

10  me finish up with what I had.  Then I made a note.  You

11  seem to also plead, well, due process claim but a

12  substantive due process claim.  Are you trying to plead

13  that?

14         MR. ROTH:  The substance of our claim it

15  basically relies on the statutory 1395hh requirements

16  which then in addition to that, the statutory use of

17  appropriate data and if I can at least open the door on

18  this subject and if you want to slam it shut, I'm

19  sympathetic to it.

20         THE COURT:  You can try.  I'm not sure I agree

21  with the Government on the scope of this limitation on

22  review.  I don't see how you get an estimate without

23  data.  And I don't see how you are going to argue to me

24  that absent some bizarre conduct by the Secretary because

25  they chose one set of data and you like another set of

1    data, I'm going to correct that.

2            MR. ROTH:  That was certainly -- that

3    characterization comes out of *Florida Health Sciences* and

4    that's the kind of thing that the Department of Justice

5    presented here, but of course, that's not the situation

6    because the situation here was what they did procedurally

7    was they -- we're not questioning the data.  They got the

8    data right for Hospital of Saint Raphael for goodness

9    sake and they got the data right for Yale New Haven

10   Hospital.  So we have not qualms about the data they

11   used, but what they did do is they then, having decided

12   what the right data is, they excluded the data.

13           Now excluding the data they found to be

14   appropriate is a violation of that statute so

15   substantively that's the problem.

16           THE COURT:  Maybe they decided between the

17   notice that showed the data that you say is the right

18   data and promulgation of the regulation, the Secretary

19   made a decision that wait a minute, we're a little short

20   of money here.  We have a tight budget and I think what

21   we're going to do is if these people don't want to roll

22   their work under their own number, we won't include them

23   this year.

24           Maybe next year we'll do it, but for now, we're

25   going to skip that.  They can change their mind.

1          MR. ROTH:  First of all, they can't do it

2     legally.

3          THE COURT:  Let's say they gave a notice and

4     said we told you you are going to have both hospitals,

5     but we thought about it and listened to the comments.  We

6     think we're going to do the one hospital number and they

7     announced it, told you, gave a chance to complain, then

8     chose that route.  Why couldn't they do that?

9          MR. ROTH:  Two responses.  The first on is, as

10    you know, I have been litigating these Medicare cases for

11    32 years and the premise is incorrect.  There's no extra

12    money from the Government.  It's a zero sum.  They come

13    up with the money in Factor Three, 7.785 billion dollars.

14    The only question is who gets it.

15         THE COURT:  Let me erase my comment.  Let me say

16    that they reflect upon their proposal of including all

17    these merged no longer existing hospitals whose number

18    has been taken over by the successor hospital and they

19    say we don't like that practice.  I don't know why.

20    Let's assume.  But there's a reason, probably could be a

21    reason.  Let's assume it is a reasonable reason of why

22    they really want to discourage that.  Okay.  So they

23    decide all right.  This is how we're going to discourage

24    it.  We're going to make everybody migrate all that data

25    into the one remaining hospital and stop this two

1    hospital thing.  So the way we'll do it is by saying you

2    won't get paid if you don't do it.  They tell you and

3    then they do it.  You are telling me that I can say

4    that's illegal and I should reverse the Secretary and

5    tell her she can't do that?

6                MR. ROTH:  If they properly follow notice and

7    comment rulemaking?

8                THE COURT:  They follow all of that.

9                MR. ROTH:  That's a different case.

10               THE COURT:  I know it is.  That's why it is a

11   hypothetical.

12               MR. ROTH:  But if they did something that we

13   thought was -- we would have the legality of the

14   appropriate data question, number one, because if you

15   remember in the *DCH* oral argument, Judge Millett made a

16   similar hypothetical.  She said what if they just said

17   fiscal year 2014 is too complicated.  We won't include

18   any data from any merged hospitals at all.  That's the

19   question.

20               The response from the Government lawyer,

21   well-prepared Government lawyer.  He said well, that's

22   not our case.  So but if the Secretary did something that

23   was flatly contradicted by the statute, it would be very

24   hard to pry it open in light of that preclusion statute.

25   I will grant you that.

1          THE COURT:  A cabinet secretary promulgating

2     regulations really got to be outside the realm of

3     reasonableness and beyond the pale for a judicial review

4     to say you made the wrong choice, right, as a general

5     principle?

6          MR. ROTH:  Right and here, Your Honor, the

7     Secretary has given that judge or you cover.  Because

8     when it came to the next year and the first thing she

9     said was, you know what, we had the thing we did at the

10    end of last year, and we realized it didn't result in

11    appropriate payment and appropriate data on which to make

12    these payments.  So whatever it is this thing that we

13    think that would help us in our very difficult case to

14    say yeah, this is an example of something that's like

15    *COMSAT* and *Southwest Airlines* so beyond the pale that it

16    actually justifies judicial action.

17         THE COURT:  My hypothetical ends.  I will agree

18    with you.  I don't think it's beneficial to take it

19    farther.  I don't think the fact they did it one way one

20    year that makes the prior year irrational and capricious

21    or whatever standard you would have to meet.

22         MR. ROTH:  On the Fox television, Your Honor,

23    what we wrote in our brief, we gave you one snippet from

24    federal fiscal year 2016 final rule where the Secretary

25    made clear that how she treats merged hospitals for

1      purposes of the wage index.

2              We attached a PRB decision that states how it is

3      done for DSH hospitals, Medicare disproportionate share

4      hospitals.  The problem with 2014 is that it's a

5      departure and even under Fox Television in Paris there

6      had to be some explanation about why they changed gears

7      and there was none in 2014.

8              THE COURT:  Isn't that good you used that word

9      "disruption" because I wrote it down before.  How can it

10     be a disruption or a change in practice or policy when

11     this statute was just passed?  They never had a policy

12     under this statute.  How can it be a departure?  I'm

13     shocked they departed from their historic practice.

14             MR. ROTH:  I have the answer for you and it is a

15     programmatic answer.  Because although things have

16     changed now for 2019, in 2014, the way that the Secretary

17     decided to implement the uncompensated DSH program was to

18     use data from what's called traditional DSH, the original

19     DSH program.  They used --

20             THE COURT:  Historic data.

21             MR. ROTH:  The historic.  There was only 25

22     percent.  It was 100, then 25 percent but the point is to

23     say that what our argument of lack of departure is

24     because they treated DSH always the same way up until

25     2014.  Then because they used the same data for UC DSH

1    for 2014, they changed the way they did it.  That was the

2    change so although there was a change to what percentage

3    of DSH was old DSH versus uncompensated care DSH, they

4    continued to use the same data and they used it in a way

5    that was a complete departure from what they had done

6    previously and then what they did in 2015 forward.

7            THE COURT:  I will reveal my ignorance.  As I

8    understand '14, the change was that they went to the

9    25/75.  They did 25 percent of the money, the money that

10   they had, they did 25 percent the way they had been doing

11   it.  Then they did 75 percent with this prospective

12   estimate or whatever they called it based upon the future

13   payments?

14           MR. ROTH:  Correct.

15           THE COURT:  The use of the two hospitals in say

16   2010 when they did it on historic data.  If you merged in

17   '09, but you adopted the number of the dead hospital and

18   you are the survivor, you would get paid for both under

19   the historic 100 percent goes on history payment?

20           MR. ROTH:  Correct.

21           THE COURT:  Fast forward to '14.  Did they do

22   you get the two hospitals for the 25 percent piece they

23   kept using the old method of historic?

24           MR. ROTH:  That's our understanding.

25           THE COURT:  So this is all about -- this

1    problem, as you see it, of only allowing the one

2    hospital's numbers to be put into the formula relates to

3    the 75 percent prospective which, of course, estimated

4    based on historic.

5         MR. ROTH:  Where they used the same data.  They

6    said because we don't have time to develop a whole new

7    data strategy which took them four or five years, we're

8    going to use the old DSH formulas for purposes of

9    allocating the new DSH money.

10        THE COURT:  The 75 percent?

11        MR. ROTH:  Yes.  If they had changed entirely

12   that would be a different factual scenario.  That's not

13   what happened here.  That's in our papers, Your Honor.

14        THE COURT:  Give me a moment.  I wanted to ask

15   you this question, hypothetically assume I find

16   jurisdiction to hear your procedural claim.  I think you

17   framed under it under the APA as not excluded by the

18   preclusion of judicial review, and the case went forward

19   and I eventually issue a ruling of the summary judgment

20   or whatever it is on, after trial, whatever.  There's

21   eventually a ruling that gets affirmed and say I rule for

22   the plaintiff.  You didn't get your notice of comment

23   rights.  They screwed up.  Go back and do it again.  I

24   think that's what the remedy is, by the way.  We don't

25   get many judicial reviews up here.  I think that's the

1    remedy I give you.  And it went back.  They did

2    everything perfect.  All the process, announced it, they

3    got comments, they did the second announcement.  Look,

4    they changed it a little bit.  This is what we think we

5    want to do.  More comments.  Then they adopt what they

6    said they were going to adopt.  No surprises.  No

7    changes.  No dropping a hospital from a table.  That

8    scenario do you agree that in that process, Yale may not

9    eventually get anymore share of this pie?

10            MR. ROTH:  These are very interesting

11   hypotheticals.  I'm going with your hypothetical.

12            THE COURT:  I think that could happen but

13   whatever you can live in hope.

14            MR. ROTH:  It will be.  Just as an aside, it

15   would be fascinating if the Secretary would actually say

16   some of that stuff because of the effect it would have in

17   other areas of Medicare.  They would have to say merged

18   hospitals aren't subject to liabilities.  I think it is

19   unlikely.

20            I think you make a good point because if it went

21   back to cure a procedural defect, we have seen this in

22   some other Medicare cases recently, they have to do a new

23   notice.  Here's a new notice.  Give us your comments and

24   thank you for your comments.  But we're going to do what

25   we said we're going to do.  We cannot foreclose the

1    possibility that there would be no relief.

2           THE COURT:  I think I'm done with my questions

3    for you if you can wait one moment.

4           (Discussion Off the Record)

5           THE COURT:  I don't have anymore questions for

6    you, sir.  I do have a question or two for the

7    Government's counsel if you don't mind.  If you want to

8    address something, you have a few minutes.

9           MR. ROTH:  I have a couple of things I would

10   like to put on the record.  Will I get another chance?

11          THE COURT:  Why don't you do that now.

12          MR. ROTH:  Just a couple of quick hitters.  For

13   the record, there was a mention of the *Palisades* case,

14   the *Palisades* case, ultimately there was a limitation on

15   the remedy because of preclusion and judicial review, not

16   on jurisdiction.  On the disruption issue, the disruption

17   here there would be if whatever would happen on remand

18   even if there would ultimately be some kind of payment,

19   that payment would not require any kind of recalculation.

20   That's explained in our papers because the Government

21   already has a mechanism for reconciliation for hospitals

22   that become entitled afterwards.

23          THE COURT:  You think that's automatic.  All

24   that would happen if they changed the rec and benefitted

25   you.

1          MR. ROTH:  Absolutely that's what would happen.

2          THE COURT:  I want to understand.  Maybe I don't

3     understand that process which I know you mentioned and I

4     looked at it so I know it is there.  This is a pot of

5     money, right?  And we're creating a formula to give each

6     hospital their fair share presumably is a goal, right?

7     If they gave you a million dollars and they gave Hartford

8     Hospital two million dollars, and now they say no, you

9     ought to get a million two, doesn't that mean Hartford

10    gets less?

11         MR. ROTH:  That's not how it works.  First of

12    all, one of the arguments I think Judge Silberman had an

13    interesting question about this in *DCH*.  The Government

14    said there's no reconciliation and they don't do that.

15    Judgment comes out of the judgment fund as replenished by

16    or from the Medicare program and all comes out of the

17    Medicare Trust Fund pot of money.  There's no redo and no

18    budget neutrality requirement for the DSH.  Even when

19    there is budget neutrality in the wage index, they don't

20    go back and redo.  That's not how the Secretary has ever

21    done it.

22         THE COURT:  They have to redo something.  Let's

23    say they go back and do a redo.  We ought to do the '15

24    and '14 two hospitals, you would put your hand out.  Your

25    general counsel would put his hand out and say give me

1    that five million dollars.

2          MR. ROTH:  Right.  It would only apply to the

3    hospitals affected but not a redo.  That's where I think

4    the Government argument about minuscule effect of this

5    .0006, whatever percent it is, that makes the point

6    because there's five million dollars.  That's a lot of

7    money obviously to Yale New Haven Hospital, but when you

8    are talking about the IPPS, the Inpatient Prospective

9    Payment, Medicare 600 billion and that program itself is

10   140 billion dollars, we're talking about hundreds of tens

11   of one percent.  So it is not something that they would

12   cause a redo.

13          So the Government's focus on a minuscule effect

14   I think supports our view that, in fact, there will be,

15   it undermines their disruption language.

16          The last point I will make and I will sit down.

17   Thank you your patience.  The Government counsel said at

18   least four times about the language in preclusion statute

19   being the strongest language possible and obviously the

20   language could be a lot stronger.  It could have

21   precluded the review of these kind of mythological

22   challenges, knew full well it had to do it.  All it did

23   was address the estimate in a situation where the

24   estimate is not being challenged but the rules that were

25   used to generate the estimate.

1          THE COURT:  Okay.  Thank you very much.  I'm

2     interested particularly, but I will give you a moment or

3     two to responded to anything else you want to.  I'm

4     interested in knowing if counsel misspoke in any way when

5     he spoke about the initial publication of the proposed

6     policy included a table that reflected the two hospital

7     approach except for some exceptions but not Yale New

8     Haven.  Yale and Saint Raphael's was there, and that when

9     it was finalized and promulgated, that it did not call

10     for inclusion that was reflected in the table in the

11     notice.  Is he mistaken about that?

12          MR. SCHWEI:  I'm not sure I fully understand

13     Your Honor's the last half of that question.  Maybe I can

14     start with the proposed rule tables and take it from

15     there if there's confusion.

16          So the fiscal year 2014 proposed rule included a

17     table with hospitals projected Factor Three numerators.

18     In that table, there were separate entries for Yale New

19     Haven Hospital and Hospital of Saint Raphael. Critically

20     those separate entries were listed under the hospital's

21     separate provider numbers.  One of which at that moment

22     in time when the fiscal year 2014 proposed rule was

23     issued was no longer in existence.  The Hospital of Saint

24     Raphael provider number was no longer being used.  HHS in

25     calculating the Factor Three enumerators did not know

1    that.  So it listed them separately.  But it did so based

2    on different provider numbers and specifically requested

3    that providers inform HHS of any changes in hospital

4    status such as closures and so the proposed rule made

5    clear that HHS viewed these as two independent entities

6    with separate provider numbers and requested updates if

7    anything has changed.  So we think there was adequate

8    notice.

9           The table itself is in the administrative record

10   that's been filed with the Court.

11          THE COURT:  Can you give me the page number?

12          MR. SCHWEI:  I believe it is 292.  If I can just

13   confirm.

14          THE COURT:  That's fine.

15          MR. SCHWEI:  Yes, page 292 and in the left-hand

16   column, it is captioned PROV, that's the provider

17   numbers.  If you cross reference it with the provider

18   numbers alleged in the complaint in this case, you see it

19   is listing them as separate.

20          THE COURT:  Both of them are there separate?

21          MR. SCHWEI:  Correct.  Under the separate

22   provider numbers.  In the proposed rule at 78 Federal

23   Register 27590, that's where HHS requests for hospitals

24   to notify them if there have been changes in the

25   hospital's status.

1          THE COURT:  Okay.  How many people, how many

2     hospitals wrote and said this line item, this hospital,

3     whatever, this provider number has been merged and we

4     took over their number?

5          MR. SCHWEI:  One set of hospitals did which was

6     *DCH* which --

7          THE COURT:  But I thought to listen to counsel,

8     they were in a little different situation.

9          MR. SCHWEI:  So there -- I don't think it is

10    reflected in the administrative record here, but the

11    tables for the proposed rule I believe did not include

12    the surviving hospital.  But we didn't think that's --

13    did not include -- I have it backwards.  Did not include

14    the expired, for lack of a better term, hospital.  But we

15    don't think that's dispositive of the notice issue which

16    again is sort of the merits of the claim.

17         THE COURT:  It is merits, though.  I kept saying

18    to myself this is the merits, not a motion to dismiss for

19    heaven sakes as 12(b)(1). It is jurisdiction so I

20    shouldn't keep asking questions.  But I can't stay away

21    from it I guess.

22         MR. SCHWEI:  We think this goes to merits.  But

23    number one, the table itself puts them on notice that HHS

24    views these as distinct entities.

25         THE COURT:  That's how they had been viewed

1   historically even when there was a merger situation,

2   wasn't it?  Do you disagree with the idea that

3   historically when they did the DSH calculations based on

4   the history, that there were hospitals in those numbers

5   and had merged maybe after the close period and somebody

6   had taken over their number, they gave that surviving

7   hospital the benefit of the two hospital numbers

8   historically?

9           MR. SCHWEI:  I'm not sure exactly how the

10  traditional DSH calculation dealt with mergers.  I think

11  for purposes of the uncompensated care payment Factor

12  Three, the proposed rule says we're going to evaluate

13  Factor Three based on a hospital's provider number.  It

14  is CCN.  In conjunction with that statement, it puts the

15  hospital on notice.  We have you listed as two CCN'S.

16  One for Yale New Haven.  One for Hospital of Saint

17  Raphael.  At that moment in time, the merger had already

18  occurred.  HHS asked for updates.  Heard nothing and so I

19  don't think there's a meaningful lack of notice here.

20  The proposed rule --

21          THE COURT:  Then maybe you will win on a motion

22  under 12(b)(6).

23          MR. SCHWEI:  Fair enough, Your Honor.  If I can

24  speak to preclusion of procedural claims.

25          THE COURT:  Go ahead.

1          MR. SCHWEI:  You know, I don't think this topic

2     was.

3          THE COURT:  I'm sorry.  This is so typical GSA.

4     I called the gentleman up.  He did his magic.  It is now

5     73 degrees in here.  Go ahead.  It's been a long day.

6          MR. SCHWEI:  We would be happy to provide

7     supplemental briefing on this question in light of what

8     Your Honor thinks the plaintiff might say.  I would note

9     throughout the DC circuit cases as well as the Ninth

10    Circuit's cases they have applied preclusion regardless

11    of whether it's a substantive or procedural claim.

12         THE COURT:  You said that to me.  But you never

13    told me where I'm going to find the Florida D.C. Circuit

14    case speaking in language that reflects clearly they were

15    addressing within the same bailiwick of preclusion, a

16    procedural notice and due process, whatever you want to

17    call it.  You pointed me to the district court or

18    something in the district court's language, but I don't

19    and again this is the way the circuit choices to write,

20    right?  They can make the case sound however they want

21    to, but the fact of the matter is its precedential value.

22    I don't know if I missed it.  They had such a dead on

23    preclusion issue in that case.  For heaven sakes, it is

24    exactly what the second paragraph says you can't do,

25    these people wanted to do.  So why would they ever.  I

1    don't know.  I just don't see that they talked about due

2    process.

3          MR. SCHWEI:  I agree with Your Honor that there

4    was not a due process claim.  But there was a notice and

5    comment claim in that case.  The district court makes

6    that clear.  Respectfully, I think the precedential value

7    comes from the Court's judgments.  The district court

8    dismissed all claims as precluded including notice and

9    comment.  That judgment in its entirety was appealed and

10   the D.C. Circuit affirmed that judgment in its entirety.

11   I think regardless of the period issue at play in *Florida*

12   *Health Sciences Center,* if procedural claims were allowed

13   to go forward, the D.C. Circuit would have been

14   compelled to distinguish between those two, but they

15   affirmed the judgment in its entirety.

16          THE COURT:  I guess what I'm trying to say -- I

17   won't repeat again what I'm trying to say.  I don't see

18   anything in their opinion that evidences they were

19   focusing on both substantive attacks on the period and

20   procedural complaints about a process that led to a

21   policy that picked a period.  If it is in here, I really

22   want you to tell me where it is, so I can be sure to go

23   back and read it again carefully but I don't see it.

24          MR. SCHWEI:  I think it comes from the District

25   Court's opinion plus the fact that the judgment was

1    affirmed.  But let me stop repeating myself.

2            THE COURT:  I was asking you to tell me a page

3    and paragraph in the opinion where I will find that.

4            MR. SCHWEI:  I will do that with respect to

5    other D.C. Circuit opinions so *Texas Alliance* involved

6    notice and comment claims as well as this separate

7    Medicare notice and comment statute.  That is made clear

8    in the opinion at 681 F.3d, 408.  They describe the

9    plaintiffs as bringing both types of claims.

10           In 2017, in *Knapp Medical Center.*  The D.C.

11   Circuit makes clear that one of the plaintiff's claims

12   there is that HHS had failed to publish and accept

13   comments on a version of the policy.  They still held the

14   claims precluded.  That's at 875 F.3d 1127 and then the

15   Ninth Circuit in the *Skagit* decision.  The plaintiff

16   there claimed that the secretary violated the APA by

17   basing her decision on an improperly promulgated

18   substantive rule.  The Ninth Circuit held the claim was

19   precluded at 80 F.3d 383.  So I think consistent

20   throughout these cases is the procedural claims are still

21   precluded.  We would be happy to brief that issue

22   directly if Your Honor would find it useful.

23           I have two more things I want to say on

24   different topics.

25           THE COURT:  Go ahead.

1          MR. SCHWEI:  One is with regard to separation of

2     powers, what Congress gives courts in terms of

3     jurisdiction, Congress is free to take away.  At least

4     the Tenth and Seventh Circuits have rejected the notion

5     that Medicare preclusion provisions somehow violates the

6     separation of powers.  The Tenth Circuit held that in

7     *Painter versus Shalala*, 97 F.3d at 1359.  And the Seventh

8     Circuit held as much in the *American Society of Cataract*

9     *and Refractive Surgeons versus Thompson* 279 F.3d at 456.

10    Although Congress can create jurisdiction.  They can also

11    take it away.  There's no constitutional problem with

12    that.

13          The last thing I will say is with regard to this

14    notion of disruption.  I think regardless on what HHS

15    remedial options would be for this particular case,

16    adopting their interpretation of the preclusion

17    provision, even allowing only procedural claims to go

18    forward would have massive disruption to the underlying

19    DSH program because already we have seen over a thousand

20    hospitals file complaints.  Some of them are challenging

21    Factors One and Two, you know, nine billion dollars'

22    worth of money did HHS calculate that pool of money

23    properly or not.  I think HHS has the discretion about

24    how they would respond in terms of minimizing disruption

25    on the program, but allowing these types of claims to go

1    forward ultimately would lead to the type of disruption

2    that Congress wanted to avoid.  Unless Your Honor has

3    further questions, thank you.

4           THE COURT:  No, I don't.  Thank you very much.

5    All right then thank you both very much.  The Court will

6    take it under advisement.  Obviously if you become aware

7    before I issue my opinion of rulings from the D.C.

8    Circuit on the pending case, I would appreciate a phone

9    call to chambers to alert us so we don't overlook it as

10   it comes out as I'm working on a draft.  Thank you very

11   much.  We'll stand adjourned.

12          (Whereupon, the above proceeding adjourned at

13   5:00 p.m.)

14          COURT REPORTER'S TRANSCRIPT CERTIFICATE.

15   I hereby certify that the within and foregoing is a true

16   and correct transcript taken from the proceedings in the

17   above-entitled matter.

18

19   /s/  Terri Fidanza

20   Terri Fidanza, RPR

21   Official Court Reporter

22

23

24

25