**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| YALE NEW HAVEN HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-1230 (JCH) |
| | ) | |
| ALEX M. AZAR II, | ) | |
| *in his official capacity as Secretary of* | ) | |
| *Health and Human Services*, | ) | |
| | ) | |
| Defendant. | ) | October 31, 2019 |
| | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.    This Court Lacks Jurisdiction Over the Sole Remaining Procedural Claim ..................... 4

    A.    There Is No Procedural Impediment to This Court Reconsidering the Prior Jurisdictional Ruling ........................................................................ 4

    B.    Plaintiff's Procedural Claim is Precluded from Judicial Review, Consistent with Binding Precedent ................................................................ 6

II.   The Secretary Complied With All Procedural Rulemaking Requirements ........................ 9

    A.    The Hospital Misconstrues the Legal Framework Governing Agencies' Rulemaking Obligations ........................................................... 10

        1.    HHS's Prior Policies Are Irrelevant, and In Any Event No Prior Policies Existed Here ........................................................... 11

        2.    The Agency Need Only Provide A General Notice of the Subjects Involved in Rulemaking ........................................................ 14

    B.    The FY2014 Proposed Rule Stated Exactly How the Secretary Intended to Calculate the Hospital's Uncompensated Care DSH Payment .......................... 18

    C.    Additional Features of the Proposed Rule Confirm that the Hospital Received Adequate Notice ......................................................... 21

        1.    Factor Three Would Be Estimated Prospectively Using Historical Data ................................................................................ 21

        2.    The Factor Three Spreadsheets Provide Further Notice Regarding HHS's Methodology ......................................................... 22

        3.    The Proposed Rule Affirmatively Requested Updates on Changes in Hospitals' Operating Status ................................................ 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006)..................................................................... 1, 4, 5, 6

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019)............................................................................ 15

*Canadian St. Regis Band of Mohawk Indians v. New York*,
  388 F. Supp. 2d 25 (N.D.N.Y. 2005)...................................................... 5

*Cmty. Nutrition Inst. v. Block*,
  749 F.2d 50 (D.C. Cir. 1984) ................................................................ 17

*Cooling Water Intake Structure Coal. v. EPA*,
  905 F.3d 49 (2d Cir. 2018) ................................................... 3, 11, 16, 18

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ................................................................ 8

*Empire Health Found. v. Price*,
  334 F. Supp. 3d 1134 (E.D. Wash. 2018)............................................. 16

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016))........................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).............................................................................. 12

*Fla. Health Scis. Ctr., Inc. v. HHS*,
  830 F.3d 515 (D.C. Cir. 2016) ................................................................ 8

*Good Samaritan Hosp. v. Shalala*,
  508 U.S. 402 (1993).............................................................................. 14

*Hamer v. Neighborhood Hous. Servs. of Chi.*,
  138 S. Ct. 13 (2017)................................................................................ 6

*Heckler v. Ringer*,
  466 U.S. 602 (1984)............................................................................ 7, 8

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007)................................................................... 4, 18, 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................ 4

*N.Y. Dep't of Soc. Servs. v. Shalala,*
   21 F.3d 485 (2d Cir. 1994) ............................................................................. 16

*Nat'l Ass'n of Mortg. Brokers, Inc. v. Donovan,*
   641 F. Supp. 2d 8 (D.D.C. 2009) .................................................................. 18

*Perez v. Mortg. Bankers Ass'n,*
   135 S. Ct. 1199 (2015) ............................................................................ 12, 17

*Post Acute Med. at Hammond, LLC v. Azar,*
   311 F. Supp. 3d 176 (D.D.C. 2018) ............................................................ 16, 17

*Sebelius v. Auburn Reg'l Med. Ctr.,*
   568 U.S. 145 (2013)................................................................................... 1, 5

*Shalala v. Ill. Council on Long Term Care, Inc.,*
   529 U.S. 1 (2000).................................................................................... 7, 8

*Walsh v. McGee,*
   918 F. Supp. 107 (S.D.N.Y. 1996) ........................................................... 4, 5

## STATUTES

5 U.S.C. § 553(b)(3) .................................................................................. 16, 18

28 U.S.C. § 1331 .......................................................................................... 7

42 U.S.C. § 1395hh(a)(2) ............................................................................. 11

42 U.S.C. § 1395ww(r)(3)(A) ........................................................................ 8

## RULES

Fed. R. Civ. P. 12(h)(3) ............................................................................. 5, 26

Fed. R. Civ. P. 56....................................................................................... 26

## REGULATIONS

42 C.F.R. § 412.106 .................................................................................... 22

*FY2014 Proposed Rule,* 78 Fed. Reg. 27,486 (May 10, 2013)............................ *passim*

*FY2015 Proposed Rule,* 79 Fed. Reg. 49,854 (Aug. 22, 2014) ........................... 24

## INTRODUCTION

Plaintiff Yale New Haven Hospital (hereafter YNHH, or the Hospital) is seeking to challenge the accuracy of its fiscal year 2014 (FY2014) payment for being a disproportionate share hospital (commonly known as a DSH payment). YNHH has now filed its cross-motion for summary judgment, *see* ECF No. 38-1 (hereafter Pl.'s MSJ), on the sole remaining claim in this case—*i.e.*, a procedural claim that the Secretary of Health and Human Services (HHS) failed to comply with notice-and-comment procedures in setting forth the methodology for calculating the FY2014 DSH payments. As discussed further below, the Hospital's cross-motion only serves to further confirm that HHS is entitled to summary judgment for two reasons.

First, as explained in Defendant's opening motion for summary judgment, this Court lacks jurisdiction over Plaintiff's sole remaining claim. *See* Def.'s MSJ (ECF No. 37-1) at 11-12. Despite this Court previously describing this jurisdictional issue as presenting "a very close question," MTD Ruling (ECF No. 33) at 19, the Hospital spends almost no time addressing this argument. *See* Pl.'s MSJ at 40-42. YNHH's primary response is to argue that this Court should not even consider the jurisdictional argument because it represents an untimely motion for reconsideration of this Court's prior ruling. *See* Pl.'s MSJ at 40-41. As explained in Defendant's opening motion for summary judgment, however, jurisdictional holdings are generally not subject to law-of-the-case principles, *see* Def.'s MSJ (ECF No. 37-1) at 11-12, and for that same reason jurisdictional challenges can be raised "at any time," even if the "tardy jurisdictional objection[]" results in "untoward consequences" for litigants. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Thus, this Court can—and indeed must—address HHS's jurisdictional argument. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists.").

On the substance of the jurisdictional argument, the Hospital offers minimal responses. In

the Medicare context, the Supreme Court has held that preclusion provisions cannot be avoided simply by characterizing claims as "procedural" in nature. *See* Def.'s MSJ at 12-16, 19. YNHH argues that those cases involve different preclusion provisions, *see* Pl.'s MSJ at 42, but that is not a material distinction—the legal principles embodied in the Supreme Court's decisions remain binding. YNHH's remaining arguments also do not meaningfully respond to HHS's jurisdictional argument. For the reasons set forth in HHS's opening motion, therefore, this Court should hold that it lacks jurisdiction over the sole remaining procedural claim in this case.

To the extent that the Court concludes it has jurisdiction, HHS is nonetheless entitled to summary judgment for a second reason. The Secretary did not violate notice-and-comment requirements, as the proposed rule described for hospitals exactly how the Secretary intended to estimate Factor Three for FY2014. YNHH seeks to undermine the plain text of the proposed rule by distorting the governing legal framework. First, YNHH contends that the Secretary's FY2014 rulemaking "reversed an established policy" regarding combining merged hospitals' data for Medicare payment purposes. But this contention is legally irrelevant to the notice-and-comment claim here, and is also factually incorrect—FY2014 was the first year of the uncompensated care DSH payment, and thus there was no "established policy" regarding treatment of merged hospitals.

YNHH also contends that because the FY2014 Proposed Rule did not *explicitly* address how merged hospitals would be treated, the proposed rule necessarily failed to provide adequate notice. Under the APA and the Medicare Act, however, a proposed rule need not spell out exactly how every interested party might be affected by the proposed policy. It is sufficient that, as here, the proposed rule "fairly apprise[s] interested persons of the subjects and issues of the rulemaking." *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 61 (2d Cir. 2018).

Here, there can be no question that the FY2014 Proposed Rule fairly apprised interested

parties that HHS was considering how best to estimate hospitals' Factor Three.  The proposed rule spelled out exactly how HHS would make those estimates—on the basis of Medicaid and Medicare SSI patient days, as reflected in each individual hospital's FY2010/2011 cost report data—which is exactly how HHS estimated YNHH's Factor Three in the final rule.  YNHH thus had ample notice that HHS intended to use data from before YNHH's merger with Hospital of Saint Raphael (HSR), and YNHH could have submitted a comment on that issue.

Indeed, several additional features of the proposed rule further underscore that YNHH had ample notice of HHS's methodology for estimating Factor Three.  First, HHS expressly stated that its estimates were based on historical data predating FY2014 and that HHS did not intend to reconcile its estimates with actual FY2014 data.  Second, HHS published a spreadsheet listing YNHH's Factor Three exactly how it would be calculated under the final rule, *i.e.*, based only on YNHH's own data from its FY2010/2011 cost reports.  Third, HHS expressly invited comment on its Factor Three estimates as reflected in the spreadsheet, particularly with respect to any changes in hospitals' operating status.  In response to these features of the proposed rule, YNHH largely falls back on its attempts to distort the governing legal framework, and offers several other arguments that misconstrue the factual record here.

In these circumstances, even assuming that the Court has jurisdiction over YNHH's sole remaining claim, HHS is still entitled to summary judgment because YNHH was provided adequate notice that its FY2014 uncompensated care payment—rooted in historical data from FY2010/2011—might not include data from YNHH's merger in 2012.  At a minimum, this result was "reasonably foreseeable" from the proposed rule, and thus no procedural violation occurred. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).  Accordingly, summary judgment for Defendant is warranted here.

## ARGUMENT

## I.     THIS COURT LACKS JURISDICTION OVER THE SOLE REMAINING PROCEDURAL CLAIM

### A.     There Is No Procedural Impediment to This Court Reconsidering the Prior Jurisdictional Ruling

YNHH moves to strike Defendant's jurisdictional argument on the basis that it is an untimely motion for reconsideration of the Court's prior jurisdictional ruling, and also violates the summary-judgment briefing schedule set by the Court.  *See* Pl.'s MSJ at 40.  Plaintiff's request to strike the Government's jurisdictional argument is meritless.

As an initial matter, nothing in the Court's briefing schedule or the parties' motion for entry of that briefing schedule purported to limit or preclude the Secretary's ability to raise a jurisdictional defense.  *See generally* ECF Nos. 35, 36.  Indeed, it is quite common for litigants to challenge jurisdiction even at the summary-judgment stage.  *See generally Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (jurisdiction must be established "with the manner and degree of evidence required at the successive stages of the litigation").  In any event, it is black-letter law that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."  *Arbaugh*, 546 U.S. at 514.  Thus, nothing in the parties' joint motion for entry of a briefing schedule could legally preclude the Secretary from raising the jurisdictional defense here.

Moreover, YNHH largely ignores the cases cited in the Secretary's opening memorandum establishing that "questions of subject matter jurisdiction are generally exempt from law of the case principles." *Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996); *see* Def.'s MSJ at 11.  Just as law-of-the-case principles do not prevent consideration of jurisdictional challenges, neither do rules regarding motions for reconsideration.  *See Canadian St. Regis Band of Mohawk Indians v. New York*, 388 F. Supp. 2d 25, 36 (N.D.N.Y. 2005) ("Plaintiffs' assumption . . . that the current

motion is 'implicitly' a motion for reconsideration of . . . prior rulings regarding jurisdiction is misplaced" because "the law-of-the-case doctrine . . . need not be followed by a court when addressing a Rule 12(h)(3) motion"); *see also Walsh*, 918 F. Supp. at 112 ("[A] federal court cannot assert jurisdiction over a claim that is outside the scope of the court's jurisdiction merely by relying on the court's own prior decision that jurisdiction over such claim was proper.").  Indeed, any rule purporting to limit a party's ability to raise jurisdictional challenges would be flatly contrary to Rule 12(h)(3), which makes clear that "the court *must* dismiss the action" if it "determines *at any time* that it lacks subject-matter jurisdiction[.]"  Fed. R. Civ. P. 12(h)(3) (emphasis added).

Recognizing this reality, YNHH concedes that "the Court can revisit the issue of jurisdiction at any time." Pl.'s MSJ at 41.  That concession should be the end of the matter.  YNHH nonetheless asserts that the Secretary "should have sought leave of this Court to file an out-of-time motion for reconsideration, which the Hospital could then oppose procedurally and substantively." *Id.*  But again, binding precedent makes clear that jurisdictional challenges are appropriate at any time.  *See, e.g.*, *Auburn Reg'l Med. Ctr.*, 568 U.S. at 153 ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy," and even if the "[t]ardy jurisdictional objection[] . . . result[s] in a waste of adjudicatory resources[.]"); *Arbaugh*, 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").  Thus, motions for leave to file such jurisdictional challenges are unnecessary as a matter of law.

In any event, even if the Court were to consider YNHH's procedural objection, the objection should be overruled.  YNHH identifies no prejudice stemming from the Secretary raising the jurisdictional argument in the context of a motion for summary judgment rather than a motion

for reconsideration.  If anything, that was the more efficient course, and avoided any potential delay in briefing the merits of YNHH's remaining claim.  Moreover, the Secretary has identified strong reasons for this Court to reconsider its prior jurisdictional analysis:  the parties' prior briefing did not focus on the extent to which procedural claims fall within the statutory preclusion provision, and this Court itself described the preclusion issue as presenting "a very close question."  MTD Ruling at 19.  Thus, even if striking the Secretary's argument were theoretically available, YNHH has failed to justify that request here.

Finally, even if this Court were to strike the Secretary's argument, that still would not avoid the need for this Court to confront the Secretary's jurisdictional challenge.  That is because "courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."  *Arbaugh*, 546 U.S. at 514; *see also Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017) ("In contrast to the ordinary operation of our adversarial system, courts are obliged to notice jurisdictional issues and raise them on their own initiative.").  Regardless of whether this Court strikes the Secretary's argument, therefore, the Court is still obliged to re-consider the jurisdictional issue *sua sponte*.  For that reason alone, YNHH's motion to strike should be denied.

**B.    Plaintiff's Procedural Claim is Precluded from Judicial Review, Consistent with Binding Precedent**

As for the substance of HHS's jurisdictional argument, YNHH fails to offer any meaningful response.  As the Secretary previously explained, the Supreme Court has held that, at least in the Medicare context, preclusion provisions generally apply to both substantive and procedural claims.  *See* Def.'s MSJ at 12-19 (citing *Heckler v. Ringer*, 466 U.S. 602 (1984), and *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) (hereafter *Illinois Council*)).

YNHH's only response to these Supreme Court decisions is to say that they are "inapposite

because the issue in them was whether the court had jurisdiction under 28 U.S.C. § 1331 or whether the plaintiffs had to bring [their] action under the administrative and judicial review provisions of the Medicare Act," and here YNHH *is* bringing its claims under the Medicare Act rather than § 1331.  Pl.'s MSJ at 42.  But this is a distinction without a difference.  The factual context in which *Ringer* and *Illinois Council* arose is irrelevant to the broader legal principles embodied in those decisions.  Specifically, those decisions establish that whenever a claim falls within the terms of a preclusion provision, that is dispositive regardless of whether the claim is characterized as "procedural" or "substantive" in nature.  *See Ringer*, 466 U.S. at 615 ("[T]o be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act, not whether it lends itself to a 'substantive' rather than a 'procedural' label."); *Illinois Council*, 529 U.S. at 13-14 (holding that the purportedly "general" and "collateral" nature of the claims did not bring them outside the scope of the preclusion provision); Def.'s MSJ Br. at 14.

Here, there can be no doubt that YNHH's Count Two seeks to challenge an estimate over which judicial review is precluded (albeit on procedural grounds).  *See* Def.'s MSJ at 14-15.  Indeed, YNHH's own brief makes this plain.  YNHH seeks to challenge a purported policy that resulted in YNHH's Factor Three estimate being .06042 percent lower.  *See* Pl.'s MSJ at 16.  Through its procedural claim, YNHH is asking this Court to require the Secretary to "redo this part of his 2014 rulemaking," *id.* at 23, which would necessarily require vacating the Secretary's initial Factor Three estimate for YNHH—even though that is precisely the subject over which review is precluded.  *See* 42 U.S.C. § 1395ww(r)(3)(A) (precluding all forms of judicial review over "[a]ny estimate of the Secretary for purposes of determining the [uncompensated care DSH] factors").

To be sure, given the procedural nature of the claim, the Secretary would remain free to

"adopt[] the same policy after remand."  Pl.'s MSJ at 23.  The key point, however, is that for the remand to be meaningful, the Court would still have to vacate the Secretary's initial Factor Three estimate for YNHH, contrary to the plain terms of the preclusion provision.[1]  And again, this is exactly the same situation as in *Ringer*, where the Supreme Court held that both the substantive *and procedural* claims were precluded.  *See* 466 U.S. at 614 ("We, therefore, disagree with the Court of Appeals' separation of the particular claims here into 'substantive' and 'procedural' elements.  We disagree in particular with its apparent conclusion that simply because a claim somehow can be construed as 'procedural,' it is cognizable in federal district court by way of federal-question jurisdiction."); *see also Illinois Council*, 529 U.S. at 13-14 (refusing to distinguish between different types of claims for Medicare preclusion purposes).  Thus, YNHH has failed to distinguish these key Supreme Court cases establishing that, at least in the Medicare context, preclusion provisions also extend to procedural claims.

Separately, YNHH contends that the D.C. Circuit's decisions in *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir. 2019) and *Florida Health Sciences Center v. HHS*, 830 F.3d 515 (D.C. Cir. 2016), "did not (and could not) present a procedural challenge akin to Count Two."  Pl.'s MSJ at 42.  But YNHH does not offer any support or citation for that assertion.  And as discussed in the Secretary's opening memorandum, that assertion is contrary to the record in both *DCH* and *Florida Health Sciences Center*; both cases did, in fact, involve procedural challenges that were held to be precluded.  *See* Def.'s MSJ at 15-16.

---

[1] To the extent YNHH is not actually requesting that the Court vacate the Secretary's initial Factor Three estimate, then YNHH's remaining claim must be dismissed for a more fundamental reason—*i.e.*, because YNHH's only cognizable injury (an alleged $5.5 million underpayment) would not be redressed by its requested relief.  Stated differently, because the Secretary's initial Factor Three estimate is the source of YNHH's claimed injury, that injury can *only* be redressed if the Court vacates that estimate, contrary to the preclusion provision.

Finally, YNHH acknowledges that the Secretary presented a variety of other arguments regarding preclusion, but YNHH simply asserts that those arguments "are makeweight and provide no basis for the Court to revisit its earlier decision." Pl.'s MSJ at 43. That response fails to engage with the arguments substantively, and is also inconsistent with this Court's prior acknowledgment that the preclusion issue presents "a very close question." MTD Ruling at 19.[2] For all the reasons previously set forth in the Secretary's motion for summary judgment, therefore, this Court should hold that YNHH's sole remaining procedural claim is precluded from judicial review.

## II. THE SECRETARY COMPLIED WITH ALL PROCEDURAL RULEMAKING REQUIREMENTS

In the event that the Court concludes that it has jurisdiction over the sole remaining procedural claim, the Court should nonetheless enter summary judgment for Defendant. The Secretary complied with all procedural rulemaking requirements, and adequately disclosed the methodology for estimating Factor Three in the FY2014 Proposed Rule. YNHH's arguments to the contrary rest on mistaken legal theories and incorrect characterizations of the facts.

In particular, YNHH seeks to distort the governing legal framework in two important ways. First, YNHH spends significant time arguing that HHS "reversed established policy" by choosing not to combine merged hospitals' data in the FY2014 rule. But YNHH never explains why this argument is legally relevant to any of the notice-and-comment issues currently before the Court. And in any event, the argument is wrong: there was no "established policy" for the uncompensated care payments, because FY2014 was the very first year HHS made those payments.

Second, YNHH repeatedly asserts that because HHS's proposed rule did not *explicitly*

---

[2] Having chosen in its cross-motion not to meaningfully address many of the Secretary's arguments, YNHH should not be permitted in its final brief to address those arguments for the first time, *i.e.*, when the Secretary will not have an opportunity to further respond.

discuss how it intended to handle merged hospitals, then the proposed rule necessarily failed to provide adequate notice.  But that argument bears little resemblance to what the APA and Medicare Act actually require for purposes of adequate notice.  The proposed rule need only provide a general description of the topics involved in the rulemaking, not a comprehensive catalogue of how the proposed rule might apply to every conceivable fact pattern.

Once the legal framework is properly defined, there is little doubt that HHS adequately satisfied its notice obligations.  First, the plain text of the FY2014 Proposed Rule stated exactly how HHS intended to estimate Factor Three, and that is exactly what HHS did in the final rule. YNHH fails to grapple with the actual language of the proposed rule.  For example, YNHH never explains why the proposed rule's straightforward language was not enough to make it at least "reasonably foreseeable" that HHS would do the exact same thing in the final rule.  Instead, YNHH tries to create confusion by focusing on its own unilateral assumptions and understandings, without ever reconciling those assumptions with the plain text of the proposed rule itself.

Moreover, were there any doubt about the meaning of the proposed rule, several additional features make it abundantly clear that, at a minimum, it was reasonably foreseeable that HHS would not combine merged hospitals' data if those mergers occurred after the relevant timeframe of FY2010/2011.  Again, YNHH's responses on these points distorts both the law and the facts. For the reasons discussed below, HHS provided adequate notice regarding its methodology for estimating Factor Three, such that interested parties were "fairly apprise[d] . . . of the subjects and issues of the rulemaking."  *Cooling Water Intake Structure Coal.*, 905 F.3d at 61.

## A.    The Hospital Misconstrues the Legal Framework Governing Agencies' Rulemaking Obligations

Before discussing the specific reasons why YNHH received adequate notice here, two over-arching points must be addressed: (1) YNHH's focus on prior policies regarding merged hospitals

is both irrelevant and incorrect; and (2) YNHH's arguments significantly distort the governing legal framework regarding agencies' rulemaking obligations.

### 1. HHS's Prior Policies Are Irrelevant, and In Any Event No Prior Policies Existed Here

Throughout YNHH's filing, YNHH criticizes the Secretary for purportedly "reversing an established policy" of combining merged hospitals' data for purposes of calculating Medicare payments. Pl.'s MSJ at 27; *see also id.* at 23, 25, 26, 31-32, 34-35 & n.10, 36. This criticism is both legally irrelevant and factually incorrect.

**a.** As a legal matter, it is unclear what YNHH is attempting to prove by accusing HHS of changing its policy. At times, YNHH's argument appears to be that, because the FY2014 Proposed Rule changed HHS's prior policies, the proposed rule needed to undergo notice-and-comment. *See, e.g.*, Pl.'s MSJ at 30 (citing 42 U.S.C. § 1395hh(a)(2), which requires notice-and-comment for any policy that "changes a substantive legal standard" governing payments). To the extent that is YNHH's argument, the point is academic; HHS does not dispute that notice-and-comment was required for the FY2014 IPPS rulemaking because it "*establishe[d] . . . a substantive legal standard governing . . . the payment for services.*" *Id.* § 1395hh(a)(2) (emphasis added).

At other times, YNHH appears to argue something different—that YNHH lacked adequate notice because it assumed, based on prior policy, that HHS would combine merged hospitals' data for the uncompensated care payment as well. *See, e.g.*, Pl.'s MSJ at 27 ("CMS did not include in the 2014 IPPS Final Rule <u>any</u> discussion to indicate that CMS intended to change its long-standing treatment of merged hospitals for DSH payment purposes[.]"). This argument, however, is irrelevant to the notice-and-comment issue before the Court. Regardless of whether HHS's FY2014 rulemaking constituted a change in policy or not, the question is simply whether the proposed rule provided interested persons with adequate notice that they should comment on the

issue.  For the reasons discussed below, the proposed rule here plainly did put interested persons on notice.  YNHH cites no authority for the proposition that a party's assumptions—even ones rooted in the agency's past practice—can render invalid an otherwise straightforward notice of proposed rulemaking.  To the contrary, the Supreme Court has held that changes in agency policies generally are *not* subject to extra scrutiny under the APA.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review.").

YNHH's only attempt to argue that changes in agency policy have any bearing on agencies' procedural obligations is a citation to the Supreme Court's decision in *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015); *see* Pl.'s MSJ at 11.  YNHH cites *Perez* for the proposition that "if an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish under the APA without notice and comment."  Pl.'s MSJ at 11 (citing *Perez*, 135 S. Ct. at 1205).  But that quote from *Perez* was describing the so-called *Paralyzed Veterans* doctrine, which was then *overruled* by the Supreme Court as inconsistent with the APA.  *See Perez*, 135 S. Ct. at 1206 ("The *Paralyzed Veterans* doctrine is contrary to the clear text of the APA's rulemaking provisions, and it improperly imposes on agencies an obligation beyond the maximum procedural requirements specified in the APA.").

Thus, YNHH provides no explanation as to why it is legally relevant whether the FY2014 rulemaking changed HHS's prior policies on DSH payments.  Regardless of whether HHS's methodology for estimating Factor Three constituted a change from "prior policies" or not, the sole question is whether the proposed rule provided adequate notice of HHS's methodology, which it did for the reasons set forth below.  *See* Parts II.B-C, *infra*.

**b.**   Even if past agency policies were relevant, YNHH is factually incorrect that HHS had any such policies with respect to the new uncompensated care DSH payments.   As YNHH acknowledges, "[t]he 2014 IPPS Rulemaking was the Secretary's first [year] implementing the UC DSH program."   Pl.'s MSJ at 24; *see also* Pl.'s Resp. to Def.'s Stmt. of Mat. Facts (ECF No. 38-3) ¶ 3 (hereafter "Pl.'s Resp. to D-SMF").   As YNHH concedes, then, because FY2014 was the first year that HHS implemented the uncompensated care DSH payment, there could not yet have been any "established policies" for that payment.

YNHH tries to argue around this fact, claiming that "even though the UC DSH payment was new for 2014, the Secretary decided to calculate those payments using the Traditional DSH data and methodology."   Pl.'s MSJ at 31.   It is true that, in FY2014, the Secretary proposed using the same *type* of data for estimating the uncompensated care DSH payments as was used for calculating the traditional DSH payments—*i.e.*, hospitals' Medicaid and Medicare/SSI fractions. But that is where the similarities between the two payments end, as the FY2014 Proposed Rule made clear: unlike the FY2014 traditional DSH payment, which was retrospectively calculated based on *actual* patient data from FY2014, the new uncompensated care DSH payment would be *estimated* prospectively, based on historical data from several years prior (*i.e.*, from FY2010/2011 cost reports).   *See* Def.'s MSJ at 25-27; Part II.C.1, *infra*.   Simply because both payments relied on the same *type* of data does not mean that every other policy regarding the traditional DSH payment automatically became "established policy" for the new uncompensated care payment as well—especially given the clear differences in *how* the data was to be used in determining the different payments.   Thus, YNHH still cannot establish that there was any "established policy" relevant to the uncompensated care payments prior to the FY2014 rulemaking.

Aside from policies regarding the traditional DSH payment, YNHH also cites several other

Medicare payments in which HHS purportedly consolidates merged hospitals' data.  *See* Pl.'s MSJ at 13 (citing various payments).  But YNHH never explains the relevance of these other payments. Medicare is governed by a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), and there is no reason to believe that HHS's policies on different payments, arising under different payment schemes, have any bearing on HHS's policies with respect to the uncompensated care payment.  Indeed, YNHH's handful of cherry-picked examples hardly demonstrates that the Secretary has a uniform policy about how to treat merged hospitals for all Medicare payment purposes.

In any event, YNHH's examples are consistent with the Secretary's FY2014 approach.  In those examples, multiple hospitals were treated as a single hospital if they operated under a single provider number.  *See* Pl.'s MSJ at 13.  Here, YNHH and HSR were distinct hospitals using distinct provider numbers in FY2010/2011, and therefore their data from those cost reports was not consolidated.  That was fully consistent with the policies cited by YNHH, in which data is combined only after the hospitals begin operating under a single provider number.  *Cf. FY2014 Final Rule*, 78 Fed. Reg. 50,496, 50,642 (Aug. 19, 2013) ("A hospital's Factor 3 is calculated based on the data tied to its CCN. This is consistent with the treatment of other IPPS payment factors[.]").  Thus, these other Medicare payments also do not establish any "prior agency policy" with respect to the uncompensated care payment, nor do they undermine the ample notice provided to YNHH through the FY2014 Proposed Rule itself.  *See* Parts II.B-C, *infra*.

> ## 2.    The Agency Need Only Provide A General Notice of the Subjects Involved in Rulemaking

In addition to mistaken legal arguments regarding HHS's prior policies, YNHH's filing also suffers from a second over-arching flaw:  YNHH repeatedly distorts the governing legal framework regarding agencies' rulemaking obligations.  Specifically, YNHH repeatedly argues

that because the FY2014 Proposed Rule did not expressly discuss how the Secretary intended to treat merged hospitals, that itself demonstrates a lack of adequate notice. *See, e.g.*, Pl.'s MSJ at 33 (asserting that "the Secretary nowhere argues that the 2014 Proposed Rule explicitly discussed the Merged Hospital Policy" which "is fatal because notice under the APA and the Medicare Act must be explicit"); *see also id.* at 25, 26, 27, 29, 30, 31, 32, 34 & n.10, 35.   This argument mischaracterizes the notice that agencies must provide in proposed rules.

As an initial matter, YNHH appears to suggest that "the Medicare Act and APA embody different requirements" for notice-and-comment.  Pl.'s MSJ at 34.  It is true that, on some issues, the Medicare Act and the APA impose different procedural requirements.  *See, e.g.*, *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) (holding that some "statements of policy" under the Medicare Act require notice-and-comment rulemaking, even if the APA would not require such procedures).  But YNHH does not identify any manner in which the Medicare Act's and the APA's notice-and-comment requirements differ here.  *See* Def.'s MSJ at 21 (citing cases holding that the two statutes' notice-and-comment requirements are materially the same).  Indeed, YNHH itself advocates relying on the APA's standards.  *See* Pl.'s MSJ at 11.  Thus, there is no material difference between the two statutes with respect to YNHH's notice-and-comment claim here.

As the APA makes clear, an agency satisfies its procedural notice-and-comment requirements if the notice of proposed rulemaking includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  The "central question" in evaluating adequacy of the notice is "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking." *Cooling Water Intake Structure Coal.*, 905 F.3d at 61.  Even a summary of the proposed policy is likely sufficient. *See N.Y. Dep't of Soc. Servs. v. Shalala*, 21 F.3d 485, 495 (2d Cir. 1994) (holding that summary

was sufficient because the APA "does not require a precise notice of each aspect of the regulations eventually adopted so long as it affords interested parties a reasonable opportunity to participate in the rulemaking process"); *see also* Def.'s MSJ at 20-22.

YNHH's view of notice-and-comment rulemaking is flatly inconsistent with these cases. In YNHH's view, every precise detail must be expressly spelled out in the proposed rule. *See, e.g.*, Pl.'s MSJ at 34-35 n.10 ("The problem was not the Secretary's words, but his silence on the reversal of his exogenous and long-standing merged hospital data policy."). YNHH cites no legal authority supporting that version of notice-and-comment.  The only authority YNHH cites is a district court decision involving a situation where the agency affirmatively misstated the agency's existing policy.  *See* Pl.'s MSJ at 33 (citing *Empire Health Found. v. Price*, 334 F. Supp. 3d 1134, 1160 (E.D. Wash. 2018)).  But here, there is no question that the proposed rule accurately described how HHS intended to estimate YNHH's Factor Three—the final rule estimated it in exactly the same way.  *See* Def.'s MSJ at 22-25; Part II.B, *infra*.

The more on-point authority regarding notice-and-comment is *Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176 (D.D.C. 2018), which made clear that "[t]he Administrative Procedure Act . . . does not require an agency to advise regulated entities as to the individualized implications of a proposed rule[.]"  *Id.* at 183; *see also* Def.'s MSJ at 24.  As that Court held, it would be both unlawful and unworkable to require an agency "to explain the potential negative consequences of a proposed rule on each regulated entity—to act as devil's advocate at law, in essence[.]"  *Post Acute Med.*, 311 F. Supp. 3d at 183.  Yet that is exactly what YNHH demands, in arguing that HHS should have anticipated YNHH's particular factual situation and affirmatively addressed it in the proposed rule.  Neither the APA nor the Medicare Act contains such a requirement, and there is no basis for this Court to impose one.  *See Perez*, 135 S. Ct. at 1207

("Beyond the APA's minimum requirements, courts lack authority to impose upon an agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." (modifications omitted)).[3]

As a practical matter, moreover, YNHH's view of notice-and-comment would effectively disable agency rulemaking altogether. The whole point of notice-and-comment is to allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and then for the agency to "consider and respond to significant comments received during the period for public comment." *Perez*, 135 S. Ct. at 1203. Under YNHH's view, however, every round of notice-and-comment would place agencies in an impossible position: if an agency ever made changes to a proposed rule in response to public comments, the agency would either need to conduct yet another round of notice-and-comment or else risk being sued for not expressly mentioning that change in the proposed rule itself. *Cf. Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C. Cir. 1984) ("Rulemaking proceedings would never end if an agency's response to comments must always be made the subject of additional comments."); *see also Nat'l Ass'n of Mortg. Brokers, Inc. v. Donovan*, 641 F. Supp. 2d 8, 16 (D.D.C. 2009). That is why courts do not actually require proposed rules to be "explicit" about every potential consequence of a policy as YNHH demands, Pl.'s MSJ at 33, but instead only require that the policy set forth in the final rule be "reasonably foreseeable" from the proposed rule. *Long Island Care at Home*, 551 U.S. at 175.

---

[3] YNHH seeks to distinguish *Post Acute Med.* on the basis that the proposed rule in that case gave the interested party "all the information it has now." *Post Acute Med.*, 311 F. Supp. 3d at 184; Pl.'s MSJ at 35. That is a wholly artificial distinction, however, as that fact was not material to the decision's legal analysis. *See Post Acute Med.*, 311 F. Supp. 3d at 182-84. In any event, that fact would equally apply here: the proposed rule here provided YNHH "all the information it has now" regarding how its Factor Three would be estimated. *See* Parts II.B-C, *infra*.

In sum, YNHH misconstrues the governing legal framework in repeatedly suggesting that the proposed rule needed to *explicitly* address how merged hospitals would be treated. Instead, the proposed rule only needed to provide a "description of the subjects and issues involved" in the rulemaking. 5 U.S.C. § 553(b)(3). As discussed further below, the proposed rule more than met that standard. *See* Part II.B-C, *infra*.

### B.   The FY2014 Proposed Rule Stated Exactly How the Secretary Intended to Calculate the Hospital's Uncompensated Care DSH Payment

Once the legal framework is properly defined, it is apparent that the FY2014 Proposed Rule provided adequate notice to YNHH regarding the methodology for estimating Factor Three. Far more than just describing the "substance of the proposed rule or . . . the subjects and issues involved," 5 U.S.C. § 553(b)(3), the proposed rule actually described in extensive detail how HHS intended to estimate Factor Three. *See* Pl.'s Resp. to D-SMF ¶ 5 (admitting that the proposed rule discussed HHS's Factor Three methodology across more than six pages in the Federal Register).

YNHH responds that "the Secretary's general discussion about Factor 3" is irrelevant. Pl.'s MSJ at 34. But the intense detail of the proposed rule underscores that interested parties were "fairly apprise[d]" of the overall "subjects and issues of the rulemaking," *Cooling Water Intake Structure Coal.*, 905 F.3d at 61, and also demonstrates that YNHH's demand here—for an express statement about how merged hospitals would be treated—is attempting to challenge HHS's proposed rule at an extraordinarily granular level. Given the in-depth discussion within the proposed rule, YNHH cannot establish that it lacked notice that HHS was actively considering all the details of how best to estimate Factor Three.

Regardless, even at the granular level YNHH seeks to challenge HHS's actions, the proposed rule was straightforward. As discussed previously, *see* Def.'s MSJ at 22-25, the plain text of FY2014 Proposed Rule set forth exactly how YNHH's Factor Three would be calculated:

"The numerator of Factor 3 would be the estimated Medicaid and Medicare SSI patient days for the individual hospital based on its most recent 2010/2011 Medicare cost report data (including the most recently available data that may be used to update the SSI ratios)." *FY2014 Proposed Rule*, 78 Fed. Reg. 27,486, 27,590 (May 10, 2013).  That methodology is exactly how HHS estimated YNHH's Factor Three in the final rule—*i.e.*, using the estimated Medicaid and Medicare SSI patient days for the individual hospital (YNHH) based on its most recent 2010/2011 Medicare cost report data.  *See* D-SMF ¶ 7 (citing Board A.R. at 000290, 000317).  Thus, YNHH was plainly on notice regarding HHS's intended methodology for estimating Factor Three.

Indeed, the only plausible reading of the FY2014 Proposed Rule's language is that YNHH's Factor Three would be estimated based solely on its own FY2010/2011 cost-report data—*i.e.*, based on "the estimated Medicaid and Medicare SSI patient days for *the individual hospital* based on *its* most recent 2010/2011 Medicare cost report data[.]" *FY2014 Proposed Rule*, 78 Fed. Reg. at 27,590 (emphasis added).  Incorporating data from both YNHH and HSR would necessarily require combining data from more than an "individual hospital," using more than a single hospital's cost report data, because YNHH and HSR were separate entities—using separate provider numbers—as of FY2010/2011.  *See* Pl.'s Resp. to D-SMF ¶ 8.

In response, YNHH asserts that both YNHH and HSR were "in fact a 'single hospital'" as of FY2014.  Pl.'s MSJ at 37.  But this argument ignores the relevant timeframe; the proposed rule expressly stated that the estimates would be based on data "for *the individual hospital* based on *its* most recent *2010/2011* Medicare cost report data."  Thus, the proposed rule made clear that the key timeframe for YNHH's and HSR's data was FY2010/2011, not FY2014.

YNHH also contends that, even if the proposed rule provided "ample notice" about not combining merged hospitals' data, "the Secretary never explained in the 2014 Rulemaking or

otherwise why it would be reasonable for CMS to calculate how much uncompensated care a surviving hospital of a merger would provide in 2014 if the subsumed hospital's data is ignored[.]" Pl.'s MSJ at 32.   This response is irrelevant, as it reflects a *substantive* challenge to the reasonableness of the Secretary's actions. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (when an agency "fail[s] to provide even that minimal level" of explanation, "its action is arbitrary and capricious").   Because the sole remaining claim in this case is a *procedural* one, YNHH's argument about a lack of sufficient explanation is irrelevant.

Despite its lengthy filing, YNHH makes little effort to explain why the plain language of the proposed rule did not itself provide adequate notice regarding HHS's intended methodology for estimating Factor Three.   Indeed, YNHH's Response to Defendant's Local Rule 56(a)(1) Statement of Undisputed Material Facts effectively confirms that the proposed rule placed YNHH on notice of how its Factor Three would be estimated.   Specifically, YNHH admitted that the proposed rule contained the language quoted above regarding how Factor Three would be estimated. *See* Pl.'s Resp. to D-SMF ¶ 6.   Additionally, YNHH did not meaningfully dispute that HHS, in connection with the final rule, calculated YNHH's Factor Three exactly how HHS said it would in the proposed rule. *See* Pl.'s Resp. to D-SMF ¶ 7.[4]   Those two facts alone demonstrate that the proposed rule, by its plain terms, placed YNHH on adequate notice regarding HHS's intended methodology for estimating Factor Three.   At a minimum, it was "reasonably

---

[4] Although YNHH purported to deny Paragraph 7, YNHH did not identify any inaccuracy in the factual statement contained in Paragraph 7, nor did YNHH cite any admissible evidence supporting the denial. *Cf.* Local Rule 56(a)(3) ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.").   Consistent with Local Rule 56(a), therefore, YNHH should be deemed to have admitted Paragraph 7, and all other paragraphs to which it has offered no meaningful response.   To the extent the Court accepts YNHH's invitation to examine the contents of the cited documents, however, attached to this filing is an Appendix containing the pages cited by the Secretary, for ease of reference.

foreseeable" that YNHH's Factor Three would be estimated using only its FY2010/2011 cost-report data, exactly as the proposed rule stated. *Long Island Care at Home*, 551 U.S. at 175.

C. **Additional Features of the Proposed Rule Confirm that the Hospital Received Adequate Notice**

Even apart from the proposed rule's straightforward discussion of HHS's methodology for estimating Factor Three, several additional features further confirm that the Hospital received adequate notice of the need to submit written comments, including on the merged hospital issue.

1. **Factor Three Would Be Estimated Prospectively Using Historical Data**

In contrast to the traditional DSH payments that were retrospective based on actual patient data, the FY2014 Proposed Rule made clear that its Factor Three calculations would only be estimates and would be prospective in nature—meaning that the estimates would be based on historical data, not actual data from FY2014. *See FY2014 Proposed Rule*, 78 Fed. Reg. at 27,591; Def.'s MSJ at 25-27. As such, it should have been apparent to hospitals that the Secretary's estimate of each hospital's Factor Three may not track the hospital's actual experience in FY2014. Indeed, the Secretary expressly requested comments on this very issue. *See FY2014 Proposed Rule*, 78 Fed. Reg. at 27,591 ("We are inviting public comments on this proposal, especially in regard to whether we should include Factor 3 within the reconciliation process."). If YNHH wanted its uncompensated care payment to be based on its actual data from FY2014 (instead of historical data from FY2010/2011), it should have submitted a comment about including Factor Three in the reconciliation process, as HHS invited it to do.

YNHH wholly ignores this language in the proposed rule. Instead, YNHH tries to muddy the waters by asserting that *both* the uncompensated care payments and traditional DSH payments are based on estimates. *See* Pl.'s MSJ at 32 n.8. This argument is disingenuous, because hospitals receive only *interim* traditional DSH payments based on estimates of what their final payment

amount will be.  The ultimate calculation for the final payment amount, however, is still calculated using actual patient data, not estimates.  *See id.*; *see also* 42 C.F.R. § 412.106.  That is what makes the uncompensated care DSH payment fundamentally different from the traditional DSH payment—the former is prospective based on estimates, whereas the latter is retrospective based on actual patient data.  *See also FY2014 Proposed Rule*, 78 Fed. Reg. at 27,591.

YNHH also contends that the prospective nature of the uncompensated care payment is irrelevant "because the issue here is the unjustified and unexplained exclusion of data from HSR's facilities, not whether the 2014 and 2010/2011 data differed."  Pl.'s MSJ at 39.  But this response overlooks that the exclusion of HSR's data occurred *solely because* the uncompensated care payments were based on historical data from FY2010/2011.  If Factor Three was included in the reconciliation process—such that it was based on actual patient data from FY2014—then HSR's data would have been included with YNHH's data for FY2014.  Given the historical nature of the data and the lack of a reconciliation process for Factor Three, however, using YNHH's data from FY2010/2011 necessarily excluded HSR's separate data from those years (because that data was listed in HSR's separate cost reports).  The proposed rule made this apparent to YNHH based on its discussion of estimating Factor Three prospectively using historical data; if YNHH wanted a different result, it should have submitted a comment supporting reconciliation of Factor Three, pursuant to HHS's express invitation.

## 2.    The Factor Three Spreadsheets Provide Further Notice Regarding HHS's Methodology

The spreadsheets published in connection with the FY2014 Proposed Rule further confirm that YNHH received adequate notice regarding the topics being considered in the rulemaking.  *See* Def.'s MSJ at 27-28.  Indeed, YNHH continues to assert that the spreadsheets caused it to believe that data from YNHH and HSR would be combined.  *See, e.g.*, Pl.'s MSJ at 36 ("[T]he inclusion

of data from both HSR and the Hospital in the UC DSH tables included in the Proposed Rule was consistent with the Hospital's understanding that HSR's data would be used for calculating 2014 UC DSH payments."); *id.* at 38.  That only proves that the proposed rule provided adequate notice, however, because YNHH understood that the Secretary's methodology for estimating Factor Three—including with respect to merged hospitals—was at issue in the rulemaking.  *See* Def.'s MSJ at 28.  YNHH's only response is to fallback on its general argument—that the proposed rule did not expressly highlight that it would not be combining merged hospitals' data, and thus YNHH did not think it needed to submit a comment.  *See* Pl.'s MSJ at 34-35 n.10.  For the reasons discussed above, however, there was no requirement for HHS to expressly highlight the merger issue, and YNHH's recognition that the proposed rule was addressing merged hospitals is enough to foreclose its "lack of adequate notice" claim.  *See* Part II.A.2, *supra*.

In any event, the best reading of the proposed rule's spreadsheets is that HHS did *not* intend to combine YNHH's and HSR's data.  The two hospitals' data was listed in two separate entries, with HSR's data listed under its separate provider number even though that provider number was no longer in use.  YNHH argues that "the Secretary does not explain why he would have included HSR's data in the 2014 Proposed Rule if he did not intend to use it to calculate 2014 UC DSH payment."  Pl.'s MSJ at 37 (emphasis omitted).  As the FY2014 Proposed Rule made clear, however, the spreadsheets still needed to be updated based on changes to hospitals' operating status.  *See* Part II.C.3, *infra*; *see also FY2015 Proposed Rule*, 79 Fed. Reg. 49,854, 50,020 (Aug. 22, 2014) (noting that "the data systems used to calculate Factor 3 do not identify hospitals that have merged").  Thus, HSR's presence on the spreadsheet was expressly *not* a signal that changes in HSR's operating status would be ignored.

YNHH also contrasts its situation with the hospital plaintiff in *DCH v. Azar*, arguing that

-23-

because the merged hospital's data was excluded from DCH's data in the spreadsheet, "then it logically follows that the <u>inclusion</u> of HSR's data . . . could only have meant that HSR's data would be included with the Hospital's data the for purposes of calculating the Hospital's 2014 UC DSH payment." Pl.'s MSJ at 38. But YNHH's logic is flawed. Simply because *one* merged hospital's data was excluded does not mean that all others *would* be included, particularly when the proposed rule itself expressly noted that the spreadsheets may still be updated based on changes in hospitals' operating status.[5]

Finally, YNHH resists the notion that by listing the two hospitals' data separately, it was reasonably foreseeable that HHS did not consider HSR's data to be subsumed within YNHH's data. YNHH contends that "[t]his argument fails because the data in the Proposed Rule was from 2010/2011 and the Hospital and HSR did not merge until 2012," and thus "separate listings for HSR and the Hospital were appropriate[.]" Pl.'s MSJ at 38-39. But this argument only proves the point: the proposed rule made clear that Factor Three would be estimated using data from 2010/2011, *i.e.*, from before YNHH's and HSR's merger, and thus it was reasonably foreseeable that HSR's data would not be subsumed into YNHH's data—as the spreadsheet itself reflected.

### 3. The Proposed Rule Affirmatively Requested Updates on Changes in Hospitals' Operating Status

Finally, the proposed rule further made clear that it was considering whether and how to estimate Factor Three for hospitals that had changed their operating status. Indeed, the proposed rule affirmatively directed hospitals to "notify CMS in writing within 60 days from the date of

---

[5] Additionally, as YNHH acknowledges, the two hospitals in DCH were in a materially different situation, because their merger occurred in 2011, and thus five months' of the merged hospital's data *was* included in DCH's Factor Three estimate. *See* P-SMF (ECF No. 38-2) ¶¶ 21, 23. Thus, the DCH example indicated nothing about how HHS intended to treat YNHH and HSR, which merged in 2012 *after* the FY2010/2011 cost reports.

display of this proposed rule of any change in a hospital's subsection (d) hospital status." *FY2014 Proposed Rule*, 78 Fed. Reg. at 27,590; *see also id.* ("We intend to update in the final rule the list of hospitals that we estimate will be eligible for DSH payments for FY 2014 and our estimate of Factor 3 using more recent data and verified hospital notifications regarding hospital status (*for example, closures*)." (emphasis added)).  This discussion gave YNHH ample notice—and ample opportunity—to submit a comment regarding its Factor Three calculation, particularly with respect to the change in HSR's operating status (*i.e.*, HSR's merger with YNHH).

YNHH's only response is to misconstrue the proposed rule's language and claim that "it was about only hospital <u>closures</u>, not <u>mergers</u>."  Pl.'s MSJ at 39.  As quoted above, however, the language clearly directs hospitals to notify about "*any change* in a hospital's subsection (d) hospital status[.]" *FY2014 Proposed Rule*, 78 Fed. Reg. at 27,590 (emphasis added).  YNHH does not dispute that the merger with HSR constitute a change in YNHH's and/or HSR's operating status.

YNHH also contends that HHS already "had notice in 2012 about the Hospital's Merger with HSR." Pl.'s MSJ at 39.  Regardless of whether other data sources within HHS already tracked the merger, however, that does not change that the proposed rule itself made clear that HHS's Factor Three spreadsheets might not fully reflect recent changes to hospitals' operating status.

In sum, YNHH's arguments do not undermine the plain text of the proposed rule, which disclosed exactly how HHS intended to estimate YNHH's Factor Three.  Based on all of the above, there was no procedural violation in connection with the FY2014 rulemaking.

## CONCLUSION

Plaintiff's claim should be dismissed for lack of jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), or in the alternative summary judgment should be entered for Defendant, *see* Fed. R. Civ. P. 56.

Dated:  October 31, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN H. DURHAM
United States Attorney

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ Daniel Schwei*
DANIEL SCHWEI
Senior Trial Counsel (N.Y. Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 12024
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:    (202) 616-8470
Email:  daniel.s.schwei@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
1100 L St. NW, Room 12024
Washington, D.C. 20005

*Counsel for Defendant*