## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF CONNECTICUT

| | |
|---|---|
| YALE NEW HAVEN HOSPITAL, | Civil Action No.: 3:18-cv-01230-JCH |
| Plaintiff, | |
| v. | |
| ALEX M. AZAR II, Secretary, United States Department of Health and Human Services, | |
| Defendant. | November 14, 2019 |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE ARGUMENT I OF DEFENDANT'S MEMORANDUM

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT ......................................................................................................3

      A.     The Secretary's Argument that the 2014 Merged Hospital Policy was not a
Procedurally-Improper Reversal of His Long-Standing Merged Hospital
Policy (Albeit for Only One Year) Lacks Merit Factually and Legally. .................3

      B.     The Secretary's Other Arguments Lack Merit and are Makeweight. ....................12

      C.     The Court Should Strike the Secretary's Procedurally-Improper
Jurisdictional Arguments. ....................................................................................15

      D.     Even if Considered, the Secretary's Jurisdictional Arguments Lack Merit..........17

III. CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ................................................................................................2

*Bowen v. Michigan Academy of Family Physicians*,
  476 U.S. 667 (1986) ..................................................................................................18

*Council for Urological Interests v. Sebelius*,
  668 F. 3d 704 (D.C. Cir. 2011) ........................................................................3, 18, 19

*DCH Regional Medical Center v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) .......................................................................13, 19, 20

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .............................................................................................7, 9

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................8, 9

*Florida Health Sciences Center v. HHS*,
  830 F.3d 515 (D.C. Cir. 2016) ...................................................................................20

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ......................................................................................17, 18, 19

*Link v. Wabash R. Co.*,
  370 U.S. 662 (1962) ..................................................................................................17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................16

*Ne. Hosp. Corp. v. Sebelius*,
  657 F.3d 1 (D.C. Cir. 2011) .........................................................................................1

*NRDC v. FDA*,
  884 F. Supp. 2d 108 (S.D.N.Y. 2012) ........................................................................17

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ...........................................................................................9, 12

*Post Acute Med. at Hammond, LLC v. Azar*,
  311 F. Supp. 3d 176 (D.D.C. 2018) ...........................................................................13

*Shalala v. Illinois Council on Long Term Care, Inc.*,
   529 U.S. 1 (2000) ...................................................................................................17, 19

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ......................................................................................10

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§551 *et seq* ...............................................1, 3, 8, 14, 17

28 U.S.C. §1331 ..........................................................................................................17, 18

42 U.S.C. §405(h) ..............................................................................................................18

Medicare Act, 42 U.S.C. §§1395 *et seq.* ...........................................................1, 3, 8, 9, 14, 17
   §1395hh(a)(2) .........................................................................................................1, 8
   §1395hh(a)(4) ......................................................................................................2, 8, 10
   §1395nn(i)(3) ..............................................................................................................19

**Other Authorities**

78 Fed. Reg. 50,496, 50,642 (Aug. 19, 2013) ..........................................................................12

84 Fed. Reg. 42,044 (Aug. 16, 2019) ......................................................................................5
   p. 42,379 .....................................................................................................................5
   pp. 42,352–55 ...............................................................................................................5
   pp. 42,359-64 ...............................................................................................................5

**GLOSSARY OF PERTINENT ABBREVIATIONS AND ACRONYMS**

| | | |
|---|---|---|
| ACA | -- | Patient Protection and Affordable Care Act |
| APA | -- | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |
| A.R. | -- | Administrative Record |
| CCN | -- | CMS Certification Number |
| CMS | -- | Centers for Medicare & Medicaid Services |
| DSH | -- | Disproportionate Share Hospital |
| FFY | -- | Federal Fiscal Year |
| 2014 Final Rule | -- | FFY 2014 IPPS Final Rule, 78 Fed. Reg. 50,496 (Aug. 19, 2013) |
| 2014 Proposed Rule | -- | FFY 2014 IPPS Proposed Rule, 78 Fed. Reg. 27,486 (May 10, 2013) |
| 2015 Final Rule | -- | FFY 2015 IPPS Final Rule, 79 Fed. Reg. 49,854 (Aug. 22, 2014) |
| 2015 Proposed Rule | -- | FFY 2014 IPPS Proposed Rule, 79 Fed. Reg. 27,978 (May 15, 2014) |
| GME | -- | Graduate Medical Education |
| HCFA | -- | Health Care Financing Administration |
| HHS | -- | United States Department of Health and Human Services |
| HSR | -- | Hospital of Saint Raphael |
| IPPS | -- | Medicare Hospital Inpatient Prospective Payment System |
| July 25, 2019 Decision | -- | Court's Ruling on Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 16) and Plaintiff's Motion for Leave to File a Sur-Reply (Doc. No. 26) (July 25, 2019), ECF No. 33 |
| Medicare Act | -- | 42 U.S.C. §1395 *et seq.* |
| Preclusion Statute | -- | 42 U.S.C. §1395ww(r)(3) |
| PRRB | -- | Provider Reimbursement Review Board |
| Secretary | -- | Secretary of HHS |

SSI                    --        Supplemental Security Income

UC DSH            --        Uncompensated Care Disproportionate Share Hospital

## I.  INTRODUCTION

The Hospital's summary judgment argument here is straight-forward:

1.  The Medicare Act and the APA require the Secretary to use notice-and-comment rulemaking when implementing "any rule or policy that establishes or changes a substantive legal standard" governing Medicare payment, and

2.  The Secretary unlawfully failed to use notice-and-comment rulemaking when implementing the 2014 Merged Hospital Policy, which reversed the Secretary's long-standing policy of combining data from merged hospitals when calculating Medicare payments, including DSH payments (which the Secretary "unreversed" in 2015).

The Secretary's Reply Memorandum ("Sec'y Reply") (ECF No. 40) (at 9) argues that because "FY2014 was the very first year HHS made [UC DSH] payments," there was no "established policy" that the 2014 Rulemaking could have changed.  The Secretary's argument fails because it is based on the false premise that, when the Secretary first implemented the UC DSH provisions in the 2014 Rulemaking, he did not rely on any preexisting Medicare policies.  This "island" premise is false because of (a) the interconnectedness of the "labyrinthine" other Medicare payment provisions to the UC DSH provisions in the 2014 Rulemaking,[1] and (b) the Secretary's decision to use Traditional DSH data to calculate 2014 UC DSH payments, which necessarily incorporated all Traditional DSH-related policies, including the long-standing Merged Hospital policy.

The falseness of this premise also defeats as a matter of law the argument in the Secretary's Reply (at 9-10) that the Secretary's "general description" of his implementation of the UC DSH program in the 2014 Proposed Rule is sufficient for APA and Medicare Act purposes so that he did not have to discuss explicitly the reversal of his long-standing Merged Hospital policy therein.  This is because (a) 42 U.S.C. §1395hh(a)(2), as interpreted by the

---

[1]  The complexity of the Medicare statutory scheme is legendary in the judiciary, having often been described as "labyrinthine."  *See, e.g., Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 17 (D.C. Cir. 2011) (quoting Learned Hand, *In Memoriam: Thomas Walter Swan*, 57 Yale L. 167, 169 (1947)).

Supreme Court in *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809 (2019), requires the Secretary to use notice-and-comment rulemaking when changing a "substantive legal standard" governing Medicare payment, such as his long-standing Merged Hospital policy, and (b) 42 U.S.C. §1395hh(a)(4) states that a "final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking . . .  shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation."

Remarkably, the Secretary's Reply does not even mention 42 U.S.C. §1395hh(a)(4), even though it was addressed numerous times in the Hospital's Memorandum in Support of its Cross-Motion for Summary Judgment ("Hosp. Mem.") (ECF No. 38-1) at 4, 28-29, and 34.  Instead, the Secretary's Reply argues (at 11-12) that the "question" before the Court "is simply whether the proposed rule provided interested persons with adequate notice that they should comment on the issue."  The Secretary's Reply further argues (at 14-15) that he was required only to "provide a general notice of the subjects involved in the rulemaking" because "an agency satisfies its procedural notice-and-comment requirements if the notice of proposed rulemaking includes 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'"  And in support of these arguments, the Secretary's Reply (at 13-24) presents many details from the preamble of the 2014 Proposed Rule to show that he "actually described in extensive detail how HHS intended to estimate Factor Three," which allegedly gave hospitals sufficient information to figure out that the Secretary was proposing to reverse (for only a single year) his long-standing Merged Hospital policy.

These arguments fail because the question actually before the Court is whether the Secretary unlawfully failed to use notice-and-comment rulemaking when implementing the 2014 Merged Hospital Policy.  And, as the Hospital's Memorandum explained (at 21-23), the answer is

yes because the APA and the Medicare Act required the Secretary to (a) give notice about any proposed change to his long-standing Merged Hospital policy, (b) explain why the Secretary was proposing to change this policy so as to provide the public with a meaningful opportunity to comment, and (c) offer reasoned responses to significant comments.  It is undisputed that none of this occurred.  This is fatal because notice under the APA and the Medicare Act must be explicit – the regulated providers should not be required to read the Secretary's mind.  Hosp. Mem. at 33.

The Secretary's Reply also fails to rebut the Hospital's motion to strike the Secretary's procedurally-improper jurisdictional challenge.  And, if considered, the Secretary's jurisdictional challenge lacks merit because it relies on <u>channeling</u> cases to support its <u>preclusion</u> argument.  But these cases are inapt because they do not address preclusion of judicial review.  *See Council for Urological Interests v. Sebelius*, 668 F. 3d 704 (D.C. Cir. 2011) (emphasis added).  For these reasons and the others discussed below, the Court should (a) deny the Secretary's motion, and grant the Hospital's cross-motion for summary judgment and (b) grant the Hospital's motion to strike the Secretary's procedurally-improper jurisdictional challenge or, if considered, deny it.

## II.  ARGUMENT

**A.**   **The Secretary's Argument that the 2014 Merged Hospital Policy was not a Procedurally-Improper Reversal of His Long-Standing Merged Hospital Policy (Albeit for Only One Year) Lacks Merit Factually and Legally.**

1.   *The Secretary Incorporated into the UC DSH Provisions in the 2014 Rulemaking His Long-Standing Policy of Combining Data from Merged Hospitals When Calculating Medicare Payments.*

The Secretary's Reply (at 13) contains the following "counterfactual" assertion:

Even if past agency policies were relevant, YNHH is factually incorrect that HHS had any such policies with respect to the new uncompensated care DSH payments. As YNHH acknowledges, "[t]he 2014 IPPS Rulemaking was the Secretary's first [year] implementing the UC DSH program." Pl.'s MSJ at 24; *see also* Pl.'s Resp. to Def.'s Stmt. of Mat. Facts (ECF No. 383) ¶ 3 (hereafter "Pl.'s Resp. to D-SMF"). <u>As YNHH concedes, then, because FY2014 was the first year</u>

> that HHS implemented the uncompensated care DSH payment, there could not yet
> have been any "established policies" for that payment.

(Emphasis added.)  The Secretary's assertion, that the Hospital "concedes" there could not yet
have been any "established policies" relating to 2014 UC DSH payments "because FY2014 was
the first year that HHS implemented" that payment, is dead wrong -- the Hospital has never
made, and the facts do not support, any such "concession."

The Hospital's Memorandum acknowledged (at 24-25 (emphasis in original)) that the
"2014 IPPS Rulemaking was the Secretary's first implementing the UC DSH program," adding:

> In doing so, rather than to relying on new data to calculate those payments, the
> Secretary decided to calculate 2014 UC DSH payment using Traditional DSH
> data. . . .  Using Traditional DSH data to calculate 2014 UC DSH payments was a
> sensible exercise of the Secretary's discretion because the Secretary had decades
> of experience with that data. . . .  In the 2014 Proposed Rule, CMS announced its
> proposed methodology to calculate UC DSH payments for 2014 using Traditional
> DSH data without mentioning in either the preamble or the regulatory text any
> proposed deviation from the agency's long-standing policy of calculating post-
> merger Medicare payments using combined data from hospitals that had merged
> for Medicare payment purposes.

Rather than "conceding" that there were no "established policies" relating to UC DSH payments
before the 2014 Rulemaking, the Hospital's consistent position has been that the "2014 Final
Rule presented for the first time the 2014 Merged Hospital Policy, which reversed the Secretary's
long-standing policy of combining data from merged hospitals when calculating Medicare
payments, including DSH payments."  Hosp. Mem. at 23 (emphasis in original).

The Secretary's assertion that there was no "established policy" that the 2014 Rulemaking
could have changed because "FY2014 was the very first year HHS made [UC DSH] payments"
fails factually because of the interconnectedness between the general statutory and regulatory
provisions related to Medicare payments and the UC DSH payments as implemented by the
Secretary in the 2014 Rulemaking, which relied on numerous established Medicare policies.  In

fact, the UC DSH provisions could not have been implemented <u>at all</u> if the 2014 Rulemaking did not incorporate explicitly or implicitly numerous Medicare statutory and regulatory provisions.

For example, the calculation of a hospital's UC DSH payment would be meaningless if the Secretary could not make the payments and hospitals could not receive them.  Thus, the 2014 Rulemaking (and all other IPPS rulemakings) relied on numerous statutory and regulatory provisions <u>unrelated</u> to IPPS, such as those addressing how (a) the Secretary makes UC DSH payments to qualifying hospitals (these payments are made by Medicare contractors under authority delegated by the Secretary (Sec'y Mem. in Support of Mot. to Dismiss (ECF No. 16-1) at 4)), and (b) hospitals enroll in Medicare so they can receive payments from their MAC, including by having signed provider agreements and meeting Medicare conditions of participation.

But more important, the Secretary's "island" argument ignores that UC DSH payments are inextricably intertwined with Traditional DSH payments <u>generally</u> and to a greater extent for 2014 because the Secretary used Traditional DSH data to calculate 2014 UC DSH payments.[2]  For example, the total amount of UC DSH payments to be distributed to hospitals is required <u>by statute</u> to be calculated by taking 75% of <u>the amount of total Traditional DSH payments</u> for a given FFY. Sec'y Mem. in Support of Mot. for Summ. J. ("Sec'y Init. Mem") (ECF No. 37-1) at 4.

Undaunted, the Secretary's Reply argues (at 21-22) that UC DSH payments are distinct from Traditional DSH payments because unlike Traditional DSH payments, UC DSH payments are "prospective" only and not "based on actual patient data."  But this argument is defeated by the Secretary's acknowledgment in his Initial Memorandum (at 4) (a) that UC DSH payments are

---

[2]  It was not until the 2020 Rulemaking that the Secretary abandoned the use of Traditional DSH data in calculating Factor 3 of the UC DSH payments.  *See* FY 2020 IPPS Final Rule, 84 Fed. Reg. 42,044, 42,359-64, 42,379 (Aug. 16, 2019) (finalizing transition from using Traditional DSH data to Worksheet S–10 data to determine UC DSH payments.).  Factor 1 of the UC DSH calculation continues to rely on Traditional DSH data.  *See* 84 Fed. Reg. at 42,352–55.

available only to hospitals that qualify for Traditional DSH and (b) qualification for Traditional

DSH is based *entirely* on a retrospective review of a hospital's Traditional DSH data.[3]

Further, the Hospital explained (at 24) that using Traditional DSH data to calculate 2014

UC DSH payments was a sensible exercise of the Secretary's discretion because the Secretary

had decades of experience with that data.  The Secretary's Reply argues (at 14):

> Simply because both payments relied on the same *type* of data does not mean that every other policy regarding the traditional DSH payment automatically became "established policy" for the new uncompensated care payment as well—especially given the clear differences in *how* the data was to be used in determining the different payments.

This *post-hoc* argument fails because (a) as a practical matter, Traditional DSH data could be used

to calculate 2014 UC DSH payments <u>only if</u> all of the policies concerning calculation of

Traditional DSH payments also applied, and (b) in the 2014 Proposed Rule, the Secretary could

have, but did not limit the incorporation of essential Medicare payment policies, such as the long-

standing Merged Hospital policy.

The Secretary's Reply also argues (at 14):

> Here, YNHH and HSR were distinct hospitals using distinct provider numbers in FY2010/2011, and therefore their data from those cost reports was not consolidated. That was fully consistent with the policies cited by YNHH, in which data is combined only after the hospitals begin operating under a single provider number. *Cf. FY2014 Final Rule*, 78 Fed. Reg. 50,496, 50,642 (Aug. 19, 2013) ("A hospital's Factor 3 is calculated based on the data tied to its CCN. This is consistent with the treatment of other IPPS payment factors[.]").

But the Secretary apparently missed the Hospital's point that the Hospital and HSR had distinct

provider numbers before their 2012 merger, after which HSR was merged into the Hospital.  Hosp.

---

[3]  Thus, the Secretary errs by asserting (at 13 of his Reply):  "It is true that, in FY2014, the Secretary proposed using the same *type* of data for estimating the uncompensated care DSH payments as was used for calculating the traditional DSH payments—*i.e.*, hospitals' Medicaid and Medicare/SSI fractions. But that is where the similarities between the two payments end [. . . . ]" The similarities of Traditional DSH and UC DSH are far more extensive.

Mem. at 13, 15, 25–26, 28, 38, and 39.  Thus, the Hospital reasonably expected that data from both HSR and the Hospital would be included to calculate Hospital's 2014 UC DSH payment.

Nevertheless, the Secretary's Reply (at 19) argues that "the proposed rule made clear that the key timeframe for YNHH's and HSR's data was FY2010/2011, not FY2014."  But as the Hospital explained (at 14 and 25), (a) 2014 UC DSH payments were required to be estimated based on the amount of uncompensated care IPPS hospitals expected to provide in 2014 and (b) the amount of uncompensated care that the Hospital expected to provide in 2014 could be determined reasonably only if HSR's data were included because HSR's inpatient operations merged into the Hospital in 2012 (the Secretary has done this every year except 2014).

The Secretary's Reply argues (at 19-20 (emphasis in original)) that such a point is "irrelevant" because it reflects "a *substantive* challenge to the reasonableness of the Secretary's actions" and "the sole remaining claim in this case is a *procedural* one, YNHH's argument about a lack of sufficient explanation is irrelevant."[4]  But the Hospital's point is to show the effect of the reversal of the Secretary's long-standing Merged Hospital policy.  Also, the Secretary relies on *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016), in support of his characterization of the Hospital's arguments regarding "lack of sufficient explanation" as a "*substantive* challenge."  Sec. Reply at 20.  However, *Encino Motorcars* directly supports the Hospital's challenge as *procedural* in nature because the Supreme Court explained that "[o]ne of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions," before finding that "the unavoidable conclusion is that the 2011 regulation was issued without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interests involved."  *Id*. at 2125–26.

---

[4]  This is a particularly odd position for the Secretary's Reply to take after insisting (at 7) that it is "irrelevant" whether a claim is "characterized as 'procedural' or 'substantive.'"

2.    *Because the Secretary's 2014 Final Rule Reversed His Long-Standing Merged Hospital Policy, the Secretary Was Required to Have Used Notice-and-Comment Rulemaking to Adopt this Reversal Properly.*

Because the Secretary used Traditional DSH data to calculate 2014 UC DSH payments and the 2014 Proposed Rule did not limit the incorporation of Medicare policies in the 2014 Rulemaking, such as the long-standing Merged Hospital policy, the Secretary gave hospitals (including the Hospital) no reason to believe that such policies would not apply for purposes of calculating 2014 UC DSH payments.  This is because the Secretary did not include in the 2014 Proposed Rule <u>any</u> discussion about a possible change to the Secretary's long-standing Merged Hospital policy and (a) 42 U.S.C. §1395hh(a)(2) required the Secretary to use notice-and-comment rulemaking if he wanted to change his long-standing Merged Hospital policy, and (b) 42 U.S.C. §1395hh(a)(4) states that a "final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking . . . shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation." Moreover, the APA and the Medicare Act required the Secretary to (a) give notice about any proposed change to his long-standing Merged Hospital policy, (b) explain why the Secretary was proposing to change this policy so as to provide the public with a meaningful opportunity to comment, and (c) offer reasoned responses to significant comments. It is undisputed that none of this occurred.

The Secretary's Reply (at 12) argues that "changes in agency policies generally are *not* subject to extra scrutiny under the APA," citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).  However, the Supreme Court in *Fox Television* held the APA's procedural requirement "that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."  *Fox Television*, 556 U.S. at 515 (emphasis in original).  The Court went on to explain that:

> An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.  *See United States v. Nixon*, 418 U.S. 683, 696, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).  And of course the agency must show that there are good reasons for the new policy.

*Id*. at 515.  The guiding analysis under the APA, as highlighted in *Fox Television*, focuses on whether the agency provided a "reasoned explanation" for its action.  And, where the action departs from a prior policy, such a "reasoned explanation" ordinarily would demand that an agency at least (1) not depart from a prior policy *sub silentio*, (2) acknowledge that it is changing position, and (3) provide good reasons for the new policy.  None of that occurred here.

Moreover, where (as here) decades of industry reliance on the Secretary's long-standing Merged Hospital policy engendered serious reliance interests in hospitals (*e.g.*, hospitals accepting assignment of the subsumed hospital's Medicare provider agreement, including numerous liabilities attached thereto, with the expectation of receipt of Medicare payments associated with the subsumed hospital), such a "reasoned explanation" requires "a more detailed justification than what would suffice for a new policy created on a blank slate." *See id.*; *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary or capricious to ignore such matters.'") (quoting *Fox Television Studios*, 556 U.S. at 515); *see also Encino Motorcars*, 136 S. Ct. at 2126–27.  Thus, the Secretary was required by the Medicare Act and the APA to provide a reasoned explanation acknowledging the reversal of his long-standing Merged Hospital policy and providing "good reasons" for the 2014 Merged Hospital Policy.  This did not occur.

The Secretary's Reply argues (at 11-12) that it is "irrelevant" whether "HHS's FY2014 rulemaking constituted a change in policy or not" because the issue here is whether "the proposed

rule provided interested persons with adequate notice that they should comment on the issue." But in doing so, the Secretary completely ignored (and thus should be found to have conceded) the Hospital's arguments (at 28-29) that (a) the Secretary violated 42 U.S.C. §1395hh(a)(4) by not proposing to reverse his long-standing Merged Hospital policy in the 2014 Proposed Rule and (b) the 2014 Merged Hospital Policy could not become effective when published for the first time in the 2014 Final Rule because the reversal of the Secretary's long-standing Merged Hospital policy was not addressed in a previously-published proposed rule. The Secretary also violated the APA because information that appears for the first time in a final rule does not meet the notice requirement. *See Solite Corp. v. EPA*, 952 F.2d 473, 499-500 (D.C. Cir. 1991) (rejecting argument that notice requirement was satisfied by post-notice supplement regarding methodology). Hosp. Mem. at 29.[5]

3.    The *Secretary's Argument that the Discussion About UC DSH in the 2014 Proposed Rule Met the APA and the Medicare Act Requirements Does Not Withstand Scrutiny.*

The Secretary's Reply includes (at 15) an elaboration on his argument that his failure to address the Merged Hospital Policy in the 2014 Proposed Rule is not fatal because the "central question" in evaluating adequacy of the notice is "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking." In support of this argument, the Secretary includes a lengthy explanation about why the 2014 Proposed Rule should be read to have given the Hospital *de facto* notice that the Secretary would be reversing his long-standing Merged Hospital policy and calculating the Hospital's 2014 UC DSH payment without

---

[5]    Thus, the Secretary's Reply (a) argument (at 15) that "the Medicare Act's and the APA's notice-and-comment requirements" are "materially the same" is incorrect and (b) series of "the sky is falling" arguments (at 17) to support his view that the Hospital's position "would effectively disable agency rulemaking altogether" fails because the requirements cited by the Hospital were enacted by Congress.

including HSR's data.  However, the Secretary's argument fails <u>as a matter of law</u> because, as explained above, the Secretary was required to provide <u>specific notice</u> about the reversal of his long-standing Merged Hospital policy and an explanation why the reversal was proper.  The cases that the Secretary cites (at 15) are inapt because they do not address, or purport to address, where, as here, a proposed rule failed to provide notice of the reversal of a long-standing policy.

Also, the Secretary's argument fails <u>as a matter of fact</u> because the 2014 Proposed Rule did not "fairly apprise" IPPS hospitals generally, or the Hospital specifically, that the Secretary would be reversing (for one year) his long-standing Merged Hospital policy. The Secretary's Reply (at 18-21) argues that "the intense detail of the proposed rule underscores that interested parties were "fairly apprise[d]" of the overall "subjects and issues of the rulemaking" and, thus, the Hospital was "plainly on notice regarding HHS's intended methodology for estimating Factor Three."  But lengthy detail with regard to how Factor Three would be calculated does not overcome the shortcoming from the complete <u>silence</u> regarding reversal of the long-standing Merged Hospital policy.

The Secretary's Reply (at 19) argues "the only plausible reading of the FY2014 Proposed Rule's language is that YNHH's Factor Three would be estimated based solely on its own FY2010/2011 cost-report data."  But this ignores that the 2014 Proposed Rule data table had an entry for HSR, a DSH Factor 3 calculation for HSR, and a "Y" in the "Projected to receive DSH" column for HSR.  Hosp. Mem. at 31 n.7.  Given that the Hospital accepted HSR's provider agreement as part of the merger, the Hospital expected the Secretary to use HSR's data when calculating the Hospital's 2014 UC DSH payment based on long-standing Merged Hospital policy.  In fact, the 2014 Final Rule stated that a "hospital's Factor 3 is calculated based on the data

tied to its CCN" (78 Fed. Reg. at 50,642), which is precisely what the Hospital was seeking because, by 2014, HSR's data <u>was</u> tied to the Hospital's CCN.[6]

The Secretary's Reply (at 17) acknowledges that the "whole point of notice-and-comment is to allow 'interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments,' and then for the agency to 'consider and respond to significant comments received during the period for public comment.' *Perez*, 135 S. Ct. at 1203," and that courts "only require that the policy set forth in the final rule be 'reasonably foreseeable' from the proposed rule." But the 2014 Rulemaking fails under both standards because the Secretary gave <u>no</u> notice of the proposed reversal of the long-standing (and still standing, except for 2014) Merged Hospital policy.

## B.  The Secretary's Other Arguments Lack Merit and are Makeweight.

The Secretary's Reply includes a hodge-podge of other arguments, each of which lacks merit. For example, the Secretary's Reply argues (at 13-14 (emphasis added)) that this Court should not consider the Hospital's citation to "several other Medicare payments in which HHS purportedly consolidates merged hospitals' data" because "there is no reason to believe that HHS's policies on different payments, arising under <u>different payment schemes</u>, have any bearing on HHS's policies with respect to the uncompensated care payment." This argument fails because the Secretary ignores that the policies that the Hospital cited (at 13) were from the 2006 <u>IPPS</u> Final Rule and IPPS is the exact payment scheme addressed by the 2014 Rulemaking.

---

[6]  The Secretary's Reply (at 22-23) oddly argues that the inclusion of data from both HSR and the Hospital in the 2014 DSH tables "proves that the proposed rule provided adequate notice" that merged hospital data "was at issue in the rulemaking." But the Secretary never connects the inclusion of HSR's data with his counterintuitive position that this gave the Hospital notice that the Secretary was proposing to reverse his long-standing Merged Hospital policy and exclude HSR's data in the 2014 Final Rule.

The Secretary's Reply (at 14) continues:  "YNHH's examples are consistent with the Secretary's FY2014 approach.  In those examples, multiple hospitals were treated as a single hospital if they operated under a single provider number."  What the Secretary omits is that these "hospitals were treated as a single hospital if they operated under a single provider number" during the FFY that was the subject of the rulemaking.  Here, by contrast, the Secretary refused to merge the Hospital's data with HSR's even though HSR and the Hospital operated under a single provider number in 2014.

The Secretary's Reply (at 21-22) asserts the Hospital should have realized that the Secretary was going to exclude HSR's data from its 2014 UC DSH payment and argues (at 23) that "the best reading of the proposed rule's spreadsheets is that HHS did *not* intend to combine YNHH's and HSR's data."  This argument fails because the Hospital reasonably believed that the Secretary would have to include HSR's data when calculating the Hospital's 2014 UC DSH payment because (a) doing so was necessary statutorily to assure that the Hospital's 2014 UC DSH payment would be based on the uncompensated care that the Hospital expected to provide in 2014 and (b) the Secretary gave no indication that he was going reverse his long-standing Merged Hospital policy.  Hosp. Mem. at 14, 18, and 19.

The Secretary's Reply (at 16-17) again relies on *Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176 (D.D.C. 2018), to support his assertion that the APA "does not require an agency to advise regulated entities as to the individualized implications of a proposed rule."  But, as the Hospital explained (at 35-36), the instant case is distinguishable from the situation in *Post Acute*, where "the proposed rule gave [the hospital] all the information it has now [*i.e.*, at the time of the ligation]."  Although that might have been true for the plaintiff-hospital in *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir. 2019), because the 2014 Proposed Rule gave DCH underline actual notice that the data from its subsumed hospital would not be included for

purposes of calculating DCH's 2014 UC DSH payment, the Hospital received no such notice because (unlike for DCH and its subsumed hospital) the 2014 data tables included data from both the Hospital and HSR and indicated that both would receive 2014 UC DSH payments.

With respect to DCH, the Secretary's Reply (at 24 (emphasis in original)) argues that the exclusion of the data from DCH's subsumed hospital "does not mean that all others *would* be included." Here again, the Secretary apparently missed the Hospital's point, which was that DCH, but not the Hospital, had notice that its merged hospital data would not be used for 2014 UC DSH purposes. Indeed, this is why DCH commented, but the Hospital did not.[7]

The Hospital explained (at 33) that the failure of the 2014 Proposed Rule to discuss explicitly the proposal to reverse the Secretary's long-standing Merged Hospital Policy was "fatal because notice under the APA and the Medicare Act must be explicit – the regulated providers should not be required to read the Secretary's mind." The Secretary's Reply (at 16) asserts "there is no question that the proposed rule accurately described how HHS intended to estimate YNHH's Factor Three," but never argues (nor could he based on the facts) that the 2014 Proposed Rule addressed explicitly or implicitly reversal of the Merged Hospital policy.

The Secretary's Reply (at 20 n.4) faults the Hospital for denying Paragraph 7 of the Defendant's SOMF by not identifying any inaccuracy or citing admissible evidence supporting the denial. The Secretary's purpose in presenting this footnote is to support the following text statement: "Additionally, YNHH did not meaningfully dispute that HHS, in connection with the final rule, calculated YNHH's Factor Three exactly how HHS said it would in the proposed rule." But the Hospital has consistently taken the position that the Secretary's calculation of the

---

[7] The Secretary's Reply (at 24-25) chides the Hospital for not notifying the Secretary about its merger with HSR. Yet, the Secretary does not dispute that the Secretary had notice of the merger before the 2014 Rulemaking.

Hospital 2014 UC DSH payment in the 2014 Final Rule was inconsistent with the 2014 Proposed

Rule because the 2014 Proposed Rule stated:

> The numerator of Factor 3 would be the estimated Medicaid and Medicare SSI
> patient days for the individual hospital based on its most recent 2010/2011
> Medicare cost report (including the most recently available that may be used to
> update the SSI ratios).

*See* Hosp. Local Rule 56(a)(2) Statement in Opp. to Def.'s Statement of Undisputed Material

Facts (ECF No. 38-3) at ¶6.

Based on this language, because the Hospital and HSR were "individual hospitals" with

distinct "Medicare cost reports" before their 2012 merger, after which HSR was merged into the

Hospital, the Hospital reasonably expected that data from both HSR and the Hospital would be

included to calculate Hospital's 2014 UC DSH payment given that (a) 2014 UC DSH payments

were required to be estimated based on the amount of uncompensated care IPPS hospitals

expected to provide in 2014 and (b) the amount of uncompensated care that the Hospital

expected to provide in 2014 could be determined accurately only if HSR's data were included

because HSR's inpatient operations merged into the Hospital in 2012 (the Secretary has done this

every year except 2014).  The inclusion of HSR's data in the Medicare DSH-Supplemental Data

table published with the 2014 Proposed Rule, and a "Y" in the "Projected to receive DSH"

column for HSR, confirmed the Hospital's expectation was reasonable.

**C.     The Court Should Strike the Secretary's Procedurally-Improper Jurisdictional
         Arguments.**

The Hospital moved to strike Argument I in the Secretary's Initial Memorandum as

procedurally improper because it actually is a request for reconsideration of the Court's July 25,

2019 decision that is untimely under both Federal Rule of Civil Procedure 59(e) and Local Rule

7(c), which required the Secretary to "file[] and serve[] such [motion for reconsideration] within

seven (7) days of the filing of the decision or order from which such relief is sought." Argument I is also inconsistent with the Court's August 12, 2019 briefing order.

Both the Secretary's Initial and Reply Memoranda acknowledge that he is seeking reconsideration by (a) asking that the "Court … re-evaluate [its] determination" that it has jurisdiction to review the Hospital's procedural claim (Sec'y Init. Mem. at 1 (emphasis added)) and (b) stating that there are "strong reasons for this Court to reconsider its prior jurisdictional analysis." Sec'y Reply at 6 (emphasis added). Moreover, the Secretary offers no new facts or law supporting his arguments, instead asserting (at 6) that reconsideration is warranted because the Court noted that the preclusion issue was "a very close question."

The Secretary seeks to justify his procedurally improper request for reconsideration by making the unremarkable point that jurisdictional challenges can be raised at any time (which the Hospital acknowledged at 50[8]), including at the summary judgment stage.[9]  But the Hospital's acknowledgement is not, as the Secretary contends (at 5), the "end of the matter" because the Secretary's arguments do not address that Argument I is untimely under the Federal and Local Rules and inconsistent with the August 12, 2019 briefing order, or that this Court has the

---

[8]  The Secretary's Reply argues (at 4) that "YNHH largely ignores the cases cited in the Secretary's opening memorandum establishing that 'questions of subject matter jurisdiction are generally exempt from law of the case principles,'" but the Secretary recognizes in the very next paragraph that the Hospital "acknowledges that the Court can revisit the issue of jurisdiction at any time." Sec'y Reply at 5 (citing Hospital's Memorandum at 41).

[9]  The Secretary cites *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (at 4) for the proposition that it is quite common for litigants to challenge jurisdiction at the summary-judgment stage and that "jurisdiction must be established 'with the manner and degree of evidence required at the successive stages of litigation.'"  But *Lujan* does not support the Secretary's improper request for reconsideration.  In *Lujan*, plaintiffs' standing was challenged at both the motion to dismiss and summary judgment stage.  504 U.S. at 560-61. At the summary judgment stage, however, the Court noted that plaintiffs could no longer rest on mere allegations of injury, causation, and redressability, but must set forth specific facts in evidence.  *Id.* at 561. Here, the jurisdictional issue centered on the *legal* question of whether the Court was precluded from hearing procedural challenges under the relevant statute.  There are no additional factual issues to be presented at the summary-judgment stage that make reconsideration necessary.

authority to manage its docket and strike improper materials.  *See Link v. Wabash R. Co.*, 370 U.S. 662, 629-30 (1962); *NRDC v. FDA*, 884 F. Supp. 2d 108, 115 n.5 (S.D.N.Y. 2012).

The Secretary also contends (at 5-6) that the Hospital would not be prejudiced from the Secretary raising the jurisdictional argument in its motion for summary judgment. But this *ipse dixit* ignores that the Secretary's circumvention of procedure robbed the Hospital of an opportunity to object <u>on procedural grounds</u> to any motion for reconsideration before being required to address the underlying substance.  The Secretary also seeks to justify Argument I by stating that raising it at this time is the "more efficient course."  But the Hospital believes that it is improper for a party to try to usurp the Court's prerogative to determine the most efficient way for cases to proceed.  Finally, the Secretary's Reply (at 6) correctly states that the Court has the obligation to "confront the Secretary's jurisdictional challenge."  However, the Court thoroughly fulfilled its obligation in ruling on the Secretary's motion to dismiss.  There is no obligation that the Court now <u>reconsider</u> that decision based on the Secretary's procedurally improper request that simply rehashes the same arguments raised at the prior stage and presents no new facts.

**D.     Even if Considered, the Secretary's Jurisdictional Arguments Lack Merit.**

As the Hospital explained (at 41-43), *Heckler v. Ringer*, 466 U.S. 602 (1984), and *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000), are inapposite because the issue in them was whether the court had jurisdiction under 28 U.S.C. §1331 or whether the plaintiffs had to "channel" their action through the administrative and judicial review provisions of the Medicare Act.  In the instant case, the Secretary has never asserted (nor could he) that the Hospital did not properly present its claim and exhaust its administrative remedies under the Medicare Act.

The Secretary responds (at 7) that the Hospital's argument is a "a distinction without a difference" in that the "factual context in which *Ringer* and *Illinois Council* arose is irrelevant" because "those decisions establish that whenever a claim falls within the terms of a preclusion

provision, that is dispositive regardless of whether the claim is characterized as 'procedural' or 'substantive' in nature." But the quote that the Secretary uses to support this argument shows that the Hospital correctly argued that these cases are inapt because the issue was whether the court had jurisdiction under §1331, which is not at issue here. Sec'y Reply at 7 (emphasis added) ("*See Ringer*, 466 U.S. at 615 ('[T]o be true to the language of the statute, the inquiry in determining whether § 405(h) bars <u>federal-question jurisdiction</u> must be whether the claim "arises under" the Act, not whether it lends itself to a "substantive" rather than a "procedural" label.').")

These cases also do not help the Secretary because the statutory provision requiring exhaustion of administrative remedies at issue in these cases (42 U.S.C. §405(h)), is "intended to <u>postpone</u> judicial review, <u>not totally preclude it</u>." *Council for Urological Interests v. Sebelius*, 668 F. 3d 704 (D.C. Cir. 2011) (emphasis added). For this reason, the Secretary's Reply (at 7) incorrectly characterizes §405(h) as a "preclusion provision" – it is not. These cases held that §405(h) <u>postpones</u> judicial review for both "procedural" and "substantive" claims. In doing so, they did not address <u>preclusion</u> of judicial review, which would require reference to the long line of cases holding that statutes that preclude administrative and judicial review of agency action must be construed narrowly because of the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986).[10]

This Court also should reject the Secretary's arguments that the Hospital's procedural arguments are <u>impliedly</u> precluded by the Preclusion Statute. This is because the Supreme Court has found implied preclusion available "only where Congress's failure to authorize review is '[c]onspicuous[]' and suggests 'deliberate[] inten[t]' to foreclose judicial review," which this

---

[10] This issue is discussed in more detail in Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 20) at 28-31.

Court properly found did not occur when denying the Secretary's motion to dismiss for lack of jurisdiction. *Council for Urological Interests*, 668 F. 3d at 711. Here, there is no basis to conclude that the Preclusion Statute showed that Congress intended to foreclose judicial review of the Hospital's procedural challenges because that Statute addressed only "[a]ny estimate of the Secretary for purposes of determining the [UC DSH] factors," not any procedural issues. As this Court explained, "Congress has demonstrated it knows how to encompass the process of establishing rules within the ambit of preclusion provisions, *see* 42 U.S.C. §1395nn(i)(3), but did not include such language in this preclusion statute." Slip Op. at 19 (ECF No. 33).

Moreover, the Supreme Court in (a) *Ringer* stated that the plaintiffs were seeking Medicare benefits ("regardless of any arguably procedural components, we see Ringer's claim as essentially one requesting the payment of benefits for BCBR surgery, a claim cognizable only under § 405(g).") 466 U.S. at 620, and (b) *Illinois Council* stated the plaintiffs were seeking jurisdiction to challenge a sanction. Thus, those cases involved circumstances where the procedural claim was a means to an end. Here, in contrast, the procedural claim is the "end" that the Hospital is seeking.

The Secretary seems to believe that it makes a difference that the Hospital's procedural claim is "asking this Court to require the Secretary to 'redo this part of his 2014 rulemaking,' *id.* at 23, which would necessarily require vacating the Secretary's initial Factor Three estimate for YNHH—even though that is precisely the subject over which review is precluded." Sec'y Reply at 7. But the Secretary's next sentence (at 7-8) defeats his own argument: "To be sure, given the procedural nature of the claim, the Secretary would remain free to 'adopt[] the same policy after remand.'"

The Hospital explained (at 42) that the Secretary's renewed assertion that this Court's decision is not consistent with *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir.

2019) and *Florida Health Sciences Center v. HHS*, 830 F.3d 515 (D.C. Cir. 2016), fails because, *inter alia*, those cases did not (and could not) present a procedural challenge akin to Count Two.[11] The Secretary responds (at 8) that the Hospital did not "offer any support or citation for that assertion" and "both cases did, in fact, involve procedural challenges that were held to be precluded." Obviously, DCH could not raise the same procedural challenge as the Hospital because DCH had explicit notice from the 2014 Proposed Rule data table about the Secretary's refusal to calculate DCH's 2014 UC DSH payment using the data from DCH's subsumed hospital. And *Florida Health Sciences Center* did not involve the Merged Hospital policy at all.

## III. CONCLUSION

For the foregoing reasons, the Hospital respectfully requests that this Court deny the Secretary's motion for summary judgment and grant the Hospital's cross-motion for summary judgment and motion to strike the Secretary's jurisdictional arguments in Argument I of his Memorandum.

Respectfully submitted,

Dated:  November 14, 2019

/s/ Robert L. Roth* (phv09684)
Robert L. Roth, Esq., D.C. Bar #441803
HOOPER LUNDY & BOOKMAN, P.C.
401 9th Street, NW, Suite 550
Washington, DC  20004
Telephone:  (202) 580-7701
Fax:  (202) 580-7719
E-mail: rroth@health-law.com
* *admitted pro hac vice*

Patrick M. Noonan (ct00189)
Donahue, Durham & Noonan, P.C.

---

[11] This Court correctly found that "unlike the claims alleged in *Texas Alliance*, *Florida Health*, and *DCH*, Count II does not challenge the Secretary's estimate of YNH's DSH payment, any of the underlying data, or the Secretary's choice of such data. Instead, it is a challenge to the procedure by which the Secretary established the FFY 2014 Merged Hospital Policy." Slip Op. at 17.

741 Boston Post Road
Guilford, CT 06437
(203) 458-9168
pnoonan@ddnctlaw.com

*Counsel for Plaintff*

## CERTIFICATE OF SERVICE

On this 14th day of November, 2019, I hereby certify that I electronically filed the foregoing Plaintiff's Reply Memorandum in Support of Cross-Motion for Summary Judgment and Motion to Strike Argument I of Defendant's Memorandum, with the clerk of court for the United States District Court for the District of Connecticut, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically.


　　　　　　　　/s/ Robert L. Roth  (phv09684)　　　
Robert L. Roth