# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| YALE NEW HAVEN HOSPITAL, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:18-CV-1230(JCH) |
| v. | : | |
| | : | |
| ALEX M. AZAR II, Secretary, | : | |
| United States Department of Health | : | MAY 6, 2020 |
| and Human Services, | : | |
| Defendant. | : | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 37) AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE (DOC. NO. 38)

## I.  INTRODUCTION

Plaintiff, Yale New Haven Hospital ("YNH"), brings this action against the

defendant, Alex M. Azar II, Secretary of the United States Department of Health and

Human Services, pursuant to Title XVIII of the Social Security Act, section 1395 et seq.

of title 42 of the United States Code ("Medicare Act"), and the Administrative Procedure

Act ("APA"), section 551 et seq. of title 5 of the United States Code.  Complaint

("Compl.") ¶ 1.  Following this court's Ruling on the Motion to Dismiss, only Count II

from the Complaint remains in this action.  See Ruling on Motion to Dismiss ("MTD

Ruling") (Doc. No. 33), at 26.  In Count II, YNH alleges that the Secretary of Health and

Human Services ("Secretary") failed to comply with notice-and-comment procedures.

See Compl. ¶¶ 59–63.

Before the court are the Secretary's Motion for Summary Judgment ("Def. Mot.")

(Doc. No. 37) and YNH's Cross Motion for Summary Judgment and Motion to Strike

("Pl. Mot.") (Doc. No. 38).  For the reasons stated below, the Secretary's Motion is denied, and YNH's Motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    Statutory Background

The Medicare Act establishes a system of insurance for qualifying beneficiaries. See 42 U.S.C. § 1395c. The Medicare program is administered by the Secretary through the Center for Medicare and Medicaid Services ("CMS") and its contractors.  42 U.S.C. § 1395kk. The Medicare program is split into five parts: A, B, C, D, and E. Relevant to this case, CMS pays providers, including YNH, for covered services under Part A.  In 1983, Congress adopted the inpatient prospective payment system ("IPPS") to reimburse providers for inpatient hospital operating costs.  See Social Security Amendments of 1983, Pub. L. No. 98–21, 97 Stat. 65 (1983).  Under the IPPS, CMS makes payments to providers for operating costs based on nationally applicable rates, subject to certain payment adjustments.  One such adjustment is the Disproportionate Share Hospital ("DSH") payment.

The DSH adjustment provides additional Medicare reimbursement to hospitals that treat a disproportionately large number of low-income patients.  See 42 U.S.C. § 1395ww(d)(5)(F).  In general, a hospital's qualification for the DSH adjustment was calculated based on its disproportionate patient percentage, which was calculated by adding two fractions: the hospital's Medicare fraction and its Medicaid fraction.  The Medicare fraction reflects the number of inpatient days a hospital experiences for patients entitled to both Medicare Part A and Supplemental Security Income benefits.

2

See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  The Medicaid fraction accounts for inpatients who are not entitled to Medicare benefits, but who qualify for medical assistance under state Medicaid assistance.  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

In 2013, as part of the Patient Protection and Affordable Care Act ("ACA"), Congress enacted the Uncompensated Care DSH ("UC DSH") payment system.  See 42 U.S.C. § 1395ww(r).  Pursuant to the UC DSH payment system, beginning in federal fiscal year ("FFY") 2014, a qualifying hospital received two separate DSH payments: (1) the "traditional" DSH payment, which amounted to 25% of the payment due to the hospital under the historic DSH methodology, and (2) the UC DSH payment, which is based on each hospital's amount of uncompensated care.  This second payment is the hospital's share of 75% of the national total DSH payment, calculated using a methodology outlined in section 3133 of the ACA.

Under the new methodology, CMS calculates the UC DSH payment for each eligible hospital based on the product of three factors.  See 42 U.S.C. § 1395ww(r)(2)(A)-(C).  Factor Three, which is the only factor relevant in this case, is equal to a faction, where the numerator is

> the amount of uncompensated care for [an eligible] hospital for a period selected by the Secretary (as estimated by the Secretary, based on appropriate data (including, in the case where the Secretary determines that alternative data is available which is a better proxy for the costs of subsection (d) hospitals for treating the uninsured, the use of such alternative data)),

and the denominator is "the aggregate amount of uncompensated care for all [eligible] hospitals that receive a payment . . . for such period (as so estimated, based on such data)."  42 U.S.C. § 1395ww(r)(2)(C).  CMS calculates the UC DSH payments in

3

advance of each FFY, as part of the annual IPPS rulemaking.  See Defendant's Local

Rule 56(a) Statement of Facts ("Def. LR 56(a)(2)") (Doc. No. 39-1), ¶ 5.

When Congress created this new DSH program, Congress also enacted a

statutory provision precluding judicial (and administrative) review over certain

determinations of the Secretary.  That preclusion provision states:

> Limitations on review.  There shall be no administrative or judicial review
> under section 1395ff of this title, section 1395oo of this title, or otherwise
> of the following:
>
> (A) Any estimate of the Secretary for purposes of determining the factors
> described in paragraph (2).
>
> (B) Any period selected by the Secretary for such purposes.

42 U.S.C. § 1395ww(r)(3).

B.      Facts[1]

YNH merged with another hospital, Hospital of Saint Raphael ("HSR"), effective

September 12, 2012.  Defendant's Local Rule 56(a)(2) Statement of Facts in Opposition

("Def. LR 56(a)(2)"), ¶ 9.  As a result of this transaction, YNH assumed HSR's Medicare

provider agreement, and HSR's CMS certification number ("CCN") was subsumed

under YNH's CCN.  Id.  Following the merger, YNH continued to operate the facility

formerly owned by HSR.  Id.

On May 10, 2013, the Secretary issued a proposed rule of the inpatient

prospective payment system ("FFY 2014 Proposed Rule" or "Proposed Rule").

Plaintiff's Local Rule 56(a)(2) Statement of Facts in Opposition ("Pl. LR 56(a)(2)") (Doc.

---

[1] The undisputed facts are taken from Defendant's Local Rule 56(a)(2) Statement of Facts in
Opposition ("Def. LR 56(a)(2)") (Doc. No. 39-1), Plaintiff's Local Rule 56(a) Statement of Facts in
Opposition ("Pl. LR 56(a)(2)") (Doc. No. 38-3), and the Administrative Record compiled before the
Department of Health and Human Services ("AR") (Doc. Nos. 16-2, 16-3).

No. 38-3), ¶ 1.  With respect to the UC DSH payment, the FFY 2014 Proposed Rule

discussed the Secretary's proposed methodology for estimating hospitals' Factor Three.

Id. ¶ 5.  In the Proposed Rule, the Secretary stated that hospitals' Factor Three would

be estimated as follows: "The numerator of Factor 3 would be the estimated Medicaid

and Medicare SSI patient days for the individual hospital based on its most recent

2010/2011 Medicare cost report data (including the most recently available data that

may be used to update the SSI ratios)."  Id. ¶ 6 (citing FFY 2014 Proposed Rule, 78

Fed. Reg. at 27,590).  In the Medicare DSH-Supplement Data table published with the

2014 Proposed Rule, CMS estimated hospitals' Factor Three using the most recent

data available data at that time.  Def. LR 56(a)(2) ¶ 13.  Data for both HSR and YNH

appeared in this table and a percentage of the UC DSH payment pool amount was

calculated for both.  Id. ¶ 15.

On August 19, 2013, the Secretary promulgated a final rule governing FFY 2014

of the inpatient prospective payment system ("FFY 2014 Final Rule" or "Final Rule").  Pl.

LR 56(a)(2) ¶ 2.  In the FFY 2014 Final Rule, the allocation to YNH was $23,465,624.

Def. LR 56(a)(2) ¶ 16.  This amount represented YNH's percent of the Factor Three

pool but did not include HSR's data.  Id. ¶ 18.  In fact, the Final Rule data file no longer

included any reference to HSR or a DSH allocation to it.  Id. ¶ 17.

YNH did not submit a comment to CMS on the calculation of FFY 2014 UC DSH

payments.[2]  Pl. LR 56(a)(2) ¶ 17.  However, another hospital which had also completed

---

[2] YNH denies this statement and directs the court's attention to the Administrative Record.  See
Pl. LR 56(a)(2) ¶ 17.  However, there is nothing in the Administrative Record to suggest that YNH ever
submitted a comment to CMS on this issue.  Indeed, YNH admits in its Complaint that it did not submit a
comment.  See Compl. ¶ 38.  The statement is therefore deemed admitted.

a merger during the relevant time period submitted a comment noting its concern that that CMS had "calculated Factor 3 using only the surviving hospital's cost report data." Def. LR 56(a)(2) ¶ 20 (citing 78 Fed. Reg. at 50,642).  CMS responded to that comment, in its publication of the FFY 2014 Final Rule, that Factor Three would be calculated using only the surviving hospital's data, because use of such data was "consistent with the treatment of other IPPS payment factors."[3] Id. ¶ 24 (citing 78 Fed. Reg. at 50,642).

On August 29, 2013, YNH contacted CMS, expressed concern that CMS had not introduced in the 2014 Proposed Rule this change to Medicare payment policy concerning merged hospitals, and recommended that CMS account for the aggregate data of both hospitals in a merger.  Id. ¶ 27 (citing AR 97-128).  CMS declined to revisit its treatment of merged hospitals as related to the FFY 2014 Final Rule.[4] Id. ¶ 29.

C.    Procedural history

YNH timely appealed its FFY 2014 UC DSH payment through a letter dated January 24, 2014.  See AR at 483.  On May 30, 2014, the appeal was dismissed for

---

[3] YNH refers to this portion of the FFY 2014 Final Rule as the "Merged Hospital Policy."  See, e.g., Compl. ¶ 41.  The Secretary does not adopt this term (nor does he object to it).

[4] The following year, in the FFY 2015 Proposed Rule, CMS stated that, since publication of the FFY 2014 Final Rule, it had received "additional input from hospitals that have undergone mergers that suggest using only the surviving CCN produces an estimate of the surviving hospital's uncompensated care burden that is lower than warranted."  Def. LR 56(a)(2) ¶ 30 (quoting 79 Fed. Reg. 27,978).  CMS therefore proposed to reverse course and to "incorporate data from both merged hospitals until data for the merged hospitals become available under the surviving CCN."  Id. (quoting 79 Fed. Reg. at 28,103).

In the FFY 2015 Final Rule, CMS adopted the revised proposed Factor Three calculation for merged hospitals.  Id. (citing 79 Fed. Reg. 49,854).  However, the FFY 2015 Final Rule did not make these changes retroactive to 2014.  Id. ¶ 38 (citing 79 Fed. Reg. 49,854).

lack of jurisdiction, based on the preclusion statute.  See AR at 151.  On July 25, 2018, CMS declined to review that decision.  See AR at 1.

Following this administrative review, YNH initiated the present action against the Secretary by filing its six-count Complaint dated July 24, 2018.  See Compl.  Counts I, II, and III arise under the Medicare Act and the APA.[5]  Compl. at 20–22.  In Count I, YNH alleges that the Secretary violated the APA and the Medicare Act by calculating the UC DSH payment "without including HSR's data."  Id. ¶ 57.  In Count II, YNH alleges that "[t]he FFY 2014 Merged Hospital Policy and the Hospital's FFY 2014 DSH payment are procedurally unlawful and should be set aside because that payment was calculated using the FFY 2014 Merged Hospital Policy, which the Secretary did not adopt properly under the APA and the Medicare Act."  Id. ¶ 60.  In Count III, YNH alleges that the FFY 2014 Merged Hospital Policy and YNH's resultant DSH payment "are unsupported by substantial evidence in the record."  Id. ¶ 65.

On November 5, 2018, the Secretary moved to dismiss the Complaint in its entirety.  See Motion to Dismiss (Doc. No. 16).  As to the Medicare and APA Claims (Counts I, II, and III), the Secretary argued, inter alia, that the plain text of the preclusion statute barred YNH's claims.  See Defendant's Memorandum in Support of its Motion to Dismiss ("Mem. in Supp. of MTD") (Doc. No. 16-1), at 12; see also 42 U.S.C. § 1395ww(r)(3) ("There shall be no administrative or judicial review . . . of [a]ny estimate of the Secretary for purposes of determining the factors described in paragraph (2).").

---

[5] Counts IV, V, and VI, which are not relevant to this Ruling, were brought pursuant to the mandamus statute, the All Writs Act, and the Due Process Clause of the United States Constitution, respectively.  Id. at 22–23.  Each of these counts, like Counts I and III, have been dismissed.  See Ruling (Doc. No. 33), at 26.

On July 25, 2019, this court granted in part and denied in part the Secretary's Motion to Dismiss. See Ruling on Motion to Dismiss ("MTD Ruling") (Doc. No. 33). This court granted the Secretary's Motion as to YNH's substantive challenges to its Factor Three estimate—Counts I and III—and concluded that "review of the data underlying the Secretary's admittedly unreviewable estimates, as sought in Count I and Count III of the Complaint, is barred." MTD Ruling at 10-11.

This court denied the Secretary's Motion as to Count II "insofar as YNH alleges that the Secretary's promulgation of the FFY 2014 Merged Hospital Policy—outside of the requirements of notice and comment of the Medicare Act and APA—was unlawful." See MTD Ruling at 26. The court reasoned that, unlike Counts I and III, Count II seeks "review of the promulgation of the Secretary's rules and polices, separate from the substance of any such rules or policies or the determination of its estimates based on the substance of those rules or policies." MTD Ruling at 19 (emphasis in original). The court therefore concluded that the preclusion statute—which bars judicial review of "any estimate of the Secretary"—does not bar Count II's "procedural challenge to the promulgation of the FFY 2014 Merged Hospital." MTD Ruling at 19. As result of this Ruling, only Count II from the Complaint remains in this action. See id. 26.

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, and affidavits and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue exists

8

where the evidence is such that a reasonable jury could decide in the non-moving party's favor.  See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson, 477 U.S. at 252).

In cases involving claims under the Administrative Procedure Act ("APA"), such as this one, and cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The entire case on review is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases); Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  With respect to notice-and-comment claims, the APA provides that a notice of proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  The Medicare Act places notice-and-comment requirements on the Secretary that are similar to those created by the APA.  See infra § IV(B)(1) (citing Monmouth Med. Ctr. Thompson, 257 F.3d 807, 814 (D.C. Cir. 2001) (citing 42 U.S.C. § 1395hh(b)).

Finally, "the question of whether an agency action required notice-and-comment rulemaking is a pure question of law that does not require any special 'deference . . . to an agency's characterization of its own rule.'"  Abington Mem. Hosp. v. Burwell, 216 F. Supp. 3d 110, 130 (D.D.C. 2016).  Similarly, whether an agency has complied with notice-and-comment requirements is a question of law for the courts, and if a court finds noncompliance, vacating the agency action is the standard remedy.  Am. Bioscience, 269 F.3d at 1083.

**IV.    DISCUSSION**

In the Motion for Summary Judgment, the Secretary argues that this court lacks jurisdiction over YNH's sole remaining claim, <u>see</u> Defendants Memorandum in Support of its Motion for Summary Judgment ("Def. Mem.") (Doc. No. 37-1), at 11, and that the rulemaking procedures complied with the APA and Medicare Act, <u>id.</u> at 19.

A.    <u>Jurisdiction</u>

The Secretary first argues that this court should reevaluate its prior holding, in which it held that the preclusion statute did not bar Count II's procedural challenge.  <u>See</u> <u>id.</u> at 11–19.  In response, YNH contends that this argument lacks merit and is procedurally invalid.  <u>See</u> Plaintiff's Memorandum in Support of Cross Motion for Summary Judgment ("Pl. Mem.") (Doc. No. 38-1), at 30–41.  As to this latter argument, YNH moves the court to strike this portion of the Secretary's Memorandum.  <u>Id.</u> at 40.

1.    YNH's Motion to Strike

YNH contends that the Secretary's jurisdictional argument is "procedurally improper because it is a request for reconsideration of the Court's July 25, 2019 decision that is untimely under both" the Federal Rules of Civil Procedure and the Local Rules.  <u>See</u> Pl. Mem. at 40.  YNH further contends that the Secretary's argument is inconsistent with this court's August 12, 2019 briefing order (Doc. No. 36), which granted the Joint Motion for Entry of Briefing Schedule (Doc. No. 35).  <u>Id.</u> at 40.  These arguments are without merit, and the court denies YNH's Motion to Strike.

Pursuant to Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  The language of this Rule makes clear that parties can raise the issue of subject-matter

10

jurisdiction, and courts have a duty to consider this issue, at any stage of the litigation. In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 101 (2d Cir. 2015) ("The background principles are elementary.  The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.") (internal quotation marks omitted).  Although the court recognizes that it had previously ruled on this issue, courts within this Circuit have held that a court's obligation to review subject matter jurisdiction generally exempts jurisdictional issues from law of the case principles.  See Cangemi v. United States, No. 12-CV-3989, 2017 WL 1274060, at *6 n.9 (E.D.N.Y. Mar. 31, 2017) (quoting Walsh v. McGee, 918 F. Supp. 107, 112 (S.D.N.Y. 1996)).

Furthermore, contrary to YNH's contention, the Secretary's jurisdictional argument is not inconsistent with this court's Order granting the parties' Joint Motion for Entry of Briefing Schedule.  In that Motion, the parties stated that they had "conferred about further proceedings in this case, and are in agreement that the next step should be cross-motions for summary judgment on Plaintiff's remaining claim."  Mot. (Doc. No. 35), at 1.  Nothing in this Motion, and nothing in this court's Order granting this Motion, limited or precluded the Secretary's ability to raise a jurisdictional defense.  Even if the Motion could be so construed, "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."  Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).  The court therefore denies YNH's Motion to Strike, and will consider the merits of the Secretary's jurisdictional argument.

11

2.      The Secretary's Jurisdictional Challenge

The Secretary contends that, contrary to this court's Ruling, the procedural

nature of Count II does not allow it to escape the preclusion statute and that any

distinction between a procedural and a substantive challenge is irrelevant.  Def. Mem. at

12.  In support of this argument, the Secretary directs this court's attention to Heckler v.

Ringer, 446 U.S. 602 (1984), and Shalala v. Illinois Council on Long Term Care, Inc.,

529 U.S. 1 (2000).  In these cases, the Supreme Court considered whether section 405

of title 42 of the United States Code barred federal-question jurisdiction.  See Heckler,

466 U.S. at 614-15; Illinois Council, 529 U.S. at 6.  Section 405(h) "channels most, if not

all, Medicare claims through [a] special review system," id. at 8, and provides that "[n]o

action against the United States, the [Secretary], or any officer or employee thereof

shall be brought under section 1331 . . . of title 28 to recover on any claim arising under

the subchapter." 42 U.S.C. § 405(h).  In Heckler and Illinois Council, the Court held that

this provision barred the plaintiffs' claims, including claims that were procedural in

nature.  See Heckler, 466 U.S. at 614-16; Illinois Council, 529 U.S. at 7, 14.  The

Secretary argues that "[c]ollectively, these cases establish that, at least in the context of

Medicare jurisdiction, Congress need not use any magic words to preclude purportedly

procedural claims."  Def. Mem. at 14.

The Secretary's reliance on Heckler and Illinois Council is misplaced.  In the

instant case, the Secretary has never asserted that YNH did not properly present its

claim under the Medicare Act and exhaust its administrative remedies thereunder.

Furthermore, a comparison between section 405(h) and the preclusion statute at issue

here demonstrates that section 405(h) is much broader.  Compare 42 U.S.C. § 405(h)

12

(precluding federal-question jurisdiction for "any claim arising under" the Medicare laws) with 42 U.S.C. § 1395ww(r)(3) (precluding administrative and judicial review of "any estimate of the Secretary for purposes of determining the factors described in paragraph (2)").  In Illinois Council, the Court similarly compared section 405(h)'s "broad statutory language," Def. Mem. at 15, with the narrower preclusion provision at issue in McNary v. Haitian Refugee Centers, Inc, 498 U.S. 479 (1991).  See Illinois Council, 529 U.S. at 14.  In McNary, the Court concluded that a preclusion statute barring judicial review of the agency's "determination respecting an application" for a special immigration status did not preclude "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications."  McNary, 498 U.S. at 491; see also id. at 492 ("The reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions.").  The Illinois Council Court distinguished McNary by noting that the latter's outcome "turned on the different language of that different statute.  Indeed, the [McNary] Court suggested that statutory language similar to the language at issue here [in Illinois Council]—any claim 'arising under' the Medicare or Social Security Acts, § 405(h)— would have led it to a different legal conclusion."  Illinois Council, 529 U.S. at 14 (citing McNary at 494 (using as an example a statute precluding review of "all causes . . . arising under any of" the immigration statutes)).[6]

---

[6] The court recognizes that the D.C. Circuit recently observed McNary to be "inapplicable" in a case affirming the dismissal of a challenge to the Secretary's Factor Three estimates.  DCH Regional Med. Ctr. v. Azar, 925 F.3d 503, 507-08 (D.C. Cir. 2019).  In dismissing YNH's substantive challenges in Counts I and III, this court similarly found McNary to be inapplicable.  See MTD Ruling at 13.

Unlike YNH's claims in Counts I and III of the Complaint, and unlike the claims alleged in DCH, Count II does not challenge the Secretary's estimate of YNH's DSH payment.  Like the plaintiffs in

Although <u>Heckler</u> and <u>Illinois Council</u> both involved Medicare-related claims (as does this case), those cases limited their analysis to a different statute than the one at issue here.  And, contrary to the Secretary's assertion, there is nothing special about the Medicare context that would alter the conclusion reached by this court in its previous Ruling.  <u>See</u> Def. Mem. at 12 ("[I]n the Medicare context, courts have generally held that the purported distinction between procedural and substantive challenges is irrelevant to determining the availability of judicial review.").  The language of <u>Heckler</u> and <u>Illinois Council</u> makes clear that those holdings were based on the broad language of section 405(h), and not on a general principle that renders distinctions between procedural and substantive challenges irrelevant in the Medicare context.

The remainder of the Secretary's jurisdictional argument revisits cases and arguments that were presented in the Memorandum in Support of the Motion to Dismiss and were subsequently rejected by this court.  <u>See</u> MTD Ruling 14–19.  The Secretary contends that a reevaluation of this holding is warranted because the "motion-to-dismiss briefing did not focus on the extent to which procedural claims fall within the statutory preclusion provision."  Def. Mem. at 11.  However, a review of the briefing, oral argument, and Ruling demonstrate that the parties addressed at length this very issue.

---

<u>McNary</u>, Count II challenges the procedure by which an agency arrived at its determination.  Resolution of this claim, like that in <u>McNary</u>, does not have "the practical effect of also deciding the claim for benefits on the merits."  <u>DCH</u>, 925 F.3d at 508 (contrasting the facts in that case with <u>McNary</u>) (internal quotations and citations omitted).  Indeed, as YNH concedes, if this courts finds the FFY 2014 rulemaking to be defective, the Secretary, on remand, could nevertheless use proper rulemaking process to readopt the same policy and arrive at the same Factor Three calculations.  <u>See</u> Pl. Mem. at 2.

Therefore, the Secretary's contention that <u>McNary</u> is inapplicable is unpersuasive.  <u>See</u> <u>DCH</u>, 925 F.3d at 508 (analyzing <u>McNary</u> and noting that "[h]ere, by contrast, DSH seeks to attack the very estimates that the preclusion provision insulates from review").  At any rate, this court discusses <u>McNary</u> only to the extent that it is discussed in <u>Illinois Council</u> (in contrasting the two preclusion statutes), the case upon which the Secretary's jurisdictional challenge principally relies.  <u>See</u> Def. Mem. at 13–15.

14

<u>See, e.g.</u>, Transcript ("Tr.") (Doc. No. 30), 6:6–15:3.  This discussion also included

detailed analysis of <u>DCH Regional Medical Center v. Azar</u>, 925 F.3d 503 (D.C. Cir.

2019) and <u>Florida Health Sciences Center v. HHS</u>, 830 F.3d 515 (D.C. Cir. 2016), two

cases that the Secretary urges the court to revisit.  But as this court previously

concluded, those cases are not directly applicable because they did not present a

procedural challenge akin to the one presented in Count II.  <u>See</u> MTD Ruling at 16-17.

      As the Secretary repeatedly reminds the court, the Ruling observed that this

preclusion issue presents "a very close question."  <u>Id.</u> at 19.  This remains true.

However, the Secretary presents no authority or argument that persuades this court that

the Ruling reached the wrong conclusion to this question.[7]  Accordingly, the court

denies the Secretary's Motion insofar as it challenges this court's jurisdiction, and it

proceeds to consider the merits of the parties' claims.

      B.      The Secretary's FFY 2014 Rulemaking

      The Secretary contends that the procedures it followed provided ample notice to

interested parties regarding the methodology for estimating Factor Three.  <u>See</u> Def.

Mem. at 22–30.  YNH argues that the FFY 2014 Final Rule's policy regarding the

treatment of merged hospitals was procedurally unlawful and contends that the policy

should therefore be set aside.  <u>See</u> Pl. Mem. at 24–30.

            1.      Procedural Requirements of the APA and the Medicare Act

      Under the APA, when an agency is required to undertake notice-and-comment

rulemaking, the agency must publish a notice of proposed rulemaking that includes

---

[7] The only new authorities the Secretary cites are <u>Heckler</u> and <u>Illinois Council</u>.  <u>See</u> Def. Mem. at 12-13.  As noted above, these cases are inapposite.

"either the terms or substance of the rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  The agency must then "give interested persons an opportunity to participate in the rule making through submissions of written data, views, or arguments with or without opportunity for oral presentation."  Id.

The Medicare Act "places notice and comment requirements on the Secretary's substantive rulemaking similar to those created by the APA."  Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 814 (D.C. Cir. 2001) (citing 42 U.S.C. § 1395hh(b)); see also Post Acute Med. at Hammond, LLC v. Azar, 311 F. Supp. 3d 176, 183 n.3 (D.D.C. 2018).   Under section 1395hh(a)(1) of title 42 of the United States Code, the Secretary is required to "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program.  42 U.S.C. § 1395hh(a)(1).  The Act further provides:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. § 1395hh(a)(2); see also Azar v. Sebelius, 139 S. Ct. 1804, 1809 (2019) (observing that "[n]otably, Congress didn't just adopt APA's notice-and-comment regime for the Medicare program" and citing 42 U.S.C. § 1395hh(a)(2)).

When notice-and-comment procedures are required, the notice is deemed defective if it does not "include sufficient detail on its content and basis in law to allow for meaningful and informed comment."  Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995).  "And once the public's comments are submitted and the agency

16

reviews them, the resulting final rule must not stray too far from the rule that the agency proposed." Abington Mem. Hosp. v. Burwell, 216 F. Supp. 3d at 130.  That is, "[a] final rule need not be an exact replica of the rule proposed in the notice, only a 'logical outgrowth.'" Cooling Water Intake Structure Coal. v. EPA, 905 F.3d 49, 61 (2d Cir. 2018); see also 42 U.S.C. § 1395hh(a)(4) (imposing a logical-outgrowth requirement on Medicare regulations).

"A central question" is "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking." Cooling Water, 905 F.3d at 61; see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 175 (2007) ("The object, in short, is one of fair notice."). To assess whether the public was "fairly apprised" of a new rule, a reviewing court should consider "whether the purposes of notice and comment have been adequately served." Am. Water Works Ass'n v. EPA, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (internal quotation and citation omitted).  Among the purposes of the notice-and-comment requirements are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005).[8]

---

[8] YNH also notes that the APA allows courts "to set aside agency action, findings, and conclusions found to be . . . arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  However, YNH does not argue that the Secretary's action was arbitrary and capricious.  Instead, YNH focuses entirely on the Secretary's alleged failure to provide adequate notice of the Merger Hospital Policy.  It is unclear whether the preclusion statute here would bar arbitrary and capricious review of the Secretary's action.  See Def. Reply at 20.  Because YNH does not press this issue, the court need not address this question.

2.      YNH's Challenge to the Secretary's FFY 2014 Rulemaking

The Secretary contends that the FFY 2014 Proposed Rule described exactly how Factor Three would be calculated and that, therefore, it provided notice to interested parties as required by the APA and the Medicare Act.  See Def. Mem. at 22–25.  In support of this position, the Secretary points to the similarity in the language between the Proposed Rule and the Final Rule.

The FFY 2014 Proposed Rule provided: "The numerator of Factor 3 would be the estimated Medicaid and Medicare SSI patient days for the individual hospital based on its most recent 2010/2011 Medicare cost report data (including the most recently available data that may be used to update the SSI ratios)."  FFY 2014 Proposed Rule, 78 Fed. Reg. at 27,590.

The FYY 2014 Final Rule provided: "For this final rule, . . . we are identifying a hospital's Medicaid days based on the Medicaid days reported on the 2011, or if not available, the 2010 Medicare Hospital Cost Report."  FFY 2014 Final Rule, 78 Fed. Reg. at 50,642.  According to the Secretary, the Final Rule codified exactly what the Secretary had previously put forth in the Proposed Rule.  See Def. Mem. at 22.  The Proposed Rule therefore provided notice to hospitals that their Factor Three would be based on cost-report data "for the individual hospital," 78 Fed. Reg. at 27,590, and that "the only plausible reading" of this language is one that excludes combining data from multiple hospitals, even after a merger.  See Defendant's Reply ("Def. Reply") (Doc. No. 39), at 19.

In response, YNH argues that the Secretary's rulemaking was deficient not on account of what the Proposed Rule said, but on account of what it failed to say.  YNH

18

does not dispute the similarities in the language between the excerpted portions of the

Proposed and Final Rules; instead, YNH notes that the Merged Hospital Policy was

absent in the Proposed Rule and appeared for the first time in the Final Rule.  See Pl.

Mem. at 17 (quoting FFY 2014 Final Rule, 78 Fed. Reg. at 50,642 ("Data associated

with a CCN that is no longer in use are not used to determine those IPPS hospital

payments under the surviving CCN . . .  [and] would not necessarily be used to

determine hospital payments for the CCN associated with the surviving provider

agreement.").  According to YNH, because this policy regarding merged hospitals

appeared for the first time in the Final Rule, the Secretary's rulemaking violated both the

APA and the Medicare Act.  See Pl. Mem. at 24–30.  The court agrees.

The court first concludes that the Final Rule was not a "logical outgrowth" of the

Proposed Rule.[9]  See 42 U.S.C. § 1395hh(a)(4).  The logical outgrowth test considers

whether "affected parties should have anticipated that the relevant modification was

possible."  Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1107 (D.C. Cir. 2014).  The

Secretary's rulemaking does not meet this test.  First, the Merged Hospital Policy

---

[9] The Secretary contends that, "[b]ecause there was no change in policy between the FY2014
proposed rule and final rule, YNHH cannot rely on the 'logical outgrowth' doctrine for its claim."  Def.
Mem. at 23 (citing Post Acute Med. at Hammond, LLC v. Azar, 311 F. Supp. 3d 176, 185 (D.D.C. 2018)
and Abington Mem'l Hosp. v. Burwell, 216 F. Supp. 3d 110, 134-35 (D.D.C. 2016).  The court is not
persuaded.

In Post Acute and Abington Memorial, the court concluded that the "logical outgrowth" doctrine
did not apply because the plaintiffs had failed to demonstrate any material differences between the
proposed and final rules.  See Post Acute Med., 311 F. Supp. 3d at 185; Abington Mem'l Hosp., 216 F.
Supp. 3d at 134-35.  Here, YNH has demonstrated a material difference: the Merged Hospital Policy is
absent in the Proposed Rule, but appears in the Final Rule.  To be sure, there is similarity between the
language of the Proposed Rule and the language of the Final Rule.  See supra § IV(B)(2).  But as the
Secretary recognizes, the Proposed Rule was silent as to the issue of merged hospitals.  See Def. Mem.
at 23 ("[T]he proposed rule did not expressly identify how HHS's proposed Factor Three methodology
might disadvantage particular hospitals that had merged after 2010/2011.")  The Final Rule's addition of
the Merged Hospital Policy represents a material difference with the Proposed Rule, making the logical
outgrowth doctrine applicable here.

appeared for the first time in the Final Rule.  See Allina Health Servs. v. Sebelius, 904

F. Supp. 2d 75, 90 (D.D.C. 2012), rev'd in part on other grounds by 746 F.3d 1102 (D.C.

Cir. 2014) (noting that a "brand-new rule" fails the logical outgrowth test);  see also

Kooritzky v. Reich, 17 F.3d 1509, 1513 (D.C. Cir. 1994) ("Something is not a logical

outgrowth of nothing.").  Furthermore, the plain text of the Proposed Rule—that Factor

Three would be calculated using data from "an individual hospital" based on "its most

recent 2010/2012 cost report data," FFY 2014 Proposed Rule, 78 Fed. Reg. at 27,590

(emphasis added)—was not written in such a way as to provide interested parties notice

that the relevant modification—the addition of the Merged Hospital Policy—was

possible.  In the absence of any discussion related to this policy in the Proposed Rule or

the exclusion of HSR in the Proposed Rule's data table, interested parties had to "divine

[the agency's] unspoken thoughts, because the final rule was surprisingly distant from

the proposed rule." CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1080

(D.C. Cir. 2009) (internal quotations and citations omitted) (alterations in original).  Such

rulemaking fails to satisfy APA's requirements.  Allina, 904 F. Supp. 2d at 90 ("Thus,

neither a brand-new rule nor one built on vague insinuations for which an interested

party would have had to 'divine [the Agency's] unspoken thoughts' will qualify as a

'logical outgrowth.'") (quoting Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1299 (D.C.

Cir. 2000)); see also Shell Oil Co. v. EPA, 950 F.2d 741, 751 (D.C. Cir. 1991) ("[A]n

unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public

should have anticipated.").

The "key focus" of the logical outgrowth doctrine considers whether the purposes

of notice-and-comment have been adequately served. Fertilizer Inst. v. EPA, 935 F.2d

20

1303, 1311 (D.C. Cir.1991).   "This means that a final rule will be deemed to be the logical outgrowth of a proposed rule if a new round of notice and comment would not provide commenters with their first occasion to offer new and different criticisms which the agency might find convincing."  Id. (internal quotation marks omitted).  Here, the FFY 2014 Final Rule provided interested parties with their "first occasion" to offer comment on the Secretary's new policy of excluding data from merged hospitals. Indeed, many interested parties did just that, and convinced the Secretary to reverse course the following year.  See FFY 2015 Final Rule, 79 Fed. Reg. 49,854.  This opportunity should have been provided in the FFY 2014 Proposed Rule.  Because the addition of the Merged Hospital Policy caused the Final Rule to "deviate too sharply from the proposal, affected parties [were] deprived of notice and an opportunity to respond to the proposal."  Nat'l Black Media Coal v. FCC, 791 F.2d 1016, 1022 (2d Cir. 1986).

Even if the court were to conclude that the logical outgrowth test does not apply here, see Def. Mem. at 23, it would nonetheless conclude that the Proposed Rule failed to "fairly apprise" interested parties of the issues and subjects involved.  Cooling Water, 905 F.3d at 61 (citing 5 U.S.C. § 553(b)(3)).  Because the Merged Hospital Policy appeared for the first time in the Final Rule, interested parties were not "fairly apprised" of this important policy issue. The Proposed Rule's oblique reference to "an individual hospital" and "its most recent . . . data" failed to provide adequate notice.  See McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1322–23 (D.C. Cir. 1988) (finding notice inadequate where relevant issue was raised only in "Supplemental Information"

section of notice and admonishing that "[a]n agency may not introduce a proposed rule in such a crabwise fashion").

That the FFY 2014 Final Rule departed from CMS' practice of using combined data from merged hospitals further supports the conclusion that interested parties lacked notice of the issues involved, specifically as they pertained to merged hospitals. See, e.g., IPPS Final Rule, 70 Fed. Reg. 47,446 (Aug. 1, 2005) ("[T]he use of the wage data for the entire multicampus hospital is consistent with [CMS's] treatment of multicampus hospitals for calculating area wage index values, GME [graduate medical education], DSH, and provider-based purposes, under which multicampus hospitals operating under a single Medicare provider number are treated as a single hospital for payment purposes."); Anna Jacques Hosp. v. Burwell, 797 F.3d 1155, 1170 (D.C. Cir. 2015) ("While the Providers wish the Secretary had made a different choice, it was entirely rational to treat Southcoast as a single institution with respect to wage data, just as it is treated for numerous other Medicare purposes."); 67 Fed. Reg. 50,080 (Aug. 1, 2002) ("A merger of the two hospitals would aggregate the two hospitals' individual FTE [full-time equivalent] caps into a merged FTE cap under the main hospital's provider number" for the purpose of calculating GME payments.).  The Proposed Rule contains nothing to suggest that the Final Rule might diverge from this practice of combining merged hospital data.

Notably, the Secretary does not contest that CMS' policy—as to at least some Medicare payments—has been to use combined merged hospital data.  See Def. Reply at 13, 14.  Instead, the Secretary contends that these past policies are irrelevant and that, in any event, no prior policy existed as to UC DSH payments.  Def. Reply at 11–14.

22

As to the first point, the Secretary argues that changes in agency policy are generally not subject to extra scrutiny under the APA.  Id. at 12 (citing FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514 (2009)).  However, Fox Television did not hold that an agency's past policies are irrelevant; the Court noted that "an agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."  Id. at 515.  Furthermore, this case is not one in which evidence regarding agency's past practice "render[s] invalid an otherwise straightforward notice of proposed rulemaking."  Def. Reply at 12.  For the reasons described above, this court concludes that the Secretary's rulemaking was far from "straightforward."

The Secretary further contends that no prior policies existed as 2014 was the first year of the UC DSH payment.  Def. Reply at 13.  This argument, however, fails to consider the interconnectedness between UC DSH payments and traditional DSH payments.  See, e.g., supra § II(A) (noting that the total amount of UC DSH payments is calculated by taking 75% of the amount of total traditional DSH payments).  For this reason, and in the absence of notice to the contrary, the Secretary's rulemaking failed to fairly apprise interested parties of its intention to reverse CMS' policy involving merged hospitals.

The Secretary concedes that Proposed Rule was silent as to the treatment of merged hospitals, but contends that "there was no requirement for HHS to expressly flag this consequence for hospitals."  Def. Mem. at 24.  In support, the Secretary cites Post Acute, in which the D.C. District Court noted that the APA "does not require an agency to advise regulated entities as to the individualized implications of a proposed rule—particularly here, where the rule merely continued a longstanding policy with

23

updates reflecting new data."  311 F. Supp. 3d 176, 183.  But the case at bar is not one

in which the agency continued "a longstanding policy."   Indeed, the opposite is true.

More importantly, YNH's claim does not rely upon a reading of the APA that would

require notice of a proposed rule's "individualized implications."  YNH claims—and the

evidence demonstrates—that interested parties were not "fairly apprised" of the Merged

Hospital Policy.  The failure to give adequate notice of this policy renders the FFY 2014

rulemaking procedurally defective.[10]

        3.     Additional Features of the FFY 2014 Proposed Rule

The Secretary presents three additional features of the Proposed Rule which it

contends demonstrate that the FFY 2014 Proposed Rule provided interested parties

adequate notice.  See Def. Mem. 25–30.  The court finds none of these to be

persuasive.

---

[10] YNH also contends that the Secretary's rulemaking violated the Medicare Act as it failed to comply with section 1395hh(a)(2) of title 42 of the United States Code.  See Pl. Mem at 28.  Section 1395hh provides:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. § 1395hh(a)(2).

      The court has already concluded that the FFY 2014 Final Rule was not a logical outgrowth of the Proposed Rule, and that the Secretary's rulemaking failed to apprise interested parties of the issues involved.  For these same reasons, the court concludes that the Secretary failed to comply with section 1395hh(a)(2).  It is undisputed that the regulation at issue established a substantive legal standard governing the payment for serviced.  Because the Final Rule was not a logical outgrowth of the Proposed Rule, the regulation was not promulgated in accordance with section 1395hh.  See 42 U.S.C. § 1395hh(a)(4) (imposing a logical-outgrowth requirement on Medicare regulations).

24

First, the Secretary notes that the Proposed Rule made clear that the Factor

Three calculations would be estimates (using data from FFY 2010 and 2011) and would

be prospective in nature:

> Given the inherently prospective nature of the Secretary's estimates, the
> decision to base those off estimates on historical data that predated
> FY2014, and the lack of reconciliation to actual FY2014 data, it should
> have been apparent that the Secretary's estimate of each hospital's Factor
> Three may not track the hospital's actual experience in FY2014.

Def. Mem. at 26.  YNH, however, is not challenging differences between the FFY

2010/2011 data and the FFY 2014 data.  Instead, YNH is challenging the total exclusion

of HSR's data from its Factor Three calculation.  Informing interested parties that its

Factor Three calculations would be based on prospective estimates not subject to

reconciliation did not give adequate notice that CMS would depart from past practice

and exclude merged hospital data.

Second, the Secretary notes that the Proposed Rule referenced spreadsheets

posted to HHS' website listing each hospital's estimated Factor Three, and that the

entry for YNH listed YNH's Factor Three based solely on YNH's own data.  Def. Mem.

at 27.  Based on this spreadsheet, the Secretary contends that "it was at least

'reasonably foreseeable' that HHS, in issuing the final rule, would again calculate

YNHH's Factor Three using only its own FY2010/2011 cost-report data." Id. (quoting

Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 175 (2007)).  However, the

spreadsheet also contained a separate entry listing HSR's estimated Factor Three.  Def.

Mem. at 27.  Based on the inclusion of HSR's data in this spreadsheet, CMS' practice of

combining merged hospital data, and the Proposed Rule's silence on this issue, it was

25

not "reasonably foreseeable" that the Secretary would exclude HSR's data in the Final Rule.

The Secretary further contends that, even if the spreadsheet led YNH to "actually believe that HHS intended to calculate its Factor Three by merging the two hospitals' data, that only proves there was no notice-and-comment violation." Def. Mem. at 28. In support, the Secretary cites Long Island Care, 551 U.S. at 175. In Long Island Care, the Supreme Court considered a proposed rule that would subject certain workers to wage and hour rules under the Fair Labor Standards Act ("FLSA") and exempt others. The agency initially proposed a rule that "would have placed outside the exemption (and hence left subject to FLSA wage and hour rules) individuals employed by third-party employers whom the Act had covered prior to 1974." Id. 174 (citing 39 Fed. Reg. 35,385 (companionship workers "not exempt" if employed by a third party that already was a "covered enterprise" under the FLSA)). "The clear implication of the proposed rule was that companionship workers employed by third-party enterprises that were not covered by the FLSA prior to the 1974 Amendments (e.g., most smaller private agencies) would be included within the § 213(a)(15) exemption" and therefore not subject to the FLSA's wage and hour rules. Id. at 175.

The agency ultimately adopted a different rule, one that withdrew the proposal for special treatment of employees of "covered enterprises," and "exempted all third-party-employed companionship workers from the Act." Id. The Court concluded that, despite the differences between the proposed and final rules, the agency complied with notice-and-comment rulemaking because the final rule was "reasonably foreseeable." Id. The Court reasoned that "the proposed rule was simply a proposal" and that "its presence

meant that the Department was considering the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it."  Id.

Like the unsuccessful plaintiffs in Long Island Care, YNH protests that the data tables referenced in the Proposed Rule led them to expect one outcome and that the Final Rule codified the opposite.  See AR at 282 (noting that the spreadsheet led YNH "to believe that the uncompensated care payment pool would be calculated for the merged hospitals using the two hospitals' data sets").  The Secretary therefore contends that, as the Court concluded in Long Island Care, it was "reasonably foreseeable" that the Secretary would promulgate a regulation reversing what YNH had believed was the agency's proposed regulation.  However, the proposed rule in Long Island Care made clear that the agency "was considering the matter" involving the special treatment of "companionship workers" for "covered enterprises." 551 U.S. at 175.  The text of the proposed rule was explicit in this regard:

> Employees who are engaged in providing babysitting and companionship services and who are employed by an employer other than the families or households using such services, are not exempt under section 13(a) (15) of the Act if the third party employer is a covered enterprise meeting the tests of sections 3(r) and 3 (s) (1) of the Act.

39 Fed. Reg. 35,385.  Thus, plaintiffs could not argue that the proposed rule failed to describe "the subjects and issues involved," 5 U.S.C. § 553(b)(3), or that the final rule (which exempted all third-party companionship workers) was not "reasonably foreseeable."  Long Island Care, 551 U.S. at 175.  Here, by contrast, the 2014 FFY Proposed Rule was silent as to merged hospitals and provided no evidence to suggest that the Secretary "was considering the matter."  Id.  Based on this silence, HSR's inclusion in the spreadsheet, and CMS' practice of combining merged hospital, the court

27

concludes that, unlike the regulation promulgated in Long Island Care, the result here

was not "reasonably foreseeable."

Finally, the Secretary directs this court's attention to the Proposed Rule's call for

comments, and to the comments that it did receive.  See Def. Mem. at 29–30.  The

Proposed Rule provided:

> In order to ensure that we have sufficient time to incorporate any updated
> information in the tables for the final rule, hospitals should notify CMS in
> writing within 60 days from the date of display of this proposed rule of any
> change in a hospital's subsection (d) hospital status. . . . We intend to
> update in the final rule the list of hospitals that we estimate will be eligible
> for DSH payments for FY 2014 and our estimate of Factor 3 using more
> recent data and verified hospital notifications regarding hospital status (for
> example, closures).

FFY 2014 Proposed Rule, 78 Fed. Reg. at 27,590.  Based on the above, the Secretary

contends that YNH had ample notice to submit a comment regarding its Factor Three

calculation, and that YNH should have been on notice that HSR's presence in the

spreadsheet may have been an error.  Def. Mem. at 29; see also Def. Reply at 25.

However, despite language involving "change in . . . hospital status," the

Proposed Rule focused on closures, not mergers.  This focus made sense as it would

be illogical for CMS to allocate a portion of the 2014 UC DSH pool to a hospital that

would not be providing services in 2014.  Because nothing in the Proposed Rule put

YNH on notice that HSR's data would ultimately be excluded, YNH had no reason to

comment on its Factor Three calculation.

YNH was therefore in a much different position than DCH Regional Medical

Center ("DCH"), the hospital that submitted a comment raising the issue of merged

hospitals.  See FFY 2014 Final Rule, 78 Fed. Reg. at 50,642.  Like YNH, DCH had

recently undergone a merger, with Northport Regional Medical Center ("Northport") being subsumed into DCH.  But unlike the instant case, data for Northport did not appear in the spreadsheets published with the Proposed Rule.  The exclusion of Northport, therefore, put DCH on notice that Northport's data would not be included in its Factor Three calculation.  Here, by contrast, both HSR and YNH appeared in the data table, and the Proposed Rule provided no notice that HSR's data would eventually be excluded.

Other comments "regarding the accuracy of the data used in the calculation of the hospital's Factor 3 amount," FFY 2014 Final Rule, 78 Fed. Reg. at 50,641, do not persuade this court that YNH should have been on notice of the Merged Hospital Policy, or that any commenter (beyond DCH) understood that this issue was under consideration.  Cf. Appalachian Power Co. v. EPA, 135 F.3d 791, 816 (D.C. Cir. 1998) ("Commenters clearly understood that these [issues] were under consideration, as the agency received comments on them from several sources[.]"); see also Abington Mem. Hosp, 216 F. Supp. 3d at 134 ("[F]ive commenters—four hospital conglomerates and a university—specifically objected to the very policy change that Plaintiffs say [was] hopelessly obscured.").  Furthermore, the agency "must itself provide notice of a regulatory proposal.  Having failed to do so, it cannot bootstrap notice from a comment." Nat'l Black Media Coal, 791 F. 2d at 1023 (quoting Small Refiner Lead Phase–Down Task Force v. EPA, 705 F.2d 506, 549 (D.C. Cir. 1983)) (emphasis in the original).

In sum, the court concludes that the Secretary's 2014 rulemaking, and these three additional features of the Proposed Rule, more specifically, failed to fairly apprise interested parties of the subjects and issues of the rulemaking.  No earlier cases finding

29

inadequate notice are exactly parallel, see McLouth Steel Products, 838 F.2d at 1323 (noting the same under different facts), and the cases YNH cite are largely distinguishable, see Def. Reply at 16.  The Secretary contends that "[t]he more on-point authority regarding notice-and-comment is Post Acute," id., but this case is likewise inapposite.  In Post Acute, the plaintiffs argued that a FFY 2016 HHS regulation that retained the HHS' FFY 2015 geographic classifications "failed to provide adequate notice of the 'potential for significant variability in the wage index for hospitals that are located in regions with only a few hospitals.'"  311 F. Supp. 3d at 181 (quoting Post Acute Compl. ¶ 43).  In ruling against the plaintiffs, the court detailed the many aspects of HHS' rulemaking establishing fair notice and concluded that "the proposed rule gave Post Acute all the information it has now."  Id. at 184.  Here, by contrast, the Secretary did not give interested parties information related to the treatment of merged hospitals until the Final Rule.

　　For similar reasons, the other cases the Secretary relies upon are also distinguishable.  See Abington Mem. Hosp, 216 F. Supp. 3d at 132 ("[W]hen one turns to the content of the proposed rule itself, the fact that the agency was changing its policy regarding the way in which wage data was to be reported could not have been more explicit."); New York Dep't of Social Servs. v. Shalala, 21 F.3d 485, 495 (2d Cir.1994) (noting that a summary of the challenged policy was set out in the Notice of Proposed Rulemaking); Long Island Care, 551 U.S. at 175 (finding the regulation was "reasonably foreseeable" when the proposed rule clearly indicated that the agency "was considering the matter").

Despite the absence of on-point authority, the court is guided by the requirements of notice-and-comment rulemaking and the purposes of such notice. With these principles in mind, the court concludes that, because the Secretary's policy involving merged hospitals appeared for the first time in the FFY 2014 Final Rule, the FFY 2014 rulemaking failed to fairly apprise interested parties of the subjects and issues involved.

    C.    <u>The Appropriate Remedy</u>

Having concluded that the Secretary's FFY 2014 rulemaking was defective, the court now considers the appropriate remedy.  In a line of cases beginning with <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission</u>, 988 F.2d 146, 150–51 (D.C. Cir. 1993), courts have considered two factors when determining whether remand without vacatur is superior to vacatur: (1) "the seriousness of the [rule's] deficiencies" and (2) "the disruptive consequences" of vacatur.  <u>Id.</u>  The first factor weighs in favor of vacatur. Deficient notice in notice-and-comment "is a 'fundamental flaw' that almost always requires vacatur."  <u>Allina Health Servs.</u>, 746 F.3d at 1110 (quoting <u>Heartland Reg'l Med. Ctr. v. Sebelius</u>, 566 F.3d 193, 199 (D.C. Cir. 2009).

The second <u>Allied-Signal</u> factor considers the disruptive consequence of vacatur, and, in this case, weighs in favor of remand without vacatur.  YNH challenges the Secretary's FFY 2014 rulemaking.  The Factor Three calculations associated with this rulemaking were finalized more than six years ago, and setting them aside would result in significant disruption.  <u>See id</u> at 151 ("the consequences [of vacatur] may be quite disruptive" because "the Commission would need to refund . . . fees collected . . . [and] it evidently would be unable to recover those fees under a later-enacted rule."); <u>Milk</u>

31

Train, Inc. v. Veneman, 310 F.3d 747, 756 (D.C. Cir. 2002) (holding that remand without vacatur was appropriate under Allied-Signal's second prong where "the Secretary here has already disbursed the 1999 program moneys to numerous dairy producers throughout the country, and those moneys may not be recoverable three years later"); Sugar Cane Growers Co-op of Fla. v. Veneman, 289 F.3d 89, 97 (D.C. Cir. 2002) (holding that remand without vacatur was appropriate because "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante" where the Secretary had improperly disbursed large quantities of sugar to farmers across the country, who in turn had already plowed under their crops).

Having found that the first Allied–Signal factor favors vacatur and the second factor counsels against vacatur, the court must weigh these competing considerations. "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors," rather "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." Shands Jacksonville Med. Ctr. v Burwell, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) (internal citations omitted). While the court does conclude that there were deficits in the Secretary's rulemaking, the court cannot conclude that they were so substantial as to warrant the considerable disruption that vacatur would likely invite. Therefore, the court finds that the appropriate remedy is to remand this case to the Secretary without vacatur.

## V. CONCLUSION

For the foregoing reasons, the Secretary's Motion for Summary Judgment (Doc. No. 37) is **DENIED**. YNH's Motion to Strike is **DENIED**, and its Cross Motion for

32

Summary Judgment (Doc. No. 38) is **GRANTED**.  The case will be remanded to the

Secretary for further action consistent with this Opinion.

**SO ORDERED.**

       Dated at New Haven, Connecticut this 6th day of May 2020.


               /s/ Janet C. Hall_____
               Janet C. Hall
               United States District Judge